JULIE M. LAKE
Registered Diplomate Reporter
Certified Realtime Reporter
Martin-Lake & Associates, Inc.
P.O. Box 7765
Missoula, Montana 59807-7765
406/543-6447 office
jml@martin-lake.net
United States Contract Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin nonprofit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CHIP WEBER, Flathead National Forest Supervisor; UNITED STATES FOREST SERVICE, an Agency of the United States Department of Agriculture,<br><br>Defendants,<br><br>and<br><br>WILLIAM GLIDDEN, RAYMOND LEOPOLD, EUGENE THOMAS, NORMAN DeFORREST, and the KNIGHTS OF COLUMBUS,<br><br>Defendant-Intervenors. | No. CV 12-19-M-DLC<br><br>PRELIMINARY PRETRIAL CONFERENCE<br><br>Russell Smith Courthouse<br>Missoula, Montana<br><br>Tuesday, June 5, 2012<br>10:28 a.m. to 11:33 a.m. |

HEARD BEFORE THE HONORABLE DANA L. CHRISTENSEN
UNITED STATES DISTRICT JUDGE
FOR THE DISTRICT OF MONTANA

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription.

A P P E A R A N C E S

For the Plaintiff:

MARTIN S. KING
Worden Thane
P.O. Box 4747
Missoula, Montana 59806-4747
mking@wthlaw.net

RICHARD L. BOLTON
Boardman & Clark, LLP
P.O. Box 927
Madison, Wisconsin 53701-0927
rbolton@boardmanclark.com

For the Defendants:

DAVID B. GLAZER
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
david.glazer@usdoj.gov

ALAN J. CAMPBELL
U.S. Department of Agriculture
Office of the General Counsel
P.O. Box 7669
Missoula, Montana 59807

For the Intervenor Defendants:

CHARLES A. HARBALL
City of Kalispell
201 First Avenue East
Kalispell, Montana 59901
charball@kalispell.com

ERIC S. BAXTER
The Becket Fund For Religious Liberty
3000 K St. NW, Suite 220
Washington, DC 20007
ebaxter@becketfund.org

CONTENTS

Proceedings.......................................... 3

Reporter's Certificate............................. 45

TUESDAY, JUNE 5, 2012

Whereupon, the following proceedings were had and entered of record in open court, with counsel present:

THE CLERK: This is the time set for a pretrial preliminary conversation in CV 12-19-M-DLC, Freedom From Religion Foundation vs. Chip Weber, et al.

THE COURT: Good morning, everyone. Welcome. For those of you that are not from Montana, welcome to district court here in Montana.

I signed this morning the orders allowing admission pro hac vice for Eric Baxter and Eric Rassbach.

Are you Mr. Baxter?

MR. BAXTER: I'm Mr. Baxter. Mr. Rassbach will not be here today.

THE COURT: All right, great. I've signed those. There are some acknowledgements that you need to do, but once you return the acknowledgment, then you are admitted for purposes of this case.

MR. BAXTER: Thank you.

THE COURT: Everybody else I think is on board. Would counsel please introduce themselves.

MR. KING: Good morning, Your Honor. My name is Martin King. I'm with the Missoula firm of Worden Thane, PC. We represent the Plaintiff, Freedom From Religion Foundation. My co-counsel from Madison, Wisconsin is Rich

Bolton of the Boardman firm of Madison.

THE COURT: All right, great, thank you.

MR. GLAZER: Good morning, Your Honor. David Glazer with the Department of Justice representing the Federal Defendants.

MR. CAMPBELL: Good morning, Your Honor. Allen Campbell with General Counsel's Office, Department of Agriculture.

MR. HARBALL: Charles Harball, representing the Knights of Columbus in this matter; and as you indicated, Eric Baxter and Eric Rassbach will be working with us. We're also representing individuals named.

THE COURT: All right, okay. Again, welcome everyone. Obviously this is the time set for the preliminary pretrial conference. I will tell you that normally we do these in--we roll up our shirt sleeves and we do them back in a conference room back here in the back part of the chambers area, although on occasion we do these in open court.

There has been obviously some interest by the public and the press in this particular case, so I thought just in case somebody wanted to see what we were up to in this process, we would go ahead and do this in open court and do it on the record. Other than that, there's no particular reason why we're all in here doing it in open court.

I don't expect you, when we do this, to stand up. You are welcome to stay seated and we'll just--like I said, this is essentially a work session.

The custom and practice in this court, as I'm sure Mr. King and Mr. Harball know--incidentally, Mr. Harball, aren't you still the acting city manager up in Kalispell?

MR. HARBALL: I am. This is just a frolic for me.

THE COURT: I was going to say, you should have plenty to do without needing to get yourself involved in this. Anyway, it's good to see you.

Normally what we do is go through the Complaint. And as I was indicating, the custom and practice here is to hammer out some of the issues involved in the case and then at the end of the process we'll issue a Scheduling Order. Our scheduling orders are pretty detailed and provide a lot of information in terms of the rules of engagement as we go forward.

I inherited a process that has been established by Judge Molloy. It's an excellent process and I haven't tweaked with it very much because if it ain't broke, why fix it.

Let me introduce to you the folks that are here with the court. You've met Beth Warren this morning. She's one of our senior people in the clerk's office. She is normally not my assigned clerk. My assigned clerk is Amanda Goodwin. If you need to talk to that person, feel free to do so.

She's--she's out this week.

Julie Martin-Lake is our court reporter. And Julie's been a court reporter here in Missoula for years, and a very good one.

