## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## MISSOULA DIVISION

FREEDOM FROM RELIGION
FOUNDATION, INC., A Wisconsin
Non-Profit Corporation

       *Plaintiff*,

v.

CHIP WEBER**,** Flathead National Forest
Supervisor, and
UNITED STATES FOREST
SERVICE**,** an Agency of the United States
Department of Agriculture

       *Defendants,*

and

WILLIAM GLIDDEN, RAYMOND
LEOPOLD, NORMAN DEFOREST,
EUGENE THOMAS, and the
KNIGHTS OF COLUMBUS
(Kalispell Council No. 1328),

       *Intervenor-Defendants.*

**Case No. 9:12-cv-00019-DLC**


### *AMICUS CURIAE* BRIEF OF MEMBERS OF CONGRESS,
### THE AMERICAN CENTER FOR LAW AND JUSTICE, AND THE
### COMMITTEE TO DEFEND THE JESUS STATUE WAR MEMORIAL
### SUPPORTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## CORPORATE DISCLOSURE STATEMENT

The ACLJ is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ has no parent corporation and issues no stock.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................. iii

**INTEREST OF** *AMICI* ....................................................................................1

**FACTUAL BACKGROUND** ...........................................................................3

**ARGUMENT** ....................................................................................................3

    **THE ESTABLISHMENT CLAUSE DOES NOT REQUIRE THE REMOVAL FROM GOVERNMENT PROPERTY OF ALL PERMANENT DISPLAYS WITH RELIGIOUS MEANING.**................3

    *A. Under The Supreme Court's Most Recent Religious Display Cases, the Monument Poses No Threat to the Establishment Clause.* .................6

    *B. The Ninth Circuit's Religious Display Cases Also Support the Conclusion that the Monument Is Not An Unconstitutional Endorsement of Religion.* ........................................................................11

    *C. Supreme Court and Ninth Circuit Precedent Regarding Displays' History and Setting Compel the Conclusion That the Monument Is Constitutional.* ...........................................................................................14

**CONCLUSION**..................................................................................................17

# TABLE OF AUTHORITIES

**CASES** ...................................................................................**PAGE(S)**

*Card v. City of Everett*, 520 F.3d 1009, 1010, 1021 (9th Cir. 2008)................11–13

*Church of the Holy Trinity v. United States,* 143 U.S. 457 (1892)...........................3

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) ...............................3, 5

*Lynch v. Donnelly,* 465 U.S. 668, 674 (1984) ...................................................3–4, 5

*Salazar v. Buono*, 130 S. Ct. 1803 (2010) ..................................................8–9, 15–16

*Sch. Dist. of Abington v. Schempp*, 374 U.S. 203 (1963) .....................................4–5

*Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011) ........................4, 13–14

*Van Orden v. Perry*, 545 U.S. 677 (2005) ........................................1, 5, 6–8, 11, 12

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................................4

## U.S. CONSTITUTION

U.S. Const. amend. I. .................................................................................3

## OTHER AUTHORITIES

Statement of Undisputed Facts .........................................................14, 15

## INTEREST OF *AMICI*

Amici, United States Members of Congress, Steve Daines (MT), J. Randy Forbes (VA), Michael Conaway (TX), Vicky Hartzler (MO), Bill Johnson (OH), Walter Jones (NC), James Lankford (OK), Jeff Miller (FL), Alan Nunnelee (MS), Steve Scalise (LA), and Lynn Westmoreland (GA) are currently serving in the One Hundred Twelfth Congress.

