## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION FOUNDATION, INC.,**<br>a Wisconsin Non-Profit Corporation, | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. CV 12-19-M-DLC** |
| **CHIP WEBER, Flathead National Forest Supervisor,** | ) ) ) | |
| **and** | ) ) | |
| **UNITED STATES FOREST SERVICE,** an Agency of the United States Department of Agriculture, | ) ) ) ) | |
| **Defendants,** | ) ) | |
| **and** | ) ) | |
| **WILLIAM GLIDDEN, RAYMOND LEOPOLD, NORMAN DEFOREST, EUGENE THOMAS, and the KNIGHTS OF COLUMBUS** (Kalispell Council No. 1328), | ) ) ) ) ) ) | **Hon. Dana L. Christensen** |
| **Intervenor-Defendants.** | ) | |

---

### PLAINTIFF'S BRIEF OPPOSING MOTIONS FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ............................................................................ 2

II. BRIEF SUMMARY OF FACTS ...................................................... 4

III. MEMBERS OF FFRF HAVE HAD UNWANTED EXPOSURE TO THE JESUS STATUE SO AS TO CONFER ASSOCIATIONAL STANDING..... 11

  A. Unwelcome Contact With, Or Avoidance Of, An Offensive Religious Display On Public Land Provides A Basis For Standing.......................................................................... 12

  B. FFRF Members Have Had Direct Contact With, Or They Have Avoided, The Shrine On Big Mountain, Which is Sufficient For Purposes Of Standing ...................................................... 15

  C. FFRF Has Associational Standing Based On The Standing Of Its Individual Members. ........................................................ 16

  D. FFRF Has Members With Personal Standing Sufficient To Provide Associational Standing And If Not, Then A Curative Amendment Is Appropriate........................................... 17

IV. THE BIG MOUNTAIN SHRINE HAS THE PURPOSE AND EFFECT OF ADVANCING RELIGION IN VIOLATION OF THE ESTABLISHMENT CLAUSE .......................................................... 19

  A. The *Lemon* Test Is Applicable To Religious Displays Like The Big Mountain Shrine ............................................................... 19

  B. The Big Mountain Shrine Was And Is Intended As A Religious Display ............................................................................... 20

  C. The Shrine On Big Mountain Has The Primary Effect Of Advancing Religion, Including Because The Shrine Gives The Appearance Of Endorsement .................................................................. 25

V.    ENFORCEMENT OF THE ESTABLISHMENT CLAUSE DOES NOT          31
      EVINCE HOSTILITY TO RELIGION........................................................

      CONCLUSION.............................................................................................          35

## **TABLE OF CASES**                                        **Page**

*American Atheists, Inc. v. Duncan*,
637 F.3d 1095, 1122 (10th Cir. 2010) ...................................   21, 25, 34

*Barnes-Wallace v. City of San Diego*,
530 F.3d 776, 784 (9th Cir. 2008) ...........................................   13, 14

*Buono v. Norton*,
371 F.3d 543, 547 (9th Cir. 2004) ...........................................   12, 13, 31

*Caldwell v. Caldwell*,
545 F.3d 1126 (9th Cir. 2008) ..................................................   13, 14

*Capitol Square Review and Advisory Board v. Pinette*,
515 U.S. 753 (1995) ..................................................................   33

*Card v. City of Everett*,
525 F.3d 1009, 1016 (9th Cir. 2008) .........................................   19

*Catholic League for Religious and Civil Rights v.*
*City and County of San Francisco*,
624 F.3d 1043, 1049 (9th Cir. 2010) .........................................   11, 13

*Delta Coal Program v. Libman*,
743 F.2d 852, 856 (11th Cir. 1984) ..........................................   17

*Ellis v. La Mesa*,
990 F.2d 1518 (9th Cir. 1993) ..................................................   13

*Freedom From Religion Foundation v. Marshfield*,
203 F.3d 487 (7th Cir. 2000) ....................................................   22

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*,
528 U.S. 167, 181 (2000) ..........................................................   15

*Johnson v. Poway Unified School District*,
658 F.3d 954, 972 (9th Cir. 2011) ............................................   30

*Lemon v. Kurtzman*,
403 U.S. 602, 612-13 (1971) ....................................................   18, 19

*Marsh v. Chambers,*
463 U.S. 783, 790 (1983) ........................................................... 30, 31

*McCreary County v. ACLU,*
545 U.S. 844 (2005) ................................................................... 18, 19,
20, 32, 33

*McGinley v. Houston,*
282 F. Supp. 2d 1304, 1307 (M.D. Ala. 2003),
*aff'd.*, 361 F.3d 1328 .................................................................. 30

*Mercier v. City of LaCrosse,*
276 F. Supp. 2d 961, 974 (W.D. Wis. 2003) ............................ 21

*Newdow v. LeFevere,*
598 F.3d 638, (9th Cir. 2010) .................................................... 12

*Pacific Rivers Council v. United States Forest Service,*
689 F.3d 1012 (9th Cir. 2012) .................................................... 16

*Pleasant Grove City v. Summum,*
555 U.S. 460, 129 S. Ct. 1125, 1138 (2009) ............................ 33

*Salazar v. Buono,*
130 S. Ct. 1803 (2010) ............................................................... 31, 32

*Smith v. CHF Industries,*
811 F. Supp. 2d 766, 774 (S.D.N.Y. 2011) .............................. 17

*Trunk v. City of San Diego,*
629 F.3d 1099 (9th Cir. 2011) .................................................... 19, 24, 25,
26, 27, 28,
29, 32

*Van Orden v. Perry,*
545 U.S. 677 (2005) ................................................................... 18, 19, 27,
28, 32

*Vasquez v. Los Angeles,*
487 F.3d 1246, 1250 (9th Cir. 2007) .......................................... 11, 12,
13,30

*Suhre v. Haywood County,*
131 F.3d 1083, 1085 (4th Cir. 1997) .......................................... 11

## <u>TABLE OF OTHER AUTHORITIES</u>  <u>PAGE</u>

<u>Public Displays of Affection for God</u>: *Religious Monuments after McCreary and Van Orden*,
32 Harv. J. L. & Pub. Pol'y., 231, 246 (2009)........................................... 19

## I.   <u>INTRODUCTION</u>

The suggestion that a permanent shrine with a six-foot statue of Jesus Christ, standing by itself in the forest on federal land, does not convey a religious impression is unsupported by evidence or common sense.  The shrine was intended as and approved by the Forest Service as a religious shrine -- and Jesus on Big Mountain remains a government-favored religious icon today.

A religious shrine on government land does not pass constitutional muster even if supported by a popular interest group.  One story now told about the Jesus Shrine is that retiring WWII veterans wanted such a religious shrine like those they saw in Europe, but this does not make the shrine any less a religious display.  A shrine is a shrine, and here, the intent and purpose remain just such, *i.e.*, a place of comfort for Catholics.

The Defendants' argument, reduced to its essence, otherwise would mean that religious iconography on public land is acceptable if supported by popular interest groups.  The Establishment Clause, in other words, would be subject to majoritarian or popular demand, according to the Defendants.  That, however, is not the lesson of our Constitution -- nor a paradigm for historical success, as world-wide religious conflict attests.  The Establishment Clause is intended as a prophylactic against divisiveness, rather than a remedy in search of sectarian conflict.