Tyler Gilman is my law clerk on loan from Judge Molloy until I get settled in and get two law clerks of my own. And with him this morning is Emily Cross, who is an undergraduate at the University of Montana and she's interning with us for the last month or so on sort of a brief internship.

I've read, obviously, everything that you all have filed. Let me just summarize what I understand to be the basic positions of the parties. Again, this is a relatively informal process, so feel free to, you know, interrupt or interject at any point in time. And I want to have sort of an open exchange here, particularly when we get to talking about setting the schedule and things of that sort here in the case.

The Complaint obviously seeks a declaratory judgment under 28 United States Code Section 2201. As I understand, the essential claim is that the continued authorization by the Government, by the U.S. Forest Service, of the statue of Jesus Christ at Big Mountain on U.S. Forest Service land violates the establishment clause of the First Amendment of the Constitution.

The Plaintiff, Freedom From Religion Foundation, Inc., a nonprofit corporation under the laws of the State of Wisconsin. And I understand you have over 100 members in Montana; is that correct?

MR. BOLTON: That's correct.

THE COURT: I know that standing is probably going to be a contested issue in this case, but I did read Paragraph 9 of the Complaint which seems to be the essential--although it's repeated later, that seems to be the essential standing paragraph.

Are there members of your organization that actually recreate up at Big Mountain, either in the summer or in the winter, either skiing or hiking or biking up there?

MR. BOLTON: Yes, Your Honor.

THE COURT: Okay.

MR. BOLTON: And, in fact, we--if we haven't already, we will be identifying specific members to the Defendants as well. Hopefully, you know, on that issue I know, as you indicated, standing is always an issue in these cases. And it may be that--I mean, we're going to be providing information that hopefully we can at least get that issue focused and perhaps even resolved, but there are individual members.

THE COURT: All right. Yeah, I didn't see any--obviously there are no individuals named as plaintiffs and I

didn't see any specific allegations in the Complaint that would address the issue of standing. But I assumed, based on the defenses being asserted, that this was probably going to be an issue.

MR. BOLTON: And I apologize. Quite frankly, I usually do identify specific members and for some reason we didn't in this particular Complaint. So when that was drawn to my attention, I went back, actually in the last day or so, and have compiled the list of specific members who have had access and exposure that we'll be relying on.

THE COURT: Just in terms of facts that seem to be--well, I think they are undisputed in this case as I read through the various answers. In October 1993 the original permit was issued by the Forest Service to the Knights of Columbus--well, that wasn't in '93. That was '53, wasn't it? We'll get that correct. 1953, yes.

On August 24 of 2011, the Forest Service determined not to renew the permit and it ordered the statue removed by October 31, 2012.

And then on October 21, 2011, the Forest Service withdrew that August 24th decision, to formally assess public sentiment. And then the Montana State Historic Preservation Office got involved about that time. And I realize this is an issue of some contention between the parties but, nevertheless, it's alleged in the Complaint

that the Montana State Historic Preservation Office concurred with the Forest Service that the statue was not a religious site and thus eligible for listing on the National Register for Historic Places.

And then on January 31st of this year, the Forest Service issued a new decision and reauthorized the special use permit. That seems to be the essential facts in terms of permitting. And I understand that the Plaintiffs allege that this statue is an inherently religious message and that its continued presence on public land violates the Establishment Clause by giving the appearance of Government endorsement of Christianity in general, and Roman Catholicism in particular, and diminishes the civil and political standing of nonreligious and nonChristian Americans and constitutes governmental preference for religion and Christianity.

Did I fairly summarize your Complaint?

MR. BOLTON: Yes, Your Honor.

THE COURT: Looking at the Answers of the Federal Defendant, you assert one affirmative defense and that goes to the issue of standing, which I saw in your answer, that they lack either Article III or prudential standing or both.

And in terms of the Intervenors, you have alleged in affirmative defenses that the Court lacks subject matter jurisdiction. I understand that argument relates largely to

the Plaintiff's lack of standing. And that the plaintiffs lack Article III standing, as well as lacking prudential standing.

Does that fairly summarize the defenses? Of course, I've gone through and seen the various--read the Complaint and the Answers and sort of compared the Complaint allegations to the specific admissions or denials by the Defendant and the Intervenors and have a pretty good sense, I think, as to where we are procedurally at least in terms of the posture of the initial pleadings.

Is there any question that the Court's got jurisdiction? I mean, other than the Article III standing issue, any dispute as to the Court's jurisdiction?

Plaintiffs? Obviously you filed it in federal court.

MR. BOLTON: We think jurisdiction is fine, Your Honor.

THE COURT: Any question from the Defendant or the Intervenor?

MR. GLAZER: If the Plaintiffs do indeed have standing, I think this is a proper federal question for this court.

THE COURT: That would be my opinion as well. Intervenor agree?

MR. BAXTER: We will concur with that, yes.

THE COURT: One of the things we take pretty

seriously, and like to try to do at this stage of the proceeding, is to see if we can't reach some agreement as to certain essential facts that are present in the case, so that the parties don't need to scurry around and conduct discovery on certain things.

I noted from the Amended Rule 26(f) Joint Discovery Plan that was filed, that--and I don't know if it was in that or if it was in one of the parties' preliminary pretrial submissions, but the indication that was made that once Administrative Record gets filed in the case, that the parties may then have a basis to stipulate to a number of facts. I think maybe it was in the Plaintiff's preliminary pretrial statement where I saw that.

One of the things that I would like to do is see if we can't agree or stipulate to certain facts today. I'm not sure that we're going to be able to, but I've got a plan here in mind in terms of what we might do over the course of the next week or so to sort of get some facts in this Scheduling Order that are agreed to between the parties.