Amicus, the American Center for Law and Justice (ACLJ) is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued or participated as amicus curiae in numerous cases involving the Establishment Clause. *See, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (counsel of record); *Van Orden v. Perry*, 545 U.S. 677 (2005) (amicus curiae). The ACLJ has represented nearly two dozen governmental entities in cases involving the defense of public displays of religious symbols, including the following reported cases: *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *City of Elkhart v. Books*, 532 U.S. 1058 (2001) (Rehnquist, C. J., with whom Scalia and Thomas, J. J., join, dissenting from denial of cert.) (Fraternal Order of Eagles Ten Commandments Monument in front of city hall); *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F. 3d 484 (6th Cir. 2004) (Ten Commandments poster in courtroom display); *ACLU Neb. Found. v. City of Plattsmouth*, 358 F. 3d 1020, *rehearing granted*, 2004 U.S. App. LEXIS 6636 (8th Cir. Neb., Apr. 6,

1

2004) (Fraternal Order of Eagles monument in city park); *Freedom From Religion Foundation, Inc. v. City of Marshfield*, 203 F. 3d 487 (7th Cir. 2000) (statue of Jesus Christ in city park); *ACLU v. Mercer County*, 240 F. Supp. 2d 623 (E. D. Ky. 2003) (Decalogue included in Foundations of American Law and Government courthouse display); *Schmidt v. Cline,* 127 F. Supp. 2d 1169 (D. Kan. 2000) (In God We Trust poster in county treasurer's office). The ACLJ has developed a special expertise in this area which would be of benefit to resolving the issues concerning the Knights of Columbus' statue of Jesus in the Flathead National Forest.

This brief is also filed on behalf of the ACLJ's Committee to Defend the Jesus Statue War Memorial which consists of over 106,000 Americans who support veterans' memorials and who oppose efforts to strip from public property recognitions of history and heritage that contain religious symbolism.

*Amici* have dedicated time and effort to defending and protecting Americans' First Amendment freedoms.  It is this commitment to the integrity of the United States Constitution that compels them to oppose Freedom From Religion Foundation (FFRF)'s efforts to remove the Flathood National Forest statue of Jesus.

2

## FACTUAL BACKGROUND

Amicus adopts the Factual Background statement in the Intervenor-Defendants' Memorandum in Support of its Motion for Summary Judgment.

## ARGUMENT

## THE ESTABLISHMENT CLAUSE DOES NOT REQUIRE THE REMOVAL FROM GOVERNMENT PROPERTY OF ALL PERMANENT DISPLAYS WITH RELIGIOUS MEANING.

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has affirmed that the Establishment Clause is not to be interpreted in a manner that would purge all governmental acknowledgments of religion or religious belief from society. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 35-36 (2004) (O'Connor, J. concurring). "Eradicating such references would sever ties to a history that sustains this Nation even today." *Id.* at 36.

In 1892, the Supreme Court stated that "this is a religious nation." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 470 (1892). The Court has discussed the historical role of religion in our society and concluded that "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly,* 465 U.S. 668, 674 (1984). In *Sch. Dist. of Abington v. Schempp*, the Court recognized that "religion has been closely identified with our history and

3

government."   374 U.S. 203, 212 (1963). Such recognition of the primacy of

religion in the Nation's heritage is nowhere more affirmatively expressed than in

*Zorach v. Clauson*:

> We are a religious people whose institutions presuppose a Supreme
> Being. We guarantee the freedom to worship as one chooses. We
> make room for as wide a variety of beliefs and creeds as the spiritual
> needs of man deem necessary. We sponsor an attitude on the part of
> government that shows no partiality to any one group and that lets
> each flourish according to the zeal of its adherents and the appeal of
> its dogma. When the state encourages religious instruction or
> cooperates with religious authorities by adjusting the schedule of
> public events to sectarian needs, it follows the best of our traditions.
> For it then respects the religious nature of our people and
> accommodates the public service to their spiritual needs. To hold that
> it may not would be to find in the Constitution a requirement that the
> government show a callous indifference to religious groups. *That
> would be preferring those who believe in no religion over those who
> do believe.*

343 U.S. 306, 313–14 (1952) (emphasis added).  Thus, as the Court of Appeals for

the Ninth Circuit recognized recently, "the touchstone of Establishment Clause

jurisprudence is the requirement of governmental neutrality toward religion,"

though "'neutrality' . . . is not so narrow a channel that the slightest deviation from

an absolutely straight course leads to condemnation by the First Amendment."