Religious icons on public land can not be sanctified by local celebrity status.  Here, Jesus on Big Mountain has achieved notoriety because it is incongruously sited on government land.  The Jesus Shrine derives its cachet from being out-of-place in the middle of Forest Service land.  Move the statue to a local church and it is far less notable

as a memorable religious display.  Religious promoters, like the Knights of Columbus, therefore, benefit with their religious icons on public land precisely it makes them stand out.  The dissonance of a religious shrine in a government forest may result in irreverence by some, but only because the shrine is perceived as a misplaced religious display.

The Defendants' argument that the Jesus Shrine is historically significant, but not a war memorial or a religious display, is not credible.  It is historically significant because it is a religious display.  In fact, the oral histories documented by the Defendants' own historian confirm the local perception of the statue as being religiously significant. The Defendants' "comforting" description of the Jesus Shrine derives from its religious imagery.

The suggestion, moreover that a stand-alone religious shrine should remain on public land because it has been there a long time is not constitutionally sound.  The Supreme Court has consistently recognized that unconstitutional acts are not justified solely because they have previously gone uncorrected.  Here, the Jesus Shrine originated, and remains, identifiably and deliberately religious.   That is the perception of a reasonable observer.

The Forest Service itself has documented that the Shrine is inappropriate on Big Mountain -- but the Forest Service has perpetuated its presence in order to avoid criticism by religious proponents.  The Forest Service has recognized that the Jesus Shrine would not be approved under applicable standards, but Knights of Columbus's Sacred Heart of Jesus Shrine has been preferentially finagled and permitted.  Just as individuals offended

by the Jesus Shrine are discouraged from making objection, so too the Forest Service has been influenced by the cacophony of Christian supporters of the Shrine.

The perception of the Jesus Shrine on Big Mountain as a religious icon cannot be denied.  The Shrine is a distinctively religious icon, in a stand-alone location on public land, so as to draw attention to it as a religious symbol.  Such a striking display, preferentially and permanently located on government land, gives the unmistakable impression of religious endorsement, and that violates the Establishment Clause.

Government land cannot constitutionally be used for permanent religious displays. The attempt here to make religious orthodoxy a matter of popular acclaim is the reason that the Establishment Clause prohibits government endorsement of religion, in order to protect matters of conscience for all.  The separation of church and state is the *sine qua non* of the Establishment Clause.

## II.   <u>BRIEF SUMMARY OF FACTS</u>

The looming Shrine on Big Mountain, consisting of a six-foot statue of the Sacred Heart of Jesus, stands by itself on Forest Service property as a striking figure.  (Bolton Dec.; Exh. 19.)  The Statue is patently recognizable as Jesus Christ, an obvious Christian religious figure.  (PSDF ¶ 132).[1]  The Christ figure stands alone and is not part of a larger display of historical figures or artifacts.  The Statue is six-foot tall, on a seven-foot pedestal, overlooking one of the most beautiful sights on the Mountain.  (PSDF ¶ 71.) The image of Christ, in short, provides a dramatic sight to passing skiers on nearby trails.

---

[1]   Plaintiff's Statement of Disputed Facts is filed herewith.  References to Plaintiffs' Statement of Disputed Facts are identified in this Brief as "PSDF."

(Bolton Dec.; Exh. 19.)   In fact, the Shrine is a well-known sight on Big Mountain. (PSDF ¶ 69.)

The Christ Statue on Big Mountain is intended as a religious shrine. (PSDF ¶ 6-7.) The application for permit to the Forest Service makes that unambiguous.   The authorization from the Forest Service further makes clear that the intent of the Forest Service was to approve the permit "for the purpose of erecting a religious shrine overlooking the Big Mountain ski run." (PSDF ¶ 12.) Contemporary descriptions of the dedication of the Christ Statute in 1954 further make clear that the Shrine was intended for its religious significance. (PSDF ¶ 40.) The Knights, moreover, still adhered to this original intent even in its October 2011 Appeal Letter, stating:

> The Statue has been in place and permitted to exist there on National Forest land since 1953.  WWII veterans and local Knights of Columbus applied for and received permission to locate the memorial there for the purpose of perpetually remind themselves and others what it was that sustained them through the horrors of the war.  (Bolton Dec.; Exh. 8.)

The Shrine on Big Mountain is unconvincingly defended as a war memorial -- no contemporaneous historical evidence supports that conclusion.  (PSDF ¶ 66.) The current creation story for the Shrine, however, does not deny the religious significance of the Jesus Statue.  According to recent lore, returning Roman Catholic veterans were inspired by religious shrines in the mountains of Europe, and the Shrine on Big Mountain allegedly is intended as a similar religious display.  (PSDF ¶ 64.) In essence, the recent explanation for the Shrine does not deny its religious significance or purpose, but simply defends it as the desire of its sponsors.  Even the Defendants' commissioned historical

research, however, does not deny that a supposed war memorial can have religious significance.  (PSDF ¶ 126.)

The Shrine on Big Mountain is not typical of war memorials, in any event.  (PSDF ¶ 70, 81, 82.)  Conventional memorials obviously exist that include images or references to local war heroes, including war memorials on private land.  What makes the Shrine on Big Mountain distinctive, however, is its obvious religious significance.  As one defender of the Shrine aptly noted, "if the Statue on our mountain had been anything other than Christ, it'd be a non-event ... If it had been, you know, a statue of a 10th Mountain Division soldier carrying a rifle, there would have been a non-event today."  (PSDF ¶ 82.)  The fact that the Shrine depicts Christ, however, is the constitutionally significant point.

The Shrine's uniqueness makes the presence of Christ on the Mountain a well-known fact and attraction.  (PSDF ¶ 69.)  The Defendants' commissioned history notes that the Christ Statue is a popular meeting place, although the Shrine is "discreetly" located for its serene and meditative emphasis.  (PSDF¶ 65.)  Despite the fact that even the nearby ski resort does not identify itself with the Shrine in advertising or promotion, the skiers who come to Big Mountain, nonetheless, are unavoidably exposed to this religious icon.

The Defendants' historical research confirms repeatedly that the Statue of Christ is recognized for its religious significance.  (PSDF ¶ 73, 77, 84, 88 , 97.)  The researcher, Ian Smith, interviewed several local residents, many of whom commented on the distinctly religious meaning that the Statue of Christ has for them.  As one individual commented, "it's just a reminder that He is constantly watching over us and protecting us

Page **5** of **42**

in His, in one of His own ways we have no control over."  (PSDF ¶ 77.)  Despite such direct evidence of the religious perception of the Christ Statue, however, the researcher allegedly made no attempt to determine whether the Christ Statue is perceived as religious.  (PSDF ¶ 114-116.)

The historian acknowledges that the Shrine actually is used periodically for religious services.  (PSDF ¶ 67.)  According to Mr. Smith, however, most people just observe the Statue, which he considers a secular "use," regardless whether skiers perceive the Shrine as having religious significance.

Mr. Smith, instead spends considerable time discussing the "playful and irreverent" interactions by some with the Jesus Statue.  Mr. Smith, however, has no idea what percentage of persons exposed to the Shrine engage in such behavior.  (PSDF ¶ 118m 122.)  He also did not consider whether playfulness and irreverence result from the perception that a Catholic Shrine on public land is incongruously out-of-place.  (PSDF ¶ 124.)  Mr. Smith interviewed no one who engaged in such behavior.  (PSDF ¶ 124.)