But if we could, let's just start by looking at the proposed stipulations of fact and law that the parties have proposed. I'm not sure there's much here that the parties are going to agree to, but what I want to do is I want to go through the ones that have been proposed. There aren't many. Get the position of the parties on the ones that are

proposed and then we'll talk about what I'm going to ask you all to do in the next week.

But let's start, if we could, with the Plaintiff's Amended Preliminary Pretrial Statement. I'm looking at Page 3 of Paragraph H. And I can sort of anticipate what the Defendants' positions are on these, but I just need a yea or nay in terms of your position on this and then we'll strike them or include them in the Scheduling Order.

And I'm sure Mr. King and Mr. Harball know what we're trying to accomplish here because I know particularly Mr. King's been over here and been through this drill before.

But let's start with the Plaintiff's proposed Stipulation of Fact No. 1. And if either of the Federal Defendants or the Intervenor object, just say so.

Number one, the continued presence of the statue of Jesus Christ on United States Forest Service property gives the appearance of governmental endorsement of religion.

MR. GLAZER: Speaking for the Federal Defendants, Your Honor, I think we would have to object to that.

THE COURT: Yeah, I understand and I anticipated that. We won't include that.

The statue of Jesus Christ is readily identifiable as a patently religious figure. Do you agree or disagree with that?

MR. GLAZER: I would disagree in this context. I am sure there are some contexts in which the statue of Jesus Christ would be readily identifiable as a religious figure. But I think in this context, in this location, I don't think that's necessarily the case.

THE COURT: So you object to that.

You'll notice, Mr. Harball, I haven't even gotten to you yet. I don't need to because we've got objections.

So those are the two proposed stipulations of fact and law from the Plaintiffs.

Let's go to the Federal Defendants' Preliminary Pretrial Statement. And here--okay.

Mr. Bolton, the court reporter is having trouble apparently hearing you. If you could move that--do we have all the mikes on in the courtroom? If you could move that mike maybe a little closer.

COURT REPORTER: The monitor, if he can move the monitor over.

THE COURT: Oh, move the monitor.

COURT REPORTER: I can't see your face.

MR. BOLTON: That's just great. I don't hear that well either, and in Wisconsin the district court that I'm in has this monitor right in front and I can't see anybody and it helps to see the speaker a lot of times.

THE COURT: It does, yeah.

MR. BOLTON: Can you hear me better now? Okay.

THE COURT: All right. Obviously we don't have any proposed factual stipulations here from the Federal Defendants other than the representation. And this is what I had read and I misrepresented that it was the Plaintiffs I thought that had proposed this. But that the parties, once the Administrative Record is filed or submitted--which I understand occurred yesterday, at least we got our copy. Did the Plaintiff get their copy of the Administrative Record?

MR. BOLTON: I did, and I'll be honest, I haven't gone through it.

THE COURT: I understand. That was just yesterday.

MR. BOLTON: But I do have it.

THE COURT: Okay. That there may be some facts that could be stipulated to.

All right, then let's go to the Preliminary Pretrial Statement filed by the Intervenors, and we've got six proposed stipulations of fact. Let's see if the Plaintiff and Defendant, the Federal Defendants, can agree to these.

One--and I'm looking at Page 4. Does everybody have them in front of them? All right.

The memorial is privately owned and maintained by residents of the Kalispell area.

Any objection to that?

MR. BOLTON: No.

THE COURT: Two. The memorial comprises private, not government speech.

MR. BOLTON: I do disagree with that.

THE COURT: Three. The memorial stands on Big Mountain within the Whitefish Mountain resort ski area. Any objection?

MR. KING: Judge, I'm not sure whether or not that little plot of land is within the resort ski area or not.

THE COURT: So you are going to hold fire on that one?

MR. KING: Yeah, I think we'll hold fire.

THE COURT: Four. The Whitefish Mountain Resort is privately owned and operated. Any disagreement with that?

MR. KING: Other than whatever special-use permit, no, I think we agree with that.

MR. GLAZER: If I may. I'm not sure what they are including within the geographic bounds. I mean, obviously there are parts of it on Forest Service land.

THE COURT: Right. They are referring here to the resort, I assume.

MR. HARBALL: As a business entity.

THE COURT: As a business entity. Any objection to four?

MR. BOLTON: With that qualification, I don't think

so, no.

THE COURT: Is the business entity still Winter Sports, Inc.? Do you know, Mr. Harball?

MR. HARBALL: Yes, sir, it is.

THE COURT: Why don't we modify No. 4 to read something to this effect: The Whitefish Mountain Resort, which is owned by Winter Sports, Inc., is a private--let's see if we can come up with something here.

MR. BAXTER: How about "is owned by Winter Sports, Inc. which is privately owned"?

THE COURT: Is that acceptable to the Plaintiffs and to the Federal Defendants?

MR. GLAZER: I mean, would it help to say Winter Sports, Inc., which is a privately owned entity, operates the Whitefish Mountain Resort?

THE COURT: The Whitefish Mountain Resort. That sounds good. Let's do that.

MR. KING: Plaintiff is okay with that, Judge.

THE COURT: I think as time goes on some of these things will be readily admitted, but we're trying to do as much of this as we can on the front end so you all, like I said, don't need to scurry around spending time and money proving things that are established.

Number five. The upper end of the Whitefish Mountain resort ski area, including where the memorial stands, is on

public land.

Acceptable to the Plaintiff?

MR. BOLTON: That's acceptable.

MR. KING: Yeah, Judge, we agree the memorial is on public land. I'm not sure what the "upper end" means.

THE COURT: Right.

MR. KING: But other than that, we agree that it stands on public land.