*Trunk v. City of San Diego*, 629 F.3d 1099, 1105–06 (9th Cir. 2011) (citations and

quotations omitted). *See also School Dist. of Abington Twp. v. Schempp*, 374 U.S.

203, 306 (1963) (Goldberg, J., concurring) (cautioning that an "untutored devotion

to . . . neutrality" can lead to "a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious").

Accordingly, religious symbols on public property are not, *per se*, unconstitutional. "[S]uch references 'serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 36 (O'Connor, J. concurring) (quoting *Lynch,* 465 U.S. at 692–93). Although the United States Supreme Court has held that "no single mechanical formula . . . can accurately draw the constitutional line in every [Establishment Clause] case," *Van Orden*, 545 U.S. at 699 (Breyer, J., concurring), two of the Supreme Court's most recent cases involving permanent displays establish that the Knights of Columbus' statue of Jesus Christ in Flathead National Forest does not violate the Establishment Clause. In addition, the Ninth Circuit's application of Supreme Court precedent affirms that the Monument is not an establishment of religion, and the Monument's history and setting compel the conclusion that it poses no danger to the First Amendment.

**B. Under The Supreme Court's Most Recent Religious Display
Cases, the Monument Poses No Threat to the Establishment
Clause.**

In *Van Orden v. Perry*, the Supreme Court upheld the constitutionality of a
Ten Commandments monument, stating that a detailed analysis of the facts
surrounding a permanent display's history and setting is essential to a
determination of whether permanent religious displays on government property
violate the Establishment Clause.  545 U.S. at 686.  *Van Orden* established further
that where a permanent display with both religious and secular meanings has been
in place for decades, it is unlikely to be perceived as an unconstitutional
endorsement of religion. *Id.* at 703–04 (Breyer, J., concurring) ("This display has
stood apparently uncontested for nearly two generations. That experience helps us
understand that as a practical matter of degree this display is unlikely to prove
divisive. And this matter of degree is, I believe, critical in a borderline case such as
this one.").

In *Van Orden*, the Ten Commandments monument had gone unchallenged
for 40 years.  Justice Breyer's concurring opinion, which controlled the *Van Orden*
decision,[1] concluded that

> those 40 years suggest more strongly than can any set of formulaic
> tests that few individuals, whatever their system of beliefs, are likely

---

[1]Justice Breyer's concurring opinion is the controlling opinion in *Van Orden*
because it upheld the constitutionality of the Ten Commandments display but on
narrower grounds than the plurality opinion.

to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to "engage in" any "religious practic[e]," to "compel" any "religious practic[e]," or to "work deterrence" of any "religious belief." *Schempp,* 374 U.S., at 305(Goldberg, J., concurring). Those 40 years suggest that the public visiting the capitol grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage.

*Id.* at 702–03.

Also central to Justice Breyer's opinion in *Van Orden* was the "mixed, but not primarily religious purpose" purpose of the display.  He distinguished the display from other Ten Commandments displays in which the primary purpose was religious.

The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state. This case also differs from *McCreary County*, where the short (and stormy) history of the . . . displays demonstrates the substantially religious objectives of those who mounted them . . . . [I]n today's world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, *a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not.*

*Id.* at 703 (emphasis added) (citations omitted).

Finally, Justice Breyer concluded that to strike down the monument would promote religious divisiveness and exhibit hostility, not neutrality, toward religion.

[T]o reach a contrary conclusion here, based primarily on the religious nature of the tablets' text would, I fear, lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause

7

traditions. Such a holding might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation. *And it could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid.*

*Id.* at 704 (emphasis added).