The Forest Service, however, has long recognized that a shrine does not meet established standards for government approval.  The Forest Service, however, has repeatedly decided to renew authorization in order to avoid "notoriety."  (PSDF ¶ 54.)  In April of 2011, Forest Service personnel nonetheless recognized the inappropriateness of reauthorizing the Shrine, but officials still wanted to avoid controversy; therefore, they advised that the Forest Service should "play up the historic nature of the site."  (PSDF ¶ 50.)  As Margaret Gorski emphasized, "push the historic significance," by calling the

Shrine a "heritage site," and "push the story behind the 10th Mountain Division."  (PSDF ¶ 49.)  Other Forest Service officials, however, have recognized that the Forest Service "would not entertain one of these permit requests today."  (PSDF ¶ 49.)

The Forest Service had already recognized, on February 22, 2011, that the questions before the Forest Service were quite simple:  "Do we reissue the permit?  Even though it is a religious monument on FS (Forest Service) land?  Do we continue Free Use/Fee Waiver as done in the past, even though this does not fit a category for fee waiver?"  (PSDF ¶ 51)  The answer to these questions, Forest Service officials recognized, would be affected by the media attention that the Missoulian and Beacon bring to the matter.  (PSDF ¶ 52.)

The Knights of Columbus, for their part, were still acknowledging the Jesus Statue's religious significance in a meeting with Forest Service officials in June of 2011. At that meeting, the Knights described the Statue as a "multi-denominational religious statue" that "speaks to all religions."  (PSDF ¶ 43.)  The Forest Service Heritage Specialist, however, concluded that the Statue did not have "historical significance." (PSDF ¶ 44.)  The Forest Service also significantly noted that it "had "rejected proposals from other groups to put monuments, grave markers, crosses, etc., on Forest Service land (for instance, grave markers in the Jewel Basin Hiking Area, war memorial crosses near the Desert Mountain Communications Site, memorial signs/plaques at various trailheads; spreading cremation ashes at the North Fork, air dropping cremation ashes in the Bob Marshall Wilderness, etc.).").  (PSDF ¶ 45.)

As a result, the Forest Service initially denied renewal of reauthorization for the Shrine because of its religious significance, and "furthermore, the Statue and its religious objective can be accommodated on adjacent private land." (PSDF ¶ 16-17.) The Defendant Weber further concluded that "Supreme Court decisions and recent case law that set the precedent regarding monuments with religious themes and icons with religious themes," prohibit such religious displays on public land. (PSDF ¶ 18.)

The Forest Service, as it feared, faced immediate criticism of its decision by religious and veterans interests, including intense lobbying by Representative Denny Rehberg. (PSDF ¶ 21.) Within a week of denying authorization, therefore, the Forest Service asked the Montana State Historic Preservation Office (MSHPO) to "concur" in a statement that the Shrine was eligible for listing on the National Register of Historic Places. (PSDF ¶ 24-28.) The record does not indicate any Forest Service study or analysis underlying its "historical" about-face. The Forest Service, however, did recognize the fancy footwork needed to reach such a disingenuous conclusion, noting that "the Statue of Jesus cannot be considered eligible for its association either with the soldiers who fought in WWII, nor for its association with Jesus." (PSDF ¶ 26.) The Forest Service, therefore, asked the MSHPO to agree that the Jesus Statue now has no association with Jesus or WWII veterans.

The MSHPO then dutifully did "concur" that the Jesus Shrine "is not believed to be a religious site because unlike Lourdes or Fatima, people do not go there to pray." (PSDF ¶ 29.) The MSHPO did not explain, however, how a statue of Christ has no

association with Christ or WWII veterans.  The MSHPO also described no investigation or study to support its concurrence.

After capitulating to popular opinion, the Forest Service considered how to manipulate public perception of the Statue, including by directing "focus on historical values rather than religious ones."  (PSDF ¶ 54.)  Forest Service personnel were told to emphasize "the Statue's association with early ski hill development, and then as secular (people go there to play) rather than a religious context (people go there to pray)."  (PSDF ¶ 59.)  With these guiding principles, the Forest Service then reapproved the Shrine on Big Mountain.  (PSDF ¶ 32.)

The fact remains, however, that many non-believers, and non-Christians, are offended and marginalized by the government's preferential treatment of the Jesus Shrine on Big Mountain.  The Forest Service received public comments opposing the Statue, although not as many as the 70,000 form letters submitted by a Christian advocacy group and the 10,000 letters solicited by Representative Rehberg.  (PSDF ¶ 30.)  FFRF also received contact from persons offended by the religious icon, including honored veterans.  (PSDF ¶ 42.)  FFRF member Pamela Morris, moreover, has deliberately avoided Big Mountain precisely because of the Shrine.  (PSDF ¶ 168, 170, 178.)  Bill Cox, another FFRF member, still skis on Big Mountain, but he finds the Jesus Statue to be wholly inappropriate and offensive, including to his Jewish wife.  (PSDF ¶ 156.)

The Flathead Valley, however, is a very Christian-fundamentalist area where outspoken opposition to a Catholic Shrine is not quickly forgiven; in fact, it is discouraged.  (PSDF ¶ 161-162.)  FFRF member Doug Bonham lives in the Flathead

Valley and he knows from personal experience that the Shrine is perceived as a religious symbol and reminder of the Christian values that the majority in the Valley promote. (PSDF ¶ 159.)  The presence of Jesus on Big Mountain is known to skiers and non-skiers alike in the Valley, and it is perceived as and understood to be a recognized symbol of the religious majority.  (PSDF ¶ 160.)  Objection to the Statue, therefore, is implicitly, if not explicitly, discouraged.  (PSDF ¶ 161.)  The Shrine, nonetheless, literally and figuratively looms over the Valley, where it has the effect of making non-believers, like Mr. Bonham, feel marginalized in their own local community.  (PSDF ¶ 162.)

## III.    MEMBERS OF FFRF HAVE HAD UNWANTED EXPOSURE TO THE JESUS STATUE SO AS TO CONFER ASSOCIATIONAL STANDING

### A.    Unwelcome Contact With, Or Avoidance Of, An Offensive Religious Display On Public Land Provides A Basis For Standing.

Article III standing exists for individuals who have unwelcome contact with an offensive religious display on public land.  The Ninth Circuit Court of Appeals has consistently reached this conclusion, after recognizing that "the concept of a 'concrete' injury is particularly elusive in the Establishment Clause context ... because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary nature."  *Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010).  With this in mind, the Court has consistently upheld standing on the basis of contact with religious images, including in numerous display cases.  *Id.* at 1050.

As the Court noted in *Vasquez v. Los Angeles*, 487 F.3d 1246, 1250 (9th Cir. 2007), *citing Suhre v. Haywood County*, 131 F.3d 1083, 1085 (4th Cir. 1997), the

injury that gives standing to plaintiffs in the Establishment Clause context is the injury caused by unwelcome contact with a religious display that appears to be endorsed by the state. *Id*. at 1251. This is just such a case, where FFRF's members, including William Cox, have had direct proximity to the Shrine on Big Mountain. Similarly, Ms. Morris has affirmatively altered her conduct in order to avoid Big Mountain.