MR. GLAZER: If I could offer an edit.

THE COURT: Yes.

MR. GLAZER: Perhaps the upper end of the Whitefish Mountain ski resort area where the memorial stands is on public land. That part I don't think anybody disputes.

THE COURT: How about that, Plaintiffs?

MR. KING: Yes, we're fine with that, Judge.

THE COURT: Okay. Are you okay with that, Mr. Harball?

MR. HARBALL: Yes, sir.

THE COURT: Good, thank you.

All right, number six. The Whitefish Mountain Resort operates the portions of its ski slopes that are on public land pursuant to a permit from the U.S. Forest Service.

Let me start with the Federal Defendant. Any objection to that?

MR. BOLTON: I don't know, Your Honor.

THE COURT: You don't know the answer to that?

MR. BOLTON: No, I don't.

THE COURT: We'll just skip that one if you don't know that as a fact.

Okay, here's what I would like the parties to do on this subject. We're going to hold off filing the preliminary--the order, the Scheduling Order, following this conference until next Wednesday. What I want the parties to do by next Tuesday, by 5 o'clock--even though we can file documents here electronically after that, we'll establish 5 o'clock Mountain Time.

I want the parties to file a stipulation of facts that includes those matters which have been alleged in the Plaintiff's Complaint and admitted by both of the parties in their Answers. And I think it's a fair amount of--I think it's a significant number of allegations.

And, Mr. King, I'm going to ask you to take the lead on this because it's obviously in your client's best interest to have this done, is to go through--I mean, I would have done it but I think it's more counsel's job to do this.

Take your Complaint, obviously go through, look at your two Answers, and then propose to the Federal Defendants and the Intervenors those matters which they have admitted, and then file that with the Court by Tuesday at 5:00 and then we'll incorporate that, along with these additional facts,

into the stipulation of facts portion of the Scheduling Order.

MR. KING: Yes, Your Honor.

THE COURT: All right, thank you.

MR. GLAZER: Your Honor, if I may?

THE COURT: Yes.

MR. GLAZER: I have to travel Tuesday for a preliminary injunction hearing on Wednesday in Idaho, so this might make it a little difficult for me. If I could get a day or two extra following Wednesday the 13th.

THE COURT: Well, it's Tuesday now. What are you doing the rest of this week?

MR. GLAZER: The rest of today I'm traveling.

THE COURT: Okay. This is pretty straightforward. I don't think this is going to be complicated and I think you and--is it Mr. Campbell?

MR. CAMPBELL: Yes, sir.

THE COURT: And where are you located?

MR. CAMPBELL: I'm across the street.

THE COURT: That's what I thought. You looked familiar to me. You are the local color on this.

MR. CAMPBELL: General Counsel's Office.

THE COURT: Right. I don't think this is going to be all that complicated, Mr. Glazer. I think when Mr. King and Mr. Bolton put this together and you look at your

Answer, you are going to see you've already admitted these things.

MR. BOLTON: We'll try to get it to them--

THE COURT: Let's see if we can hold to the schedule that I've proposed and get this done so we can get the Scheduling Order out.

Okay. The Joint Discovery Plan that has been amended and filed. One of the things that was indicated in that plan is that the federal government would file the Administrative Record, I understand, or submit the Administrative Record by the 5th. I understand that has been done.

And then there seems to be some disagreement between the parties, at least between the initial parties, the Plaintiff and the Federal Defendants, regarding the issue of whether the Court's review is limited to the Administrative Record under the Administrative Procedure Act which, of course, would govern discovery in this case.

Now, I read the federal government's filings pretty carefully and it looks to me like you've asserted that position, but you also seem to be conceding that we may be going outside of the Administrative Record here, or at least discovery may take place outside of the Administrative Record. What exactly is your position on this?

MR. GLAZER: I think our position evolved somewhat

since we first thought about the case. I think some of the controlling factors under what we think is the governing Supreme Court precedent aren't readily apparent from the record itself. And it may require, for instance, retaining a historian, for instance, to provide an understanding of the historical setting and perception of the statue.

Since that's not in the record, that would need to be supplemented--the record would need to be supplemented with that information and it may be that Plaintiffs have a competing view, which the Court would then have to resolve.

THE COURT: Right.

MR. GLAZER: I think what we mainly focused on was the forest--when we did the Joint Discovery Plan, is that the forest supervisor's decision itself is--comes within the purview of the Administrative Procedure Act. In other words, it stands or falls objectively on the record; and getting into the decision maker's thought processes really isn't appropriate or even terribly useful in a case that's basically a legal question such as this.

THE COURT: What--from the Plaintiff's point of view, what sort of discovery do you anticipate? And, again, this is--we're just having a free discussion here. I don't--you are not bound by what you say in terms of what your discovery might or might not be, but what are you contemplating here in terms of discovery?

MR. BOLTON: Beyond the Administrative Record, the types of things that we would be looking for would be, for instance, communications relating to, for instance, the reaction that was received to the initial decision disallowing it. Communications within the agency and communications by--to and from third parties, which I think may bear upon, you know, whether this is perceived as a war memorial or, as it's characterized, as a religious shrine.

In terms of just, real briefly, the APA issue, a couple of things. Number one, we don't view this as strictly an APA, Administrative Procedure Act, review. Obviously we weren't even parties to the--to any administrative proceeding.

The APA is important, in that Section 5 has been construed by the courts to be a waiver of the federal government's sovereign immunity. But the courts have also uniformly held that that waiver of sovereign immunity by--in Section 5, I believe, of the APA, does not mean that with constitutional issues only APA reviews are permitted.

And so obviously I don't see this limited to the Administrative Record and to the standard of review of an administrative review.