Similarly, in *Salazar v. Buono*, the Supreme Court stated that a government's efforts to preserve a religious symbol with a specific, secular, historical meaning, especially one involving military sacrifice, should not be viewed as a government endorsement of religion. 130 S. Ct. 1803, 1818 (2010),[2] Moreover, the plurality opinion echoed Justice Breyer's holding in *Van Orden* that when evaluating the constitutionality of a permanent monument with religious meaning, courts should consider how the "reasonable observer" would interpret a forced removal of a religious symbol that has been in place for decades. *Id.* at 1817. Justice Alito agreed in his concurring opinion: "[T]his removal would have been viewed by many as a sign of disrespect for the brave soldiers whom the cross was meant to honor . . . [and] interpreted by some as an arresting symbol of a Government that is not neutral but hostile on matters of religion . . . ." *Id.* at 1823 (Alito, J., concurring).

In *Salazar*, the display at issue was a large Latin cross permanently located on Sunrise Rock—a prominent location within the Mojave National Preserve. *Id.*

---

[2] The *Salazar* decision reversed *Buono v. Kempthorne*, 527 F.3d 758 (9th Cir. 2008) *and Buono v. Kempthorne*, 502 F.3d 1069, 1086 (9th Cir. 2007).

at 1811.  It was originally erected with private funds by the VFW in 1934 as a memorial to those who died in World War I.  The cross had been replaced several times by private parties, although a plaque that was originally next to it stating its purpose had not been replaced. Nothing within its proximity indicated the display's purpose.  Although veterans had gathered at the cross to celebrate Easter sunrise services since 1935, there was no evidence that veterans, or any other persons, had gathered at the cross for any type of veterans monument services.  *Id.* at 1838 n.9 (Stevens, J., dissenting).

The central issue in *Salazar* was whether a federal law that authorized the transfer to a private party of the portion of federal land on which the cross stood violated the Establishment Clause.  Justice Kennedy wrote a plurality opinion, joined by Chief Justice Roberts and Justice Alito, holding that the lower court failed to conduct a thorough inquiry into the purpose and effect of Congress's land transfer enactment.  *Id.* at 1820–21. Although the Court remanded the case back to the district court for proper analysis, the plurality indicated its views on the underlying Establishment Clause issue:

> The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm. A cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as a statement of governmental support for sectarian beliefs. The Constitution does not oblige government to avoid any public acknowledgment of religion's role in society.

*Id.* at 1818.

The plurality further noted that the original placement of the cross on Government-owned land was "*not* an attempt to set the *imprimatur* of the state on a particular creed. Rather, those who erected the cross intended simply to honor our Nation's fallen soldiers." *Id.* at 1816–17.

Finally, relying on Justice Breyer's concurring opinion in *Van Orden*, the *Salazar* plurality reiterated the key role that longevity plays in the Establishment Clause analysis of a permanent display.

> Time also has played its role. The cross had stood on Sunrise Rock for nearly seven decades before the statute was enacted. By then, the cross and the cause it commemorated had become entwined in the public consciousness. Members of the public gathered regularly at Sunrise Rock to pay their respects. Rather than let the cross deteriorate, community members repeatedly took it upon themselves to replace it. Congress ultimately designated the cross as a national memorial, ranking it among those monuments honoring the noble sacrifices that constitute our national heritage. . . . . It is reasonable to interpret the congressional designation as *giving recognition to the historical meaning that the cross had attained*.

*Id.* at 1817 (emphasis added).

Reminiscent of the monuments in *Van Orden* and *Salazar*, the Knights of Columbus' Monument has remained an established part of the ski resort landscape for over fifty years. There is no evidence of any impermissible purpose on the part of the National Forest in granting the permit, and the Monument has become part of the history and culture of the local area. Regardless of what some may call the Monument, it is not a religious shrine where people go to worship. Like *Van*

*Orden*, the Monument's ski slope setting does "not readily lend itself to meditation or any other religious activity. But it does provide a context of history," 545 U.S. at 702; it is a landmark monument honoring WWII veterans in the midst of a ski resort. Permitting the Monument to remain does not establish or endorse a religion any more than permitting the ski resort to operate endorses everything the resort may stand for. Removing the fifty-nine year old Monument per a heckler's veto would demonstrate constitutionally impermissible hostility towards religion, not neutrality.