FFRF member Doug Bonham also is affected by the omnipresence of the Jesus Statue, as a participating member of the Flathead Valley local community. As the court recognized in *Suhre*, 131 F.3d at 1087, "plaintiffs who are part of the community where a challenged religious symbol is located and are directly affronted by the presence of this symbolism certainly have more than an abstract interest in seeing that the government observes the Constitution." Thus, where there is a personal connection between the plaintiff and the challenged display in his or her home community, standing is established by the proximity to the conduct challenged.

The majority of other Circuits also have held that spiritual harm resulting from contact with an offensive religious symbol provides a sound basis for Article III standing. *Vasquez*, 487 F.3d at 1253. Unwelcome contact, even without avoidance, therefore, is enough to establish a legally cognizable injury and, therefore, standing. *Id*. at 1250 n. 4. *See also*, *Newdow v. LeFevere*, 598 F.3d 638 (9th Cir. 2010) (plaintiff had standing to challenge statute requiring inscription of "In God We Trust" on currency because he was forced to "encounter a religious belief he finds offensive").

The Ninth Circuit, moreover, does not distinguish between ideological and religiously-motivated objections to religious displays, although the objectors here are all

non-believers.  In *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004), the defendants suggested that the Supreme Court's decision in *Valley Forge* required that a plaintiff's offense be grounded in religious beliefs, rather than ideological values.  The Ninth Circuit rejected this interpretation, concluding that in *Valley Forge*, the plaintiffs lacked standing because their sense of offense was unaccompanied by a personal affront suffered as a consequence of the alleged constitutional violation.  According to the Ninth Circuit, the lack of a consequential personal injury, not the origin of the offense, resulted in the denial of plaintiffs' standing.  In *Valley Forge*, unlike the present case, the plaintiffs had no proximity to the site of their complaint.

The "psychological consequence" of unwanted exposure to religious displays, therefore, does constitute concrete harm where it is produced by direct exposure in one's own community.  *Catholic League*, 624 F.3d at 1052.  *See also, Vasquez*, 487 F.3d at 1252 ("unlike plaintiffs in *Valley Forge*, who were physically removed from defendant's conduct, Vasquez is a member of the community where the allegedly offending symbol is located").  FFRF's members satisfy this criterion.

The Ninth Circuit also has consistently found standing where an offensive religious display on public land has caused "affirmative avoidance" of the display, leading to an "impaired ability to freely and unreservedly use public land."  *Buono v. Norton*, 371 F.3d 543, 547 (9th.Cir. 2004).   Affirmative avoidance is sufficient to establish standing, but the Ninth Circuit does not require it.  "Unwelcome direct contact, without avoidance, is enough to establish a legally cognizable injury for purposes of standing."  *Vasquez*, 487 F.3d at 1252-53.  *See also, Barnes-Wallace v. City of San*

*Diego*, 530 F.3d 776, 784 (9th Cir. 2008) (plaintiffs had standing when they would not use public land because of religious use); *Ellis v. La Mesa*, 990 F.2d 1518 (9th Cir. 1993) (standing found to exist where plaintiffs avoided using land on which cross was displayed).

The Defendants' reliance on *Caldwell v. Caldwell*, 545 F.3d 1126 (9th Cir. 2008), is misplaced in the present case. The alleged injury in *Caldwell* was found to be too tenuous, in context, but the Court did not disavow direct contact or affirmative avoidance of a religious display as sufficient for purposes of standing. *Caldwell*, more pointedly, held that the plaintiff lacked standing to raise an Establishment Clause claim arising from discussion of religious views on a website created and maintained by the University of California. *Id*. at 1132. The Court denied standing in *Caldwell* because the plaintiffs' objection was too "abstract" and "tenuous." *Id*. *Caldwell* is distinguishable from the present case, however, because the Plaintiffs here are not mere bystanders. *Barnes-Wallace*, 530 F.3d at 785-86. On the contrary, the Court has held in numerous cases that injury is sufficient to establish standing under the Establishment Clause where an individual affirmatively avoids public land in order to resist exposure to a religious display. That is the case in the present matter.

### B.   FFRF Members Have Had Direct Contact With, Or They Have Avoided, The Shrine On Big Mountain, Which is Sufficient For Purposes Of Standing.

FFRF member Pamela Morris has affirmatively avoided Big Mountain because of the Shrine. Ms. Morris is a long-time skier in Montana, for more than 60 years, but she has skied clear of Big Mountain in order not to have direct contact with the Jesus Statue.

(PSDF ¶ 168, 170.)   Ms. Morris' avoidance has continued ever since she first encountered the Shrine as a teenager, at which time she was profoundly offended.  (PSDF ¶ 168.)

FFRF member William Cox also has had continuing direct unwanted contact with the offensive display on Big Mountain.  (PSDF ¶ 156.)  The Defendants unpersuasively try to discredit Mr. Cox's sincere and profound objection to the Jesus Shrine, as a simple disagreement with the government's decision to reauthorize the religious shrine on Big Mountain.  The Defendants characterize Cox as suffering mere psychological injury caused by disagreement with the government.  Where the offense is caused by direct contact, within one's own community, however, this is precisely the type of concrete and personal injury sufficient to confer standing.  Mr. Cox has had frequent and regular unwanted contact with the Jesus Statue at issue.  He lives only 15 miles from Big Mountain and he regularly skis there each winter.  Both his past and future exposures to the Shrine, therefore, are sufficient to establish standing in Cox's own right under applicable Ninth Circuit precedent and this court's own prior rulings.

The effect of the Shrine, moreover, impacts both skiers and non-skiers in the Flathead Valley.  FFRF member Doug Bonham explains that the Jesus Shrine has a looming omnipresence throughout the Valley which impacts him even though he is no longer able to ski.  (PSDF ¶ 159.)  Within his community, the Shrine is widely recognized and perceived as a symbol of religious preference and endorsement.  (PSDF ¶ 159.)  According to Mr. Bonham, moreover, persons who object to the Jesus Statue being on Big Mountain are discouraged and marginalized within the Valley.  (PSDF

¶ 162.)   Where such personal impact of a religious display occurs within one's own political community, the offense is sufficiently concrete for purposes of standing.

### C.   FFRF Has Associational Standing Based On The Standing Of Its Individual Members.

An organization may sue on behalf of its members who would have standing to sue in their own right.  *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181 (2000); *Pacific Rivers Council v. United States Forest Service*, 689 F.3d 1012 (9th Cir. 2012).   In the present case, FFRF has submitted declarations from three different members who would have standing in their own right to raise objections to the Jesus Statue on Big Mountain, including Mr. Cox, Ms. Morris, and Mr. Bonham.  In the case of Mr. Cox, personal standing is based upon past and continuing direct unwanted contact with the Jesus Statue.   In the case of Ms. Morris, she has affirmatively avoided a significant and beautiful ski area in order to avoid the Jesus Statue.  With respect to Mr. Bonham, he resides in the community in which the Jesus Statue exerts an omnipresent endorsement of religion and marginalization of non-believers like himself.

### D.   FFRF Has Members With Personal Standing Sufficient To Provide Associational Standing and if not, then a curative amendment is appropriate.