But realistically, you know, the types of things that we're looking for are, as Mr. Glazer, indicated, some historical things in terms of the history of the shrine; and

then more contemporaneously, communications, including communications relating to the initial reaction to the Defendant's initial decision to not renew the permit, both within communications that were received and led up to the decision, then to pull back that decision and go in a different direction, as well as communications within the agency.

Now, I understand there may be--I don't think this fairly holds true with, for instance, communications that are received from the public, and not just the public comment part of the record.

There may be internal records that would be--that would not be subject to discovery under the deliberative process of the agency, and I recognize that. And to the extent that there are documents that would be subject to that, you know, I'm not--that's not a fight that I'm wanting to have. But I think there are discoverable records--discoverable documents beyond the Administrative Record itself.

But I don't foresee, and I don't want to get into, you know, a lot of contention over that. So it's not--it's not like I'm going to be looking for, you know, communications between Mr. Weber and any counsel, for instance, or any legal advice that may have been received relating to the process that he went through.

Again, we don't know just yet whether there are any such

documents; but to the extent that there are, I'm certainly willing to discuss and work with Mr. Glazer to, you know, try and make it as unintrusive as possible, but at the same time get to the record pertinent to the criteria that we need to address.

THE COURT: Okay. Mr. Harball, Mr. Baxter, what's your thinking in terms of discovery that the Knights of Columbus may want to conduct in the case?

MR. BAXTER: I think foremost there may be some discovery on standing, depending on what the Plaintiffs present as far as their individual members.

I'm not sure on the merits we would have that much other discovery. There may be some on historical issues. But I think most of those, what's relevant is what the agency had when making the decision. Those should be in the Administrative Record.

And also the communications that the Plaintiff's counsel have mentioned, presumably those should also be in the record if they are relied upon by the agency and used to make a decision. But I don't anticipate there would be any significant amount of discovery outside of that. So we would reserve the right to object to any external.

THE COURT: Right. We're dealing here with--I mean, we're obviously very early in the case and I understand that discovery is--I assume you haven't commenced any discovery

yet, have you? Yeah.

Let me just say this, that when you get into discovery if it looks like somebody's getting heartburn over where discovery's going, just let me know. I've got a good feeling about the lawyers in this case. You obviously have all--you all are experienced and you seem to be getting along just fine so far. But what we don't want to do is get into prolonged motions to compel, things of that sort.

So, for instance, you know, Mr. Glazer, if the Plaintiffs want to take Chip Weber's deposition and you anticipate there's going to be some issues that require the Court's interference, just tee it up and let me know. Let's do it that way rather than getting into depositions and having snits and phone calls and that sort of stuff, because we can help you out with that if we need to. It doesn't sound to me like you are going to need much help; but if it comes up, just let us know and we'll help you get those things sorted out.

It seems to me--and I want to ask all of you just to sort of share with me what you think the judicial standard is here and the standard that we're dealing with.

But it strikes me that this case--whatever standard we're dealing with--that discovery concerning the history of this statue from 1953 on, not only from the standpoint of, you know, the history of the U.S. Forest Service involvement

but just the history of this statue and how it's been perceived, is probably relevant and going to be of some value to me in terms of resolving this case. Now, that's just my preliminary thinking on this.

What I'm saying is I don't think, based upon what I've seen so far, that this is a case where my review is going to be limited to the Administrative Record. But I'm open to being convinced otherwise if that's where this goes.

But I am curious, having done already some sort of preliminary reading on this and I see all of these various tests that have been articulated over the years. The Lemon test, which appears to be largely put aside or maybe in some disfavor currently.

I see what's called a--sort of a more strict endorsement test. I've come across reference to a more liberal standard, the coercion test.

And then it was proposed to me by the Federal Defendants in this case that we've got what's--what would be referred to as the flexible test under the *Van Orden vs. Perry* decision, the U.S. Supreme Court decision from 2005, which I have read, which doesn't pay a lot of heed to the Lemon test.

Again, not tying anybody to any particular position as we go forward, I'm just curious in terms of what the thinking is in terms of the tests here.

Mr. Bolton, can you give me--I mean, what do you think we're going to be looking at in terms of the test?

MR. BOLTON: You know--

THE COURT: I assume you litigate these cases all the time.

MR. BOLTON: I see these issues all the time, you are right.

THE COURT: Right, right.

MR. BOLTON: You know, most of these display cases, whether they are display or government speech, really end up not turning on the nuances of the different tests. They usually focus on a single element, which is really an element of almost all of the different formulations, and that is what's been called the endorsement issue in terms of secular purpose, entanglement under *Lemon* and some of the other. I don't think we've really got a--in other cases we've got the *Marsh* issue with legislative invocation.

I think this case, as does most of the--most of the display and speech cases, really turns on--will turn on the issue of endorsement. And I think under really all of the different formulations, that's going to be the key issue.

THE COURT: Okay. Mr. Glazer.

MR. GLAZER: Well, certainly the Court in *McCrary*, which dealt with a Decalogue display, didn't get beyond the purpose of *Lemon vs. Kurtzman*, because it found that that

element alone raised problems. The context of that case was very controversial, unlike this case. And unlike the display that was subject to an opinion that I believe was handed down the same day as *McCrary*, and that was *Van Orden*, in which the court said, well, the purpose is only one of a suite of factors we look at in deciding whether a purely factual display, at least one that's generated no controversies up to the point of actual litigation, whether that passes constitutional muster. And in this case, you know, no one has raised an issue about the statue in 60 years until very recently.

And I think if one looks at that whole context and perception of this monument, one will find that it doesn't convey any government endorsement of religion. So that's how we perceive this case.