### C. The Ninth Circuit's Religious Display Cases Also Support the Conclusion that the Monument Is Not An Unconstitutional Endorsement of Religion.

In *Card v. City of Everett*, the Ninth Circuit followed *Van Orden's* teaching that longevity is a key factor in permanent religious display cases, and upheld the constitutionality of a Ten Commandments monument outside an old city hall. 520 F.3d 1009, 1010, 1021 (9th Cir. 2008). In *Card*, the court considered a six foot-tall Ten Commandments monument placed near several secular memorials, including a September 11 memorial, a Medal of Honor memorial, a county war memorial, an Armed Forces monument and a "monument to the common worker." *Id.* at 1011. The monument was built and funded by the Fraternal Order of Eagles in 1959 in an effort to "provide youngsters with a common set of values and a common code of

conduct." *Id.* at 1012.  The monument went unchallenged for over thirty years, the first complaints being filed in the 1990s.  *Id.*

Evaluating the history and circumstances surrounding the monument, the court concluded that: 1) "nothing apart from the monument's text suggests a religious motive on the City's part;" 2) the Eagles had funded and erected the monument and the City accepted the monument as a "testament to the Eagles' lengthy relationship with, and contributions to, the City;" 3) the monument included "a prominent inscription showing that it was donated to the City by a private organization; 4) the setting of the monument "suggest[ed] little or nothing of the sacred;" 5) the monument was the "only facially religious monument" among several others and was surrounded by "trees and shrubs" that "impair[ed] most views" of it; and 6) it lacked any lighting or benches which might "lend itself to meditation or any other religious activity."  *Id.* at 1020–21 (quoting *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring)).

Most importantly, however, the court stated that the monument had been in place for over thirty years before any complaints were filed against it.  *Id.* at 1021. Relying on Justice Breyer's controlling opinion in *Van Orden,* the court held this factor "determinative."   *Id.*  The removal of long-standing monuments would "exhibit hostility toward religion" and "create the very kind of religiously based

divisiveness that the Establishment Clause seeks to avoid." *Id.* (quoting *Van Orden*, 545 U.S. at 704).

The Ninth Circuit's decision in *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011) is distinguishable and provides no support for the argument that the Monument violates the Establishment Clause. *Trunk* involved a "towering" forty-three foot cross atop Mt. Soledad. *Id.* at 1101. Though the cross had been erected in 1913, it had not been designated as a war memorial until 1989. *Id.* at 1119. In 1954, it had been designated "as a reminder of God's promise to man of everlasting life and of those persons who gave their lives for our freedom." *Id.* at 1101. The government action in question was a Congressional Act in 2006 in which Congress took ownership of the memorial. *Id.* at 1101–02.

Heeding *Van Orden*'s instruction to evaluate the facts and history surrounding the Mt. Soledad cross, the *Trunk* court held that although Congress's purpose in acquiring the land on which the cross stood was unquestionably secular, the primary effect of Congress's action was to convey an endorsement of religion. *Id.* at 1102, 1124–25. In support of this conclusion, the court found a number of facts relevant: the city had a history of anti-Semitism; the cross had a long history of religious use because religious services were frequently held at the base of the cross; the cross was dedicated as a war memorial only in 1989, and the cross was the dominant figure in the area. *Id.* at 1116, 1121–22. Taking these factors into

13

account, the court held that "the Memorial, presently configured as a whole, primarily conveys a message of government endorsement of religion that violates the Establishment Clause." *Id.* at 1125. In conclusion, however, the court noted that, "[t]his result does not mean that the Memorial could not be modified to pass constitutional muster," and though the court thought that "crosses are not generally used as war memorials," *Id.* at 1123–24, that did not "mean that no cross can be part of [a] veterans' memorial." *Id*. at 1010, 1021.