The Knights of Columbus object to FFRF's associational standing because FFRF supposedly did not have members with standing at the time that the complaint in this matter was filed on February 8, 2012.  In fact, however, both Pamela Morris and Doug Bonham quite willingly became members of FFRF on February 3, 2012, because of

FFRF's common objection to the Shrine on Big Mountain.  (*United States Forest Service*, 188-189.)

      The objection to Mr. Cox, moreover, ignores the reality that he has functionally always been represented by FFRF since the outset of this litigation.  The Knights of Columbus note that Mr. Cox officially became a member of FFRF on February 18, 2012, 10 days after the suit was filed.  On the other hand, the Knights do not deny that his interest in this suit is in complete alignment with the Freedom From Religion Foundation, and he premises his objection to the Shrine on the same operative facts and cause of action instituted by FFRF.  Mr. Cox seeks to vindicate the same claims advanced by FFRF, *i.e.*, the very same cause of action that is at stake.  Even if the pending complaint was to be dismissed without prejudice for want of jurisdiction, therefore, Mr. Cox could simply file a new lawsuit, with the same claims now pending in this Court.  Judicial economy warrants that this action proceed now without such delay and waste precipitated by a second filing.

      If the Court deems Mr. Cox's membership date decisive, however, then FFRF alternatively requests the Court for leave to amend the pleadings to allege specifically that Mr. Cox, Ms. Morris and Mr. Bonham are present FFRF members.  FFRF alternatively moves to add these members as plaintiffs.  Requiring them to file a new action would needlessly consume the additional resources of the parties and the Court.

      This Court, moreover, would not exceed its power by exercising jurisdiction over this controversy as long as there exists a substantial identity of interest between FFRF and its members, and as long as the pleadings set forth the same facts upon which the

parties base their invocation of the Court's jurisdiction.  *Cf. Delta Coal Program v. Libman*, 743 F.2d 852, 856 (11th Cir. 1984); *Smith v. CHF Industries*, 811 F. Supp. 2d 766, 774 (S.D.N.Y. 2011) (substitution would not alter substance of action and is wiser answer to starting over).  Here, Mr. Cox, Ms. Morris and Mr. Bonham each has such an identity of interest with Freedom From Religion Foundation, and their claims have functionally been before the Court since the outset.  The operative facts and the cause of action would not be changed, but only the formally named plaintiffs, if Mr. Cox, Ms. Morris and Mr. Bonham are added as named plaintiffs.

## IV.   THE BIG MOUNTAIN SHRINE HAS THE PURPOSE AND EFFECT OF ADVANCING RELIGION IN VIOLATION OF THE ESTABLISHMENT CLAUSE

### A.   The *Lemon* Test Is Applicable To Religious Displays Like The Big Mountain Shrine.

The traditional test applied by the Supreme Court to determine whether governmental action violates the Establishment Clause was set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  To be constitutional, the government conduct at issue must:  (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster an excessive government entanglement with religion.

The *Lemon* test has recently led a checkered existence.  In two relatively recent Establishment Clause cases, the Supreme Court reached differing results under distinct tests of constitutionality.  In *Van Orden v. Perry*, 545 U.S. 677 (2005), the Court held that the display of a monument inscribed with the Ten Commandments on the grounds of the

Texas capitol did not violate the Establishment Clause.  The plurality opinion stated that the *Lemon* test was not useful in dealing with this sort of passive monument that Texas had erected on its capitol grounds.  *Id*. at 686.  On the other hand, in *McCreary County v. ACLU*, 545 U.S. 844 (2005), the Court held that the display of loaned copies of the Ten Commandments on the walls of two courthouses violated the Establishment Clause because the placement of the displays evidenced a religious purpose, thus failing the first prong of the *Lemon* test.

The Ninth Circuit discussed the impact of these cases in *Card v. City of Everett*, 525 F.3d 1009, 1016 (9th Cir. 2008), a case like *Van Orden* involving a 10 Commandments display that was as part of a larger display with numerous secular monuments.  The Court came to two conclusions:  (1) that the three-part test set forth in *Lemon* remains the general rule for evaluating whether an Establishment Clause violation cause exists; and (2) that the *Lemon* test does not apply to determine the Constitutionality of some long-standing religious displays that convey a historical or secular message in a non-religious context.  *Card*, 520 F.3d at 1016.  *See also*, Public Displays of Affection for God: *Religious Monuments after McCreary and Van Orden*, 32 Harv. J. L. & Pub. Pol'y., 231, 246 (2009) ("Most courts of appeals have concluded that the *Lemon* tripartite test of purpose, effect, and entanglement still stands after *Van Orden*.").  Here, the present case does not fit the exception discussed in *Van Orden*.  Under either test, however, the Shrine on Big Mountain violates the Establishment Clause under the Ninth Circuit's reasoning in *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011), in

which the Court held that a veterans' memorial dominated by a cross violated the Establishment Clause.  (*Trunk* Decision attached hereto as Exhibit A.)

**B.    The Big Mountain Shrine Was And Is Intended As A Religious Display**.

Under both *Lemon* and *Van Orden*, the Court first considers whether the purpose of government action is predominantly secular in nature.  When the government acts with the ostensible and predominant purpose of advancing religion, it violates a central value of the Establishment Clause.  *McCreary*, 545 U.S. at 860.  The underlying value of the Establishment Clause is violated, moreover, when the government manifests a purpose to favor one faith over another faith -- or over non-believers.  The Supreme Court explained in *McCreary* that the purpose inquiry does not call for "any judicial psychoanalysis."  *Id*. at 862.  Rather, "the eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history and implementation."  *Id*.  Finally, the secular purpose must "be genuine, not a sham." *Id*. at 864.

In the present case, the Forest Service's authorization of a permanent religious shrine on Big Mountain evinces a purpose that cannot be characterized as "predominantly secular."  The Knights of Columbus requested authorization to erect a religious shrine. The request made no mention of a memorial or any secular purpose.  Contemporary accounts from 1954 confirm that the Shrine was dedicated atop Big Mountain with the assistance of a Catholic Priest.  (Bolton Dec., Exh. 2.)  The Knights, in fact, specifically dedicated the Shrine "To the Honor and Glory of God."  *Id*.  The Knights, moreover,

were and are an exclusive membership organization for Catholic men -- and the Knights constructed numerous similar Catholic shrines around the country.  (*United States Forest Service*,9-10.)  The Knights constitute an exclusively Roman Catholic organization for which "church-related activities are essential to its work as an organization of Catholic laymen."  (PSDF, ¶ 9-10).

The Forest Service, for its part, granted the Knights authorization, without cost, to put a shrine on public land.  (*United States Forest Service*,12.)  That was the purpose of the request and that was the stated purpose of the approval.  No "psychoanalysis," therefore, is necessary to determine anybody's purpose.  This is not a public forum, moreover; it is regulated use land, and permitted uses do not allow for religious shrines to be constructed permanently in National Forests!

Subsequent attempts to re-write history, moreover, do not detract from the original religious purpose of the Catholic Shrine.  The story has surfaced that returning Roman Catholic WWII veterans had seen "religious shrines" in Europe and so the Knights who already had a history of erecting religious shrines, supposedly adopted this justification.  Even that attempted rationalization, however, does not contradict that the Shrine on Big Mountain was intended for its religious significance.