THE COURT: Okay, all right.

Mr. Baxter, Mr. Harball.

MR. HARBALL: Well, the reason Mr. Baxter is here is because this is all he does.

THE COURT: Yeah. Well, I assume so. And what is--what's the name of the firm or the organization--

MR. BAXTER: The Becket Fund For Religious Liberty.

THE COURT: And what's that organization?

MR. BAXTER: Nonprofit law firm, and we focus exclusively on First Amendment religious liberty questions.

THE COURT: Have you and Mr. Bolton crossed paths before?

MR. BAXTER: I have not crossed paths with him before, but our organization has crossed paths with Freedom From Religion Foundation.

MR. BOLTON: I'm sure it was an enjoyable experience.

THE COURT: I'm sure it was. That's great.

What's your view of the standard?

MR. BAXTER: Of course, we would appreciate you adopting the coercion standard, but I understand under the existing case law that--

We basically will concur with what the Federal Defendants have said, that you'll look at this. I don't think there is any issue of purpose in this case.

But we would agree that based on the facts and circumstances of this case, the--it's a neutrally administered permitting system, private speech in an area where there is a lot of other private speech going on, that there is no indicia of any kind of government endorsement.

THE COURT: Okay, all right. Well, that's helpful to the Court and I appreciate that. And I understand as we go forward you all may want to propose a different standard or test, but that gives me some idea as to where you are coming from, at least at this early stage of the proceeding.

Let's talk about just some miscellaneous things here. As I looked at the--before we actually get into scheduling.

As I looked at the Joint Discovery Plan, we've talked about discovery. One of the things that--one of the sections within the Preliminary Pretrial Statement has to do with resolution, whether it be through compromise and/or settlement. And I am not--I mean, before I took this job on I sat out there where you are sitting, for 35 years, and the last thing that I felt that I needed was some judge putting the boot to me and telling me I needed to settle a case.

I view my responsibility as being a trial judge and this is a trial court and if you all want a trial, you are going to have a trial as soon as I can possibly give you one. And I believe that passionately.

So all I will say is this: If you want the Court's help with settlement, just let me know and we'll make available to you a U.S. Magistrate. If you want to use a private mediator, that's perfectly acceptable to me. But if you want the resources of the federal judiciary to be made available to you, we'll do that. Just give us--just make a request and give us a little bit of notice and we'll help you out on that score.

We've talked about what I want you to do by next Tuesday at 5:00. We've talked a little bit about what the standard or test is here.

Let's go through and talk about scheduling now. I've got--let me tell you what I was thinking. Before I received your materials I was looking at maybe giving you all a trial--I mean, you have to tell me what you want to do, because I'm going to do what you tell me to do in terms of a trial setting. Some people want a trial setting as soon as they can get one and some people approach these things in a little more relaxed mode. I know you are all extremely busy, but I was prepared to give you a trial setting, and work backwards from that setting, in November of this year.

MR. BOLTON: That's fine.

THE COURT: Get it done, now.

You proposed to me in your Joint Discovery Plan a close of discovery after the date I was going to give you for a trial setting. You proposed an early December close of discovery. And you all have a better idea than I do as to how much discovery you need to do in this case. And I know how we get to scheduling things and I'm already seeing fatigue set in in Mr. Glazer's eyes. He's thinking between now and November I don't have a minute free to do anything. What is this judge in Montana trying to do to me.

So I'm perfectly prepared to give you a trial setting. You know, obviously we're not going to do this between Thanksgiving and New Year's. That's inhumane, but I did have November 13th set aside as a trial setting.

I also have, as an alternative, put March 11th as a trial setting, which is the earliest trial setting I could give you following on your December 1 close of discovery proposal. And we can come up with a later trial setting. We could come up with an earlier one, but I'm sure that's not going to be of any interest. So what's--so pick your poison.

Now, here's the program, Mr. King can tell you this. When we set a case for trial, this is going to be the number one trial setting absent a criminal matter that would bump us. And unless one of you ends up with a deathly illness or something like that, we will try the case on that date. So now is your time to negotiate your trial setting, because I'm going to want to hold--we'll hold to that trial setting again unless we've got a natural disaster or death amongst counsel.

So what's the Plaintiff thinking?

MR. BOLTON: Your Honor, quite frankly from my perspective, we can accommodate pretty much--we will accommodate pretty much any schedule that we're given.

I think of the dates that you discussed, the March trial date would be our choice. Now, having said that I'll also say this: If the Defendants are crunched just because of scheduling and everything, I mean, going with May or some date like that is fine with us, but our first choice would

be the March trial date.

MR. KING: Judge--

THE COURT: Oh, I'm sorry, Mr. King.

MR. KING: On the March trial date, what do you think that the deadlines would be for motions?

THE COURT: Okay, let's--let me--I'll get to that. Let me just survey the remainder here just on the general concept of yet this year or in the spring.

Mr. Glazer.

MR. GLAZER: Excuse me, I was--

THE COURT: General concept. Do you want to try to get this case tried in November, this fall, or would you rather wait until spring?

MR. GLAZER: I would much prefer waiting until spring.

THE COURT: Mr. Harball?

MR. HARBALL: We concur. March would be fine.

THE COURT: Okay, all right. So let's be specific then. How is the March 11th date? I realize you are handicapped, you do not have your cell phones and things of that sort with you, but can you look into the future and think about March 11th?

MR. GLAZER: I guess speaking from the Federal Defendants, my only reservation is the thought that we would give motions for summary judgment a chance.

THE COURT: Well, and that's Mr. King's question. Let me go to the Intervenors. Does March 11 work for you two?