### D. Supreme Court and Ninth Circuit Precedent Regarding Displays' History and Setting Compel the Conclusion That the Monument Is Constitutional.

*Van Orden, Salazar* and the Ninth Circuit cases all point to the conclusion that the Monument does not violate the Establishment Clause. Given its history and purpose, its longevity, and its setting, no reasonable observer could view the Monument as a governmental endorsement of religion.

A private organization, the Knights of Columbus, built and maintained the Monument in 1954 to remind the community of the tragedies of war. Statement of Undisputed Facts [hereinafter "SUF"] at ¶ 5. It was modeled after statues encountered by WWII soldiers in European towns and villages. SUF at ¶ 5 The Forest Service's archaeologist recognized the historical importance of the Monument and the Montana Historical Society agreed. SUF at ¶¶ 22–28. Thus, the purpose of the Monument was "*not* an attempt to set the *imprimatur* of the state on

a particular creed. Rather, those who erected the [statue] intended simply to honor our Nation's fallen soldiers." *Salazar*, 130 S. Ct. at 1816–17 (plurality).

The Monument's setting does not convey any government religious endorsement of religion because it is surrounded by a private ski resort, and thus leaves the strong impression that the Monument is owned and controlled by the resort owners. SUF at ¶ 36. Unlike the cross in *Trunk*, the Monument is not prominently placed so as to make it "dominate" the surrounding area. Rather, the Monument is on a mountaintop with a forest of trees at its back, far from any government structures.

Equally important is the fact that, unlike the cross at issue in *Trunk*, the setting does not lend itself to religious activities, and there is no evidence that the Monument has ever been used for religious purposes. Rather, as the Montana Historical society says, "it is not considered to be a religious site because . . . people do not go there to pray, but it is a local landmark that skiers recognize, and it is a historic part of the resort." SUF at ¶ 27.

Finally, and most importantly, until last year, the Monument has gone unchallenged since its establishment in 1954, almost sixty years ago. SUF at ¶ 5, 8. Removal of the historic Knights of Columbus Monument could convey "disrespect for the brave soldiers whom the [Monument] was meant to honor" and be

15

"interpreted by some as an arresting symbol of a Government that is not neutral but

hostile on matters of religion." *Salazar*, 130 S. Ct. at 1823 (Alito, J., concurring).

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court dismiss

FFRF's Complaint with prejudice.


Respectfully submitted,


Richard M. Baskett
Baskett Law Office
210 North Higgins Ave, Suite 234
Missoula, MT 59802
Phone: (406) 549-1110
Fax: (406) 642-7037

Jay Alan Sekulow*
Stuart J. Roth*
AMERICAN CENTER FOR
    LAW & JUSTICE
201 Maryland Ave., N.E.
Washington, D.C. 20002
Phone:  (202) 546-8890
Fax: (202) 546-9309

Cecilia D. Noland-Heil*
Laura B. Hernandez*
AMERICAN CENTER FOR
    LAW & JUSTICE
1000 Regent University Dr.
Virginia Beach, VA 23464
Phone: (757) 226-2489
Fax: (757) 226-4574
CHeil@aclj.org


*Counsel for Amici Curiae*
*\* - not admitted before this court*

16

## CERTIFICATE OF COMPLIANCE WITH RULE 7.1(d)

The undersigned counsel of record for *Amici* certifies that this brief complies with the type-volume limitation of Rule 7.1(d) because this brief contains 3,847 words, excluding the parts of the brief exempted by Rule 7.1(d).


Dated: January 25, 2012

/s/ Richard M. Baskett
Richard M. Baskett
*Counsel for Amici Curiae*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2012, I electronically filed a copy of the foregoing *Amici Curiae* Brief using the ECF System which will send notification of that filing to all counsel of record in this litigation.

Dated: January 25, 2012

/s/ Richard M. Baskett
Richard M. Baskett
*Counsel for Amici Curiae*