The claim that veterans wanted a religious shrine does not make it suddenly non-religious.  The inquiry is not who wanted a Shrine, but why.  Here, the stated purpose for the Shrine confirms its religious significance.  As the Tenth Circuit Court of Appeals recognized in *American Atheists, Inc. v. Duncan*, 637 F.3d 1095, 1122 (10th Cir. 2010), a memorial cross, which is not a generic symbol of death, does not nullify religious

sectarian content.  Dedicating a patently Catholic shrine to a veteran's group also does not magically transform the shrine into a secular symbol.  The Court stated in *Mercier v. City of La Crosse*, 276 F. Supp. 2d 961, 974 (W.D. Wis. 2003), that "it is difficult to see how dedicating a monument to a particular group can diminish its religious nature ... Building a church in memory of a beloved parishioner does not make it any less a place of worship."  In *Freedom From Religion Foundation v. Marshfield*, 203 F.3d 487 (7th Cir. 2000), moreover, the Court held that a similar KOC statue of Jesus, arms open in prayer, gave the appearance of endorsement, including because the statue "portrays a figure of particular importance to one religious group."   In fact, "Jesus Christ is, if anything, more fundamental to the doctrine of Christianity than the Ten Commandments are to either Judaism or Christianity."  *Washegesic v. Bloomingdale Public Schools*, 813 F. Supp. 559, 563 (W.D. Mich. 1993).

As recently as June of 2011, moreover, the Knights continued to describe the Shrine on Big Mountain as a "non-denominational religious statue," which supposedly "appeals "to all religions."  The reality, of course, is that Jesus is a distinctively Christian figure, and the Knights did not disavow their original intent that the Shrine was intended to reflect obvious religious significance.

The Forest Service's own purpose in favoring the Christ monument is indicated by the sham tactics used to justify reauthorization.  The Forest Service recognized that war memorials and religious statues are not appropriate for approval under government regulations.  The Government's own Brief, at page 2, confirms that a religious shrine does not fit any of the stated purposes for federal permits.  The Forest Service, moreover,

recognized that it had denied non-Christian groups permission to utilize public land for religious purposes. The Forest Service, therefore, responded to criticism of its initial decision of August 24, 2011, by attributing "historical significance" to the Shrine as part of an area ski resort. The ski resort, however, has never advertised or promoted the Shrine, nor is the Shrine even situated as an obvious part of the resort, according to the defendants. In fact, the Defendants argue that the Shrine is "discreetly" remote from the groomed ski trails, although this has not always been the case. (PSDF ¶ 36). Nonetheless, knowing the tightrope it had to walk, the Forest Service coached personnel to make the remarkable argument that the Statue of Jesus has neither religious significance, nor is it a war memorial. (PSDF ¶ 26-27.)

The Forest Service's "refined" justification crystallized one week after being criticized for its initial decision -- and the administrative record shows no study or analysis even being done along the lines being suggested by the Forest Service. Similarly, the Montana State Historical Preservation Office "concurred" with the Forest Service without any study or analysis. MSHPO simply concluded that the Shrine is not like Lourdes where people come to worship. This napkin analysis, however, completely ignores the fact that religious displays are often not destination sites, such as a nativity scene on a courthouse lawn.

Unwanted exposure to religious displays, plainly violates the Establishment Clause. MSHPO's reasoning, if adopted, would sanction permanent religious displays on government land as long as people came to the site without intending to be exposed to

religious iconography.   The Establishment Clause, therefore, would countenance unwanted exposure to religious displays -- if unintended or unavoidable.

According to the Forest Service's present analysis, even a stand-alone nativity scene on government property would not be objectionable because courthouse observers did not come, in the first instance, to see the nativity scene.   Unexpected and unwanted exposure to religious displays on public property, by this reasoning, would by definition render the display constitutional under the Establishment Clause.   Realistically, the Forest Service probably does not believe this, but the Forest Service finds itself in this untenable position because it has engaged in contrived reasoning to preferentially reapprove the Shrine on Big Mountain.

In the end, the honest evidence undisputedly establishes that the Catholic Shrine on the Forest Service's property was intended and approved as a religious Shrine.   That is the current purpose as well, and the Government's subterfuges merely reflect the Government's continuing purpose.

C.     **The Shrine On Big Mountain Has The Primary Effect Of Advancing Religion, Including Because The Shrine Gives The Appearance Of Endorsement**.

The Ninth Circuit's recent decision in *Trunk* is highly instructive in evaluating the present.   *Trunk* involved a Veterans' Memorial dominated by a Christian cross.   In its analysis, the Court considered "fine-grained, factually specific features of the Memorial, including the meaning or meanings of the Latin cross at the Memorial's center, the Memorial's history, its secularizing elements, its physical setting, and the way the Memorial is used."   629 F.3d at 1110.

The government contended in *Trunk* that the relevant factors demonstrated that the Memorial's primary effect was patriotic and nationalistic, not religious. The Court disagreed. Taking all of the factors into account and considering the entire context of the Memorial, the Court concluded that "the Memorial today remains a predominantly religious symbol. The history and absolute dominance of the Cross are not mitigated by belated efforts to add less significant secular elements to the Memorial." *Id.*

The Court first acknowledged the obvious in *Trunk*, *i.e.*, that the Latin Cross "Is the preeminent symbol of Christianity." *Id.* According to the Court, the Cross also is "exclusively a Christian symbol, and not a symbol of any other religion." *Id.* at 1111. Similarly, in the present case, the figure of Jesus Christ on Big Mountain is unambiguously a symbol of Christian faiths, and more particularly, the Catholic faith. Nothing in the record, moreover, detracts from this meaning, *i.e.*, the Christ figure has not acquired an alternate, non-religious meaning.

The Court in *Trunk* next considered whether the Latin Cross had a "broadly-understood ancillary meaning as a symbol of military service, sacrifice and death." The Court rejected the Defendant's argument that the Cross had such an ancillary meaning:

> The reasoning behind our prior decision is straight forward. A sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion. *Ellis*, 990 F.2d at 1527. Thus, the use of exclusively Christian symbolism in a memorial would, as Judge O'Scannlain has put it, "Lead observers to believe the City has chosen to honor only Christian veterans." *SCSC*, 93 F.3d at 626 (O'Scannlain, J., *concurring*). And in so far as the Cross is "not a generic symbol of death" but rather "a Christian symbol of death, that signifies or memorializes the death of a Christian," *American Atheists*, 616 F.3d at 1161, a reasonable observer would view a memorial cross as sectarian in nature. 629 F.3d at 1112.

Again, in the present case, nothing in the record suggests that the Catholic Shrine on Big Mountain has acquired an ancillary meaning as a secular war memorial.  In fact, the Defendants' historian found no contemporaneous evidence that the Christ figure on the Mountain was erected as a war memorial.  In any event, shrines with Statues of Christ certainly have never become a common symbol for military cemeteries in the United States.  On the contrary, the evidence in this case shows that the Shrine on the Mountain is not typical of a memorial -- or even as an ancillary part of a resort.

The evidence does not support the conclusion that Catholic shrines have been used as a default symbol memorializing veterans buried in the United States; very few if any war memorials include catholic shrines or other religious imagery; and the Shrine on Big Mountain does not subordinate the figure of Christ to patriotic or secular symbols.  In fact, no patriotic or secular symbols are present at all.  On the basis of the evidence, therefore, the Court can only conclude that the Jesus Statue does not possess an ancillary meaning as a secular or non-sectarian war memorial.  Christ remains, as intended, an exclusively Christian symbol.