MR. HARBALL: Yes, sir.

MR. BAXTER: Yes.

THE COURT: Mr. Baxter, that's an affirmative?

MR. BAXTER: Yes.

THE COURT: Mr. King's question is, if we set this case on March 11th, let's back up. I've got the discovery deadline as December 1st. That's the one you proposed.

I've got a motions deadline, which is fully briefed, and here's where we may have the rub, of January 11th. And that's--I mean, I don't want to mess up people's holidays. But fully briefed means fully briefed, so you've got to count back from that.

So the opening briefs would be due, you know, some period of time before that. Probably about the time you have Thanksgiving or Christmas on the brain.

MR. GLAZER: It may be that we don't need that much time for discovery given the posture of this case, and it might make sense to move the motions deadline up to this year.

THE COURT: What would you think about a November 1st--I don't know what day of the week that is--discovery deadline? That's a month earlier than what you

proposed.

MR. BOLTON: For the dispositive motion?

THE COURT: No, for the discovery deadline.

MR. BOLTON: Oh, that's fine.

THE COURT: Okay, does that work, November 1st? I mean, goodness, this is one of those things where you all can set aside three or four days, go up to the Flathead, take the depositions and you are done. Probably, I mean. I don't want to tell you what to do, but that's what I would expect would probably happen.

Okay, let's work then from a November 1st discovery deadline. Tyler, what would work then in terms of a motions deadline fully briefed? Can we move that up to--

MR. GILMAN: December 3rd.

THE COURT: December 3rd?

MR. BOLTON: That's fine.

MR. BAXTER: If that's fully briefed, so that would be the Defendants' motion, response and reply in 30 days?

THE COURT: It's a motion and it's your response brief. Reply briefs are optional.

MR. GLAZER: So if I may, Your Honor.

THE COURT: Yes.

MR. GLAZER: So if the parties are cross moving, they would file simultaneous briefs?

THE COURT: Yes. Here's what it says in the

Scheduling Order that I'm going to issue. "Pursuant to Federal Rule of Civil Procedure 16(b)(3)(A), all dispositive motions, discovery motions and motions in limine shall be fully briefed by the date set forth in Paragraph 1. Fully briefed means that the brief in support of the motion and the opposing party's response brief are filed with the court."

So, Mr. Baxter.

MR. BAXTER: I would propose 45 days, Your Honor, from the close of discovery to file initial briefs and responses.

THE COURT: So you are proposing the middle of December. That's fine with me.

What date would that be, Tyler?

MR. GILMAN: 14th.

THE COURT: Is that a Monday or a Friday?

MR. GILMAN: That's Friday.

THE COURT: Friday, the 14th of December, you will have all your briefing, you will have your discovery done, you can enjoy the holidays and there we are.

Okay, so if we've got that done, a month ahead of schedule, do you still want to go with the March 11th trial? Hold that date? Okay. And then we'll work back from that. Here's the other deadlines that we're going to set.

We're going to set a deadline for disclosure of experts.

We'll talk about that in a minute. We're going to set a deadline for amending pleadings. We've talked about the motions deadline of December 14th. And then we'll set a deadline for the attorney conference to prepare the Final Pretrial Order and then a deadline for you all to submit the Final Pretrial Order and Proposed Findings of Fact and Conclusions of Law and the various notices that need to be given to the Court. And then my practice is to set the Final Pretrial Conference at the same--on the morning of the first day of trial.

Now, if that all makes you nervous and you would rather have it a couple of weeks before trial, we can do that. I've seen lawyers do both. I mean, generally everything's been filed. We've got a Final Pretrial Order. We've had all the motions filed. We pretty much have got everything resolved. I feel like at 8:30 a.m. we can have a Final Pretrial Conference and then go to trial right after we're done. But if you all want to do it earlier, tell me.

So what's your preference there, Plaintiff? Would you rather have the pretrial conference before or on the same day as the trial?

MR. KING: We're fine doing it on the same day as trial, Judge.

THE COURT: Okay, Mr. Glazer, Mr. Campbell?

MR. GLAZER: I don't think we have a preference

either way.

THE COURT: Mr. Harball, Mr. Baxter?

MR. HARBALL: We concur the same day as the trial.

THE COURT: Okay. I mean, you all don't need to be traveling back and forth here more than you need to, so let's go ahead.

We'll set the pretrial conference then on the morning of March 11th at 8:30 a.m. and then we'll start trial right after that.

How long do you think it will take to try this case? Plaintiff?

MR. KING: Two days.

MR. GLAZER: Sounds reasonable, Your Honor.

MR. BAXTER: I think that sounds about right.

THE COURT: Okay. We'll set it for three days. Things move around pretty quickly in here, especially with all the electronics. We don't have a jury to deal with. We'll go until we drop on each day and we'll see how much we get done.

So a proposed deadline for amending pleadings, that would be the first deadline, will be June 29th. Do you anticipate any further amendments?

MR. BOLTON: I don't anticipate any. The only amendment, and it's probably not even necessary, but would be to identify some of the individual members, but that's

the only thing that I would contemplate.

THE COURT: Okay. Do the Federal Defendants anticipate any amendments?

MR. GLAZER: We don't.

THE COURT: Intervenor?

MR. BAXTER: No.

THE COURT: Okay. Well, we'll set that deadline June 29th.

Now, I hear talk of potential experts, perhaps historical experts. Is the Plaintiff contemplating using any experts in this case?

MR. BOLTON: At this point we do not anticipate that.

THE COURT: Okay. Federal Defendants?

MR. GLAZER: We may indeed.

THE COURT: And Intervenor?