The Court in *Trunk* further considered whether secular elements, coupled with the history and physical setting of the Latin Cross had transformed the sectarian message of government endorsement of a particular religion.  *Id*. at 1117.  The Court concluded that such a transformation had not occurred, but the Court did "not discount the fact that the Cross was dedicated as a war memorial, as well as a tribute to God's promise of 'Everlasting Life,' when it was first erected, or that, in more recent years, the Memorial

has become a site for secular events honoring veterans." *Id*. at 1118.  The Court, in fact, did not doubt that the Memorial at issue was intended, at least in part, to honor the sacrifices of the Nation's soldiers.  Nonetheless, the Court concluded that a reasonable observer would perceive the Memorial as projecting a message of religious endorsement, not simply secular memorialization.

The Court in *Trunk* also considered important the fact that the Memorial had consisted for most of its life with the Cross alone; the Cross was dedicated in 1954 with no physical indication that it was intended as a war memorial until a plaque was belatedly added in 1989, in response to litigation; when seeking permission to erect the Cross, the applicant sought authorization to "create a park worthy to be a setting for (this) symbol of Christianity;" the Cross was dedicated in a ceremony that included a Christian religious service; and the Cross's importance as a religious symbol was a rallying cry for many involved in the litigation surrounding the Memorial.  *Id*. at 119-120.

Likewise, in the present case, secularizing factors are not present.  The Big Mountain Shrine was intended and dedicated for its religious significance; returning veterans allegedly saw similar religious shrines in Europe, after which the Jesus Shrine is supposedly modeled; the Shrine was dedicated by Catholic officiates, according to contemporary reports; and long-time local residents testify to the continued religious significance and perception of the Statue.

The fact that the Catholic Shrine on Big Mountain has no surrounding secular features also is significant.  In *Van Orden*, upon which the Defendants rely, challenge was made to an Eagle's-donated monolith on the grounds of the Texas capitol, was

surrounded by 22 acres of land, which "contains 17 monuments and 21 historical markers commemorating the people, ideals, and events that compose Texan identity."  545 U.S. at 681.  This context in *Van Orden* was significant to Justice Breyer in his concurring decision because "when placed in the midst of numerous other, non-religious monuments, a display of the (Ten) Commandments can also impart a secular moral message."  *Id.*  As a result, such a display, like a Crèche among secular objects, may be permissible.  *Trunk*, 629 F.3d at 1118.  By contrast, however, in the present case, the Catholic Shrine is not in the midst of other non-religious symbols, and unlike the Ten Commandments, undisputedly does not impart a "secular moral message."  Treating a ski slope as a museum would be a dangerously slippery slope.

Finally, the Court in *Trunk* considered physical setting to be a relevant factor.  The Court concluded, in this respect, that the Memorial's physical setting "amplified the message of endorsement and exclusion projected by its history and usage."  In particular, the Court noted that the Cross remains the Memorial's central feature, *i.e.*, it dominates the site.  *Id.* at 1122-23.  "From the perspective of drivers on Interstate 5, the Cross is the only visible aspect of the Memorial, and the secular elements cannot neutralize the appearance of sectarianism.  For these drivers, the Cross does not so much present itself as a war memorial, but rather as a solitary symbol atop a hill."  *Id.* at 1123.

The physical setting in the present case "amplifies" even more the message of endorsement.  Here, the Shrine has no secular elements at all, and to those looking at it from distant ski trails, the sectarian effect is even more dramatic.  In addition, as the Defendants emphasize, the Statue is located away from the commercial ski trails so that it

too "does not so much present itself as a war memorial, but rather as a solitary symbol atop a mountain."   Moreover, locals testify that the serenity of the site presents a meditative opportunity to reflect at this religious site.

This point is not a simple matter of aesthetics.   In *Van Orden*, the secular, historical and moral messages of the Ten Commandments display were highlighted by the fact that they were part of an assortment of monuments that supposedly shared a unifying, cohesive secular theme.   *Van Orden*, 545 U.S. at 701-702 (Breyer, J., *concurring*).   That theme supposedly reflected the historical ideals of Texans, which allegedly were grounded on moral principles involving ethics and law.   The present case, however, has no such theme, but only a message that is unambiguously religious.

The fact that some skiers may behave "playfully and irreverently" around the statue does not change the equation.   Such behavior, in fact, may as much be the result of the incongruity of a religious shrine in the forest -- and it may also evidence the religious perception of the shrine.   The significant point is that individual responses to unavoidable exposure to religious displays is not mandated by the Constitution.

The fact that few locals may be devout enough to brave inclement weather to actively worship at the Shrine also is irrelevant, as is the fact that local ministers may not motivate their congregants to trek to the Shrine.   The Defendants again misconstrue the Establishment Clause as if it only prohibited religious "uses" of public land for formal services, without any prohibition on religious displays that unexpectedly confront the passer by.

A religious shrine, moreover, is no less religious if visitors and tourists recognize the shrine as a meeting spot.  Such "use" does not destroy the religious nature of the shrine, any more than tourists meeting in front of Notre Dame destroy the religious nature of that church.

After examining the entirety of the Big Mountain Shrine in context, and considering its history, its religious and non-religious uses, its exclusively sectarian features, and the uniqueness and dominance of the Shrine, this Court should conclude, as in *Trunk*, that the Shrine primarily conveys a message of government endorsement of religion that violates the Establishment Clause.  Context carries the weight in the Establishment Clause calculation, and should be considered.  In the context of the Flathead Valley, the Government's authorization of a religious shrine on Big Mountain has the impermissible purpose and primary effect of endorsing religion in violation of the Establishment Clause.

## V.   ENFORCEMENT OF THE ESTABLISHMENT CLAUSE DOES NOT EVINCE HOSTILITY TO RELIGION

The Defendants, in the end, argue unpersuasively that removal of the Shrine on Big Mountain would constitute unacceptable hostility to religion.  This argument, if accepted, would eviscerate the Establishment Clause.  As the Ninth Circuit recognized in *Vasquez*, 487 F.3d at 1256, "it is well-established that governmental actions primarily aimed at avoiding violations of the Establishment Clause have a legitimate secular purpose."  Establishment Clause jurisprudence would be unworkable if it were any other way:  "To hold that the removal of objects to cure an Establishment Clause violation

would itself violate the Establishment Clause would result in an inability to cure an Establishment Clause violation and thus totally eviscerate the Establishment Clause." *Id.* at n.8, *quoting McGinley v. Houston*, 282 F. Supp. 2d 1304, 1307 (M.D. Ala. 2003), *aff'd.*, 361 F.3d 1328 (11th Cir. 2004).  *See also Johnson v. Poway Unified School District*, 658 F.3d 954, 972 (9th Cir. 2011) (action taken to avoid conflict with the Establishment Clause does not inhibit nor excessively entangle government with religion).