MR. HARBALL: No, sir.

THE COURT: All right. Well, we'll give you a deadline for disclosure of experts as being October 1, 2012.

And then we've got the November discovery deadline and then the December deadline for motions fully briefed. And then I'll give you the other deadlines for filing things, working back from the March 11th trial setting.

The one thing that--there are a couple of things that I would like you to do. I'm sure you probably all do this

anyway. But if you would please--and we'll provide for this in the Scheduling Order.

During discovery if you could number your exhibits seriatim as you are going through, so if we end up reading depositions or you end up submitting depositions to the Court in lieu of live testimony, that the exhibit numbers are consistent from discovery through trial.

Now, I don't know, is that Administrative Record, has that been numbered?

MR. CAMPBELL: It's numbered.

MR. GLAZER: Yes.

THE COURT: So if we could just maintain those numbers as well as you go through discovery. Did you number those one through whatever?

MR. GLAZER: I have the exhibit.

THE COURT: Are all 70,000--

MR. CAMPBELL: No, Your Honor. Each 70,000 electronic comment is not numbered individually.

MR. GLAZER: Each document has a number that consists of an alphabetic and numeric prefix.

THE COURT: So maintain, if you would, please, those numbers through the process. So if you refer to those documents during a deposition, just call them by whatever the numbering is in the Administrative Record and then do your additional numbering beyond that and then just go

seriatim all the way through so we have consistency with exhibit numbering.

All right, here's the other thing that may be unique to this court, although I would hope not, and I view it as being again a humane thing to do.

We've got a provision here within our Scheduling Order regarding foundation and authenticity of discovery items. And what it provides is that, in terms of producing documents, if the federal government produces a document and if the Plaintiff or the Intervenor objects to the foundation or authenticity of that document, you need to let counsel for the government know, before the close of discovery, that you've got an issue with authenticity or foundation to give the parties an opportunity to clean it up before we get into trial.

Similarly, if you produce a document--for instance, Mr. Harball, if you produce a document from the Knights of Columbus, and you, the producing party, have an issue with the authenticity or foundation of that document, you need to identify that you have that issue at the time you produce it, so that the parties receiving that document again have an opportunity to, if they think it's a valuable document, to establish foundation or authenticity. Again, that's spelled out here.

You know, so much of what we do is--I mean, the parties

stipulate to foundation and authenticity, but I guess you would be surprised how many times then when we get the list of the exhibits and the objections at the pretrial conference, people are objecting to foundation and authenticity. And we simply go back and refer to this order and indicate if you haven't objected and gone through this drill, then that objection's been waived.

Let me just look here. We're getting close. Okay, Tyler, did I miss anything?

(Discussion held off the record.)

THE COURT: Let's revisit the issue of briefing, because Mr. Gilman identified something for me here that we've encountered, which is, I think I heard somebody say cross-motions for summary judgment, which can be a nightmare in terms of the amount of briefs that get filed.

Let me propose an alternative, which is, the Plaintiffs will file their opening brief on November 15th. The Defendants and Intervenors will file their combined opening and response brief on November 30th. Then the Plaintiffs will file their combined response and reply brief on December 14th, with the Defendants and the Intervenors filing their reply briefs on December 28th.

Do you want me to repeat those dates? I realize this is ugly when we get into the end of December, but I would--rather than doing this fully briefed with cross-motions,

that then gets to be--pretty soon we've got six briefs filed from--I mean, we've got briefs all over the place and it's unnecessary.

Do you want to tweak that proposed schedule?

MR. GLAZER: I would, only because our opposition brief would largely be drafted during Thanksgiving week schedule, and our surreply would be during Christmas week. So either move things up or back. I mean, if the Court would indulge us in that.

THE COURT: Yeah, no, I understand. Well, we've got our December--or we've got our March trial setting. Why don't we--

MR. GLAZER: We could move discovery up.

THE COURT: Well, I don't want to jam you on discovery, but if you are all agreeable to that, we can move this whole thing up or we can move the briefing back into January.

MR. KING: I think it would be easier to move the briefing back into January.

THE COURT: Okay. Tyler, have you got some alternative January dates there or should we just go ahead and pick some?

Can we go ahead and do that? We'll just pick some--scout's honor, we're going to move all this briefing into January. We'll pick some dates. We won't make somebody

file one on January 1st, the opening--Plaintiff's opening brief. And then we'll work from there and we'll get this done so that you are not trying to do this over the holidays.

All right. Anything else? Anything I can do to help you all out that we haven't already discussed this morning?

MR. KING: Not from the Plaintiff's standpoint, Judge.

MR. BOLTON: There is one nonsubstantive comment that my assistant wanted me to pass on. She deals with a lot of the electronic filing systems and she says that your system is about the most user friendly that she's dealt with.

THE COURT: Did you hear that, Beth? That's great. Okay, we'll be in recess then. I want to thank everybody. We'll get the order out to everybody.

(Court concluded at 11:33 a.m.)

C E R T I F I C A T E

STATE OF MONTANA )
) ss.
COUNTY OF MISSOULA )

I, Julie M. Lake, RDR, CRR, CSR, Freelance Court Reporter for the State of Montana, residing in Missoula, Montana, do hereby certify:

That I was duly authorized to and did report the proceedings in the above-entitled cause;

I further certify that the foregoing pages of this transcript represent a true and accurate transcription of my stenotype notes.

IN WITNESS WHEREOF, I have hereunto set my hand on this the 6th day of July, 2012.

_Julie M Lake_______________

Julie M. Lake, RDR, CRR, CSR
Freelance Court Reporter
State of Montana, residing in
Missoula, Montana.