The Defendants apply a bootstrap approach to the Establishment Clause.  As the Supreme Court recognized in *Marsh v. Chambers*, 463 U.S. 783, 790 (1983), however "standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees."  The Establishment Clause invokes no such statute of repose. In *Marsh*, the Court upheld the practice of opening legislative sessions with solemnizing prayer, but only after concluding that the practice had the secular effect of solemnizing important occasions.  In the present case, however, the Shrine on Big Mountain has no such pedigree.  On the contrary, the Jesus Shrine solemnizes only the Christian memory of Christ, while providing a serene meditative site to reflect upon Him.

The present case, therefore, presents a situation unlike in *Salazar v. Buono*, 130 S. Ct. 1803 (2010).  The Defendants, again, rely heavily on dicta in *Salazar*, but the only issue actually before the Court in *Salazar* was the validity of a congressional land-transfer statute, adopted as a curative measure for a religious display found to violate the Establishment Clause.  The merits of the constitutional violation were not on review by the Supreme Court, but the Court nonetheless did comment in the context on which the

statute was enacted and the reasons for its passage.  The Court noted, for example, that Congress had previously designated the Cross at issue in *Salazar* as a national memorial for more than 300,000 WW-I Veterans.  *Id*. at 1817.  The Court also noted that the Cross had not been originally intended to promote a Christian message.  *Id*. at 1816.  Finally, taking account of the fact-specific context involved, the Court felt that statue at issue was part of a "broader moral and historical message reflective of a cultural heritage."  *Id*. at 1817.

The factual context of the present case, however, is quite different than in *Salazar*. The Shrine in this case was originally intended for, and is still perceived for, its religious significance.  Also, it is not part of a broader moral and historical message.  Nor is it a "public acknowledgment of religion's role in society," as the Defendants suggest. Instead, this case is most analogous to the Ninth Circuit's subsequent decision in *Trunk*, which issued after the Supreme Court's decision in *Salazar*.

The Defendants also try to make more of the supposed lack of objection to the Big Mountain Shrine than is justified.  In fact, the record in this case reflects that individuals have been long-offended by the Statue, including Mr. Cox who has been affected by the Shrine for 20 years.   Similarly, Ms. Morris has deliberately avoided skiing at Big Mountain, after being first offended by the Shrine.  Mr. Bonham, moreover, advises that criticism and objection to the Shrine is discouraged by the local Christian-Fundamentalist majority in the Flathead Valley.  Such silencing, moreover, is not at all unusual, but that does not mean that the Establishment Clause should not be enforced.  The heckler's veto is an unreliable test to apply, in any event, as even prior public complaints went

unacknowledged by the Supreme Court in *Van Orden*.  (PSDF ¶ 193-94.)  In short, the resolve necessary to object is evidenced by the response to this very suit.  (PSDF ¶ 190.)

The Establishment Clause protects the freedom of conscience and minimizes civic divisiveness, by prohibiting government endorsement of religion.  *McCreary*, 545 U.S. at 876.  "By enforcing the (Religion) Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat.  At a time when we see around the world the violent consequences of assumption of religious authority by government, Americans may count themselves fortunate:  Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish."  *Id*. at 882 (O'Connor, J., *concurring*).  While it may be true, therefore, that many Americans find religious symbols like the Statue of Christ to be in accord with their personal beliefs, "we do not count heads before enforcing the First Amendment."  *Id*. at 884.

The Supreme Court's cautionary admonitions in *McCreary* are appropriate at this point to consider.  The Defendants argue in this case that permanent religious monuments on government property should be allowed if supported by a majority.   The Establishment Clause, however, is not, and should not, be merely precautionary while subject to the overriding whims of religious majorities.

Nor does the present case raise an issue of Free Speech.  As the Supreme Court held in *Pleasant Grove City v. Summum*, 555 U.S. 460, 129 S. Ct. 1125, 1138 (2009), the Free Speech Clause's forum analysis "simply does not apply to the installation of permanent monuments on public property."  Cases like *Capitol Square Review and*

*Advisory Board v. Pinette*, 515 U.S. 753 (1995), involving temporary displays on a public square, have no applicability to the present case.  As the Supreme Court recognized in *Summum*, 555 U.S. at 470-71, permanent monuments on government land do give the appearance of government sponsorship:

> Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land. It is certainly not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated.  Because property owners typically do not permit the construction of such monuments on their land, persons who observe donated monuments routinely -- and reasonably -- interpret them as conveying some message on the property owner's behalf.  In this context, there is little chance that observers will fail to appreciate the identity of the speaker.  This is true whether the monument is located on private property or public property, such as national, state, or city park land.

A permanent monument on public land is considered government speech, even if ownership of the display remains private.  *See American Atheists,* 637 F.3d at 1115. "There is little doubt that Utah would violate the Establishment Clause if it allowed a private group to place a permanent unadorned 12-foot Cross on public property without any contextual or historical elements that served to secularize the message conveyed by such a display." *Id.* at 1120.  As a result, the Court concluded in *American Atheists*, a case of particular relevance and similarity to the present case, that the permanent placement of memorial crosses on public lands had the impermissible effect of conveying a message of religious endorsement.  (*American Atheist* decision attached hereto as Exhibit B).

The Forest Service, in the present case, similarly conveys a message of religious endorsement by allowing the Knights of Columbus to maintain a permanent Catholic shrine on federal forest lands.  Such a permanent, and striking, Christian display derives enhanced significance by virtually its incongruous siting.  The situation is made worse by discovery that the Forest Service actually has given preferred consideration to this Catholic Shrine; engaged in subterfuge; and finally reauthorized the Shrine in spite of the fact that such requests have otherwise been denied by the Forest Service, and they are inappropriate for fee-waiver under Forest Service regulations.  The record in this case, in short, does not show neutrality either in fact or in the perceptions of reasonable observers.

## CONCLUSION

For all the above reasons, the Defendants' Motions for Summary Judgment should be denied.

Dated this 13th day of February, 2013.      **BOARDMAN & CLARK LLP**

By:   */s/ Richard L. Bolton*
Richard L. Bolton, *Pro Hac Vice*
*rbolton@boardmanclark.com*
Boardman and Clark, LLP
1 S. Pinckney St., Ste 410
Madison, Wisconsin 53703-4256
Telephone: 608-257-9521
Facsimile: 608-283-1709

Martin S. King
*mking@wordenthane.com*
Reid Perkins
*rperkins@wordenthane.com*
P.O. Box 4747
Missoula, MT 59806-4747
Telephone: 406-721-3400
Facsimile: 406-721-6985

Attorneys for Plaintiff, Freedom From
Religious Foundation, Inc.

<u>Notice of Electronic Filing and Service</u>

I hereby certify that on February 13, 2013, this document was filed electronically in accordance with the ECF procedures of the United States District Court, District of Montana, Missoula Division, under Rule 5(d)(1), Federal Rules of Civil Procedure and L.R. 1.4(c).  All parties who are represented and have consented to service of electronically filed documents are served upon receipt of the NEF from the electronic filing system.

To the best of my knowledge, there are no parties in this case that require service by means other than electronic service using the Court's NEF.  The original document on file with the filing party contains a valid original signature.

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(d)(2)(E)**

I hereby certify that the foregoing document was prepared with Microsoft Word using Times New Roman 13-point proportionally spaced font.  The document contains 9,287 words, including headings, quotations, and footnotes and excluding the caption pages, tables, signature blocks and certificates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated February 13, 2013.

 /s/ Richard L. Bolton\
Richard L. Bolton
