## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION FOUNDATION, INC,** a Wisconsin Non-Profit Corporation, | ) ) ) | |
| **Plaintiff,** | ) ) ) | |
| v. | ) ) | **Case No. CV 12-19-M-DLC** |
| **CHIP WEBER, Flathead National Forest Supervisor,** | ) ) ) | |
| and | ) ) | |
| **UNITED STATES FOREST SERVICE,** an Agency of the United States Department of Agriculture, | ) ) ) ) | |
| **Defendants,** | ) ) | |
| and | ) ) | |
| **WILLIAM GLIDDEN, RAYMOND LEOPOLD, NORMAN DEFOREST, EUGENE THOMAS, and the KNIGHTS OF COLUMBUS** (Kalispell Council No. 1328), | ) ) ) ) ) ) | **Hon. Dana L. Christensen** |
| **Intervenor-Defendants.** | ) | |

## PLAINTIFF'S CORRECTED RESPONSES TO INTERVENOR-DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

<u>NUMBER</u>                                              <u>STATEMENT</u>

1.  In September 1953, the Knights of Columbus, Kalispell Council No. 1328
    (the "Knights of Columbus" or "Knights") applied for a permit from the
    Forest Service to use "[t]hat piece of land 25 feet by 25 feet approx. 400 ft.
    north-north west of the upper Terminal of the Big Mountain Ski Lift, and in
    elevation approx. 70 feet higher." Exhibit 1, Administrative Record at A-29
    pg. 1 (hereafter, "Exhibit 1, AR at __").

    **<u>RESPONSE</u>**:     No dispute.

2.  The Knights recommended that the statue "be made a permanent part of the
    recreation area on top of Big Mountain." *Id*.; Exhibit 2, Expert Report at 5
    (hereafter, "Exhibit 2, ER_").

    **<u>RESPONSE</u>**:     No dispute.

3.  The permit was granted on October 15, 1953. Exhibit 1, A-28 pg. 2.

    **<u>RESPONSE</u>**:     No dispute.

4.  The Knights commissioned the statue from the St. Paul Statuary Company in
    St. Paul, Minnesota. Exhibit 3, Knights of Columbus Document Production,
    at 8 (hereafter, "Exhibit 3, KOC Prod. at __"). The statue was crafted with a
    cavity at the bottom so that a dowel extending out from two feet deep within
    the pedestal could be inserted with cement into the statue "so that the statue
    and pedestal become like one piece." *Id*.

NUMBER                                          STATEMENT

> **RESPONSE**:     No dispute.

5.   The Knights installed the statue on Big Mountain in 1954. Exhibit 4, Parties'
     Stipulated Facts at ¶ 9 (hereafter, "Exhibit 4, Stip. Facts at ¶ __").

> **RESPONSE**:     No dispute.

6.   Although the original permit had no expiration date, Exhibit 1, AR at A-28, in
     August 1990, a new permit was issued for the statue with an expiration date
     of December 31, 1999, *id.* at A-27 pg. 3. A subsequent amendment extended
     the deadline through December 31, 2000. *Id.* at A-26.

> **RESPONSE**:     No dispute.

7.   In 2000, the permit was again reauthorized for another ten-year period, with a
     termination date of December 31, 2010. *Id.* at A-25 pg. 1.

> **RESPONSE**:     No dispute.

8.   Through that entire time—from 1953 through the end of 2010, and even into
     mid-2011—there is no evidence of any controversy regarding the statue. *See*
     Exhibit 2, ER4 ("Moreover, the oral interviews and research conducted by
     HRA uncovered no evidence of individuals commenting negatively about the
     statue or complaining about its presence on Big Mountain prior to the events
     that led to the current litigation.")

> **RESPONSE**:     Dispute that individuals exposed to the Jesus Shrine were

NUMBER                                      STATEMENT

not offended.    (Plaintiff's Statement of Disputed Facts,

Nos. 156, 168).

9.   In July 2010, the Forest Service notified the Knights via letter that their

permit would expire at the end of the year. The letter advised that, for a

regulatory fee of $111.00, the Knights could renew for another ten-year

period. Exhibit 1, AR at A-24.

**RESPONSE**:     No dispute.

10.   The Knights submitted their renewal application later that month, *id.* at A-23,

and the fee was paid on August 3, 2010, *id.* at A-22.

**RESPONSE**:     No dispute.

11.   The Forest Service accepted the application, *see id.* at A-21, but did not issue

any response.

**RESPONSE**:     No dispute.

12.   Over nine months later, on May 25, 2011, Freedom From Religion

Foundation—a non-profit organization based out of Madison, Wisconsin—

served a FOIA request on the Forest Service, seeking information about the

statue. *Id.* at B-01.

**RESPONSE**:     No dispute.

13.   The FOIA request stated that it is "very inappropriate to have religious

<u>NUMBER</u>                                         <u>STATEMENT</u>

symbols on Federal property" and that "[b]y permitting a display of this

nature, the Federal Forest Service appears to endorse religion over non-

religion, and specifically prefers Christianity over all other faiths. This is a

direct violation of the Establishment Clause of the First Amendment to the

United States Constitution." *Id.* at pg. 1.

**RESPONSE**:      No dispute.

14.   Shortly after receiving the FOIA request, the Forest Service invited

representatives of the Knights of Columbus and the Resort to meet

concerning renewal of the permit. *See* Exhibit 5, Declaration of Raymond

Leopold at ¶¶ 8-12 (hereafter "Exhibit 5, Leopold Decl. at ¶ __").

**RESPONSE**:      No dispute.

15.   The parties discussed several options for preserving the statue, including

having it declared a historical monument. The Forest Service's initial

thinking, however, was that the statue would not be eligible. *Id*.

**RESPONSE**:      No dispute.

16.   The Forest Service acknowledged at the meeting that there are real concerns

that the statue will be seriously damaged or even destroyed if it has to be

moved. *Id.*; Exhibit 3, KOC Prod. at 2.

**RESPONSE**:      Dispute that the Forest Service made such acknowledgment

NUMBER                                     STATEMENT

per the referenced exhibit supporting the Proposed Finding

of Fact.

17.   At the meeting's close, the Knights were informed that their permit "would

not be reissued. *Id*.

**RESPONSE**:      No dispute.

18.   The Forest Service followed up with a formal letter from Forest

Supervisor Chip Weber on August 24, 2011, stating, "I have determined

that the statue is an inappropriate use of [National Forest Service] lands

and must be removed ... ." *Id.* at A-18 pg. 1.

**RESPONSE**:      No dispute.

19.   The letter concluded that allowing the statue to remain on Big Mountain

would violate the Establishment Clause. *Id.* at A-18 at 2-3.

**RESPONSE**:      No dispute.

20.   The letter also noted that "Flathead National Forest Heritage Program Leader

Tim Light is currently assessing the historical significance of the statue in

accordance with the National Historic Preservation Act (NHPA), including

consultation with the Montana State Historic Preservation Office." *Id.* at A-18

pg. 2.

**RESPONSE**:      No dispute that the referenced letter so states but do not

NUMBER                                          STATEMENT

concede the truth of the matter stated including the claim that Mr. Light was currently assessing the historical significance of the Statue. The administrative record does not include any information regarding any such assessment.

21. The Knights timely appealed from Mr. Weber's decision to require the statue's removal. *Id.* at A-13.

   **RESPONSE**:    No dispute.

22. Eight days later, on September 1, 2011, while the appeal was still pending, Forest Archeologist Timothy Light wrote to the Montana State Historic Preservation Office (SHPO), concluding that, although the statue was not eligible for listing on the National Register of Historic Places either because of "its association either with the soldiers who fought in WWII nor for its association with Jesus," it probably would be eligible for its "associat[ion] with events important to local history," namely, the area's "transition . . . from a town heavily dependent on the lumber industry to a community built around tourism, skiing, and outdoor recreation." *Id.* at A-16 pgs. 1-2.

   **RESPONSE**:    No dispute that Mr. Light wrote to the Montana State Historic Preservation Office and so stated but do not concede the truth of all the matters stated, including his

NUMBER                                          STATEMENT

conclusion that the Statue is associated with "the area's
transition from a town heavily dependent on the lumber
industry to a community built around tourism, skiing, and
outdoor recreation."

23.  Mr. Light noted that, "[i]ndividually [the statue] represents a small part of the
history of the ski area but since so little remains intact of that early history,
the statue of Jesus is probably eligible for listing on the National Register of
Historic Places under criteria 'a' – associated with events important to local
history." *Id.* at pg. 2.

**RESPONSE**:     No dispute that Letter so states, but do not concede truth of
matter asserted.

24.  Mr. Light concluded that, in his opinion, "[m]oving the statue would be an
adverse effect to the integrity of the setting and location[,] and the setting,
with its grand views of the valley and proximity to Chair 2, is an important
aspect to the site's historic integrity." *Id.*

**RESPONSE**:     No dispute that Letter so states, but do not concede truth of
matter asserted.

25.  Mr. Light requested the SHPO's independent "concurrence in this
determination of eligibility." *Id.*

NUMBER                                    STATEMENT

   **RESPONSE**:      Dispute that Mr. Light's letter references "independent."

26.  By letter dated September 19, 2011, the SHPO "agree[d] that the

   commemorative marker is eligible" for listing, because it was "placed in its

   current **location** a few years after the resort was upgraded after World War II"

   and "has long been a part of the historic identity of the area." *Id.* at A-14.

   **RESPONSE**:      No dispute that Letter so states, but do not concede truth of

                matter asserted.

27.  The SHPO also noted that the statue "is not believed to be a religious site

   because unlike Lourdes or Fatima, people do not go there to pray, but it is a

   local land mark that skiers recognize, and it is a historic part of the resort.

   Based on this we believe that it is close enough to the third example of an

   Eligible property description presented in National Register Bulletin # 15 on

   page 40." *Id.*

   **RESPONSE**:      No dispute that Letter so states, but do not concede truth of

                matter asserted.

28.  The SHPO concluded that the statue was eligible for listing not only under

   criteria A, but also under criteria "F" because of its commemorative aspect. *Id.*

   **RESPONSE**:      No dispute that Letter so states, but do not concede truth of

                matter asserted.

NUMBER                                    STATEMENT

29.  Based on the SHPO's independent confirmation of the statue's listing
     eligibility, on October 21, 2011, Forest Supervisor Weber withdrew his earlier
     decision and announced that the Forest Service would "formally seek public
     comment on a proposed action for reissuing the permit."  *Id.* at A-12.

     **RESPONSE**:    No dispute that Mr. Weber withdrew his earlier decision and
                      announced that he would seek public comment but dispute
                      that the decision was based on SHPO's independent
                      confirmation.

30.  A thirty-day period for public comment was announced on November 3,
     2011.  *Id.* at A-11.

     **RESPONSE**:    No dispute.

31.  Approximately 95,000 comments were received.   They overwhelmingly
     favored the permit being renewed.  *Id.* at A-04, pg. 5 (noting the number of
     comments), and E (copy of all comments).

     **RESPONSE**:    No dispute but note that most were form responses, as
                      referenced Exhibit E.

32.  Following the notice-and-comment period, the Forest Service issued a final
     "Decision Memo" reauthorizing the Knights' special use permit for a period
     of ten years.  *Id.* at A-04, pg. 1.

NUMBER                                    STATEMENT

> **RESPONSE**:     No dispute.

33.   The memo observed that renewal was warranted because "[t]he statue has
      been a long-standing object in the community since 1953" and "is important
      to the community for its historical heritage" based on its association with the
      early development of the ski area on Big Mountain.  *Id.*

> **RESPONSE**:     No dispute that decision so states, but do not concede truth
>                   of matter asserted.

34.   The renewed permit was issued on January 31, 2012, with an expiration date
      of December 31, 2020.  The renewed permit—like all previous permits—is
      for "nonexclusive use" only. *Id.* at A-01 pg. 1-2.

> **RESPONSE**:     No dispute.

35.   The statue sits on National Forest Land among ski slopes that are part of the
      Whitefish Mountain Resort.  Exhibit 2, ER1; Exhibit 1, AR at A-15 (photos).

> **RESPONSE**:     No dispute.

36.   The Resort is privately-owned and operated, but the upper ends of its ski runs
      are on Forest Service land. Exhibit 6, Declaration of Daniel Graves at ¶ 3
      (hereafter "Exhibit 6, Graves Decl. at ¶ __"); Exhibit 1, AR at A-01 pg.
      13 (map).

> **RESPONSE**:     No dispute.

NUMBER                                    STATEMENT

37.   Thus, the land under the statue is double leased for use by both the Knights and

      the Resort. The Knights' and the Resort's permits both

      specify that they are for non-exclusive use. *Id.*; Exhibit 6, Graves Decl. at 4.

      **RESPONSE**:     Dispute that the land is leased to the Knights and further

                        dispute that the Statue is situated so as to appear as part of

                        the Resort.   (*See*  Knights of Columbus Finding of Fact

                        No. 38).

38.   While well known, the statue stands in a relatively discrete place on the

      slopes.

      **RESPONSE**:     No dispute that the Statue is located away from

                        commercially operated ski runs but dispute that the Statue is

                        not plainly visible to skiers.   (Plaintiff's Statement of

                        Disputed Facts, Nos. 72, 74, 78, 83, 98).

39.   For the first two decades after the statue was erected, an uphill trek was

      required to visit the statue, as it was 400 feet uphill from the "T-bar that

      served the resort's main ski runs at that time." Exhibit 2, ER7-8.

      **RESPONSE**:     No dispute.

40.   For years, many people did not know the statue was there. *Id.* at ER8.

      **RESPONSE**:     Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 36,

                        98).

NUMBER                              STATEMENT

41.  Even after the first chairlift was installed at Big Mountain in 1960, access to
     the statue was not significantly affected because the lift served runs located
     "on a different part of the mountain." Thus, skiers still had to "go out of
     [their] way" to get to the statue. *Id*.

     **RESPONSE**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 72,
                      74, 78, 83, 98).

42.  Although the second chairlift installed in 1968 did increase access to the
     statue—meaning that skiers were "more likely simply to happen upon it while
     making runs down the hill," the statue remained "in a location that is not
     highly visible from most of the modern ski runs on Big Mountain." *Id*.

     **RESPONSE**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 72,
                      74, 78, 83, 98).

43.  A grove of trees stands above the statue, so even when skiing the run nearest
     the statue, it cannot be seen until the skier is nearly alongside it. *See* Exhibit
     1, AR at A-01 pgs. 11, 13; A-15; Exhibit 7, Deposition of William A. Cox at
     40:15-41:7 (hereafter, "Exhibit 7, Cox Dep. at __"). "In fact, this is the way
     most visitors to Big Mountain have first encountered the statue." Exhibit 2,
     ER8.

     **RESPONSE**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 72,

<u>NUMBER</u>                                          <u>STATEMENT</u>

                           74, 78, 83, 98).

44.    Moreover, "the mountain's skiable terrain has expanded so much since the 1960s that 'it's very easy for many people to go skiing and miss it.'" *Id.* at ER9 (map from 1957); Exhibit 1, AR at A-01 pg. 13 (current map).

    **<u>RESPONSE</u>**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 69, 70, 72, 74, 78, 83, 98).

45.    The statue is not in an area that people walk by in the summer. There are no hiking trails that go by it. Exhibit 2 at ER9; Exhibit 6, Graves Decl. at ¶ 9.

    **<u>RESPONSE</u>**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 36).

46.    Current president and CEO of the resort, Dan Graves, was personally unaware of the statue for several months after he started work on the mountain in 2006. *Id.* at ¶ 8; Exhibit 2, ER9.

    **<u>RESPONSE</u>**:    No dispute but note that Mr. Graves observed the Statue the first time that he went skiing; Mr. Graves began working at the Resort in the summer.  (Plaintiff's Statement of Disputed Facts, No. 78).

47.    "Many locals . . . perceive the statue as a memorial to World War II veterans and the Tenth Mountain Division." *Id.* at ER4, 24.

    **<u>RESPONSE</u>**:    Dispute.  (Plaintiff's Statement of Disputed Facts., No. 87).

NUMBER                                    STATEMENT

48.   These perceptions are based on the historical reason why the statue was
      commissioned and installed on Big Mountain. Exhibit 8, Declaration of Bill
      Martin at ¶¶ 4-10 (hereafter, "Exhibit 8, Martin Decl. at ¶ __").

      **<u>RESPONSE</u>**:      Dispute.  The evidence does not indicate that the Statue was
                              commissioned and installed as a war memorial.  (Plaintiff's
                              Statement of Disputed Facts, Nos. 6, 7, 8, 66, 105).

49.   "[I]t is historically accurate that several of the founders and leading figures at
      Big Mountain during its early years were veterans of World War II, some of
      whom served in the Tenth Mountain Division." *Id.* at ER9-10.

      **<u>RESPONSE</u>**:      No dispute.

50.   The Tenth Mountain Division has used the statue "a couple of times" as a site
      for a veterans' gathering. *Id.* at ER13.

      **<u>RESPONSE</u>**:      No dispute.

51.   In 2010—before there was any controversy about the statue—the Resort
      installed a plaque next to the statue, with information collected by Dan
      Graves drawing the association between the World War II veterans and the
      statue:

                  When the troops started returning from [World War
                  II] in Europe to their home in the Flathead Valley
                  they brought with them many memories … some
                  good, some bad. Some of these troops were
                  members of the Knights of Columbus at St.

NUMBER                                    STATEMENT

> Matthew's parish in Kalispell. A common memory
> of their time in Italy and along the French and Swiss
> border was of the many religious shrines and statues
> in the mountain communities. This started a
> dialogue with the U.S. Forest Service for leased
> land to place this statue of Jesus. On October 15,
> 1953 the U.S. Forest Service granted a permanent
> special use permit to the KofC Council #1328 for a
> 25ft x 25 ft square for placement of the statue. A
> commission for the statue construction was given to
> St. Paul Statuary in St. Paul, Minnesota. The statue
> was installed in 1955 and has been maintained by
> the KOC from St. Matthew's ever since. We thank
> those brave troops that brought this special shrine of
> Christ to the Big Mountain and hope that you enjoy
> and respect it. – Whitefish Mountain Resort, 2010.

*Id.* at ER7, 24-25; Exhibit 1, AR at C-07. Prior to that time the pedestal

included a small metal plaque with the words "Knights of Columbus 1954."

Exhibit 5, Leopold Decl. at ¶ 14.

**RESPONSE**:    No dispute that a plaque was recently posted with the

language so indicated.  Do not concede that persons exposed

to the Jesus Statue had not previously been offended.

(Plaintiff's Statement of Disputed Facts, Nos. 156, 168).

52. Even more prevalent is the "long-standing tradition of playfulness surrounding

the statue, with skiers sometimes decorating it with ski gear and Mardi Gras

beads, or high-fiving it as they ski by -- a practice that has led to the statue's

hand being broken off on numerous occasions." Exhibit 2, ER4.

NUMBER                                   STATEMENT

**RESPONSE**:   Object to the proposed finding because it is indefinite as to

the predicate "even more prevalent," *i.e,* more prevalent than

what?  Without waiving said objection, dispute any implied

frequency of said "playfulness."   (Plaintiff's Statement of

Disputed Facts, Nos. 118, 122).

53.  Indeed, a heavily documented part of the statue's history on the mountain is

the frequency with which the statue's hands and fingers have been broken off

by skiers. *Id.* at ER20.

**RESPONSE**:   Dispute that "frequency" has been heavily documented but

do not dispute that the statue has been previously damaged.

(Plaintiff's Statement of Disputed Facts., Nos. 118, 122).

54.  The record includes evidence that the hand was broken off as early as 1970.

Exhibit 3, KOC Prod. at 3.

**RESPONSE**:   No dispute.

55.  The Knights of Columbus visit the statue several times a year to maintain and

repair the statue. The left hand and arm have been broken and repaired

numerous times over the years. Exhibit 5, Leopold Decl. at ¶¶ 4-7.

**RESPONSE**:   No dispute.

56.  In recent years, "a fence was built behind the statue . . . to help protect it from

NUMBER                                    STATEMENT

ongoing damage caused by skiers either hitting [it] with ski poles or high-
fiving it—a long-standing 'comical institution' on the mountain." Exhibit 2,
ER6-7.

**RESPONSE**:     No dispute.

57.  This "playfulness and irreverence . . . do not represent an anomaly in the
history of the Jesus statue on Big Mountain, but rather something that has
come to typify many people's interactions with and perceptions of the statue."
*Id.* at ER18-19.

**RESPONSE**:     Dispute.  The number of skiers engaging in such behavior is
not known, nor is it known whether such persons consider
the Jesus Statue to be incongruous and out-of-place.
(Plaintiff's Statement of Disputed Facts, Nos. 118, 122).

58.  There is also a "long-standing tradition" of other "perceptions and activities
surrounding the statue that have little to do with religion"—specifically, its
role as "a well-known landmark," a "meeting place for skiers on the
mountain," and "a place where visitors have enjoyed having their
photographs taken." *Id.* at ER16-20; *see also* ER4, 14.

NUMBER                                    STATEMENT

     **RESPONSE**:    Dispute that the proposed finding is inconsistent with perceptions of the Statue as having religious significance. (Plaintiff's Statement of Disputed Facts, Nos. 73, 84, 88, 90, 91, 97).

59.   "In addition, nearly all of the local people interviewed [for the expert report] said that they perceived the statue as an important part of the ski area's history and as a landmark that has simply always been there." *Id.* at ER4.

     **RESPONSE**:    Dispute that the people interviewed link the Statue to the ski area's history.

60.   In contrast, "the historical record suggests that religious uses of the Jesus statue on Big Mountain have been sporadic and inconsistent over time." *Id.* at ER16; *see also* ER4 ("[We] found no evidence showing any systematic or consistent use of the statue for church services or prayer gatherings during the nearly sixty years it has stood on Big Mountain."), *id.* at ER10 ("My review of the historical records relating to the history and development of the Big Mountain ski area uncovered limited evidence of the statue being used as a site for church services or religious gatherings during the nearly sixty years it has stood on the mountain."); *see generally id.* at ER10-16.

     **RESPONSE**:    Dispute because the claimed "historical record" does not

NUMBER                                STATEMENT

include perceptions of the Jesus statue as having religious

significance and the Statue is used as an area for reflective

meditation.     (Plaintiff's Statement of Disputed Facts,

Nos. 67, 72, 74, 84, 91).

61.   The record of religious activities at other locations within the Resort clearly

outweighs the record of religious activities at the statue. *Id.* at ER12.

**RESPONSE**:     Dispute because the "record of religious activities" does not

include information about perceptions of the religious

significance of the Jesus Statue to skiers, nor the fact of

reflective meditation at the Jesus Statue.   (Plaintiff's

Statement of Disputed Facts, Nos. 73, 84, 88, 90, 91, 97).

62.   The only documented wedding that took place at the statue was presided over

by a judge, not a pastor or priest. *Id.* at ER4.

**RESPONSE**:     Dispute.  (Plaintiff's Statement of Disputed Facts, No. 72).

63.   "[T]he vast majority of visitors to Big Mountain throughout the course of its

sixty-five-year history have gone there to recreate and enjoy the outdoors, not

to visit the Jesus statue." *Id.* at ER 23-24.

**RESPONSE**:     No dispute.

64.   In sum, "secular uses surrounding the statue have outweighed the religious

NUMBER                          STATEMENT

ones." *Id.* at ER4.

> **RESPONSE**:   Dispute in so far as the proposed finding does not include
>
> information about perceptions of the Jesus Statue by persons
>
> exposed to it, nor does it include reflective meditation that
>
> occurs at the site.

65.   The Forest Service has made explicit effort to confirm that the statue is
      privately owned and that it does not approve of the statue's religious aspect.
      *See, e.g,* Exhibit 1, AR at A-07 pgs. 1 and 9, A-18.

> **RESPONSE**:   Dispute.   Nothing at the Jesus Statue indicates Forest
>
> Service disapproval.

66.   Plaintiff Freedom From Religion Foundation ("FFRF") is a non-profit
      Wisconsin corporation. Cmplt. at 2.

> **RESPONSE**:   No dispute.

67.   In its FOIA request of May 26, 2011, FFRF purported to be "writing on behalf
      of a concerned area resident and taxpayer, and other Montana members of the
      Freedom From Religion Foundation." Exhibit 1, AR at B-01 pg. 1.

> **RESPONSE**:   No dispute.

68.   Shortly before and even long after filing this lawsuit, FFRF was still
      recruiting members to participate in the lawsuit. Exhibit 9, FFRF Document

NUMBER                              STATEMENT

Production at 2-27 (hereafter, "Exhibit 9, FFRF Prod. __").

**RESPONSE**:    Dispute that the proposed finding is supported by the referenced evidence.

69. To support its standing as an association, FFRF relies upon the standing of its member, William A. Cox.

**RESPONSE**:    No dispute, except to note that said support is not exclusive.

70. Cox joined FFRF on February 18, 2012, ten days after the complaint in this matter was filed on February 8, 2012. Exhibit 10, FFRF Membership Information at 2 (hereafter, "Exhibit 10, FFRF Membership at __"); Exhibit 7, Cox Dep. at 6, 18-20.

**RESPONSE**:    No dispute.

71. Indeed, Cox first contacted FFRF "in response to the suit" and "wasn't aware of the organization before that time." Exhibit 7, Cox Dep. at 7:14-15.

**RESPONSE**:    No dispute.

72. As a frequent skier at Big Mountain, Cox has "been acquainted" with the Jesus statue "for most of the last 20 years." *Id.* at 40:3-4.

**RESPONSE**:    No dispute.

73. He is aware that both the slopes and the statue are on federal land leased from the Forest Service. *Id.* at 45:20-24; *see also* 56:15-57:8.

NUMBER                                    STATEMENT

> **RESPONSE**:      No dispute.

74.   He has "known all along that the ski resort leases its property from the Forest

      Service," but he "hadn't really applied that to the issue of the statue until the

      question of renewing the lease came up." *Id.* at 45:20-24; *see also* 56:15-57:8.

      **RESPONSE**:      No dispute.

75.   Mr. Cox has not made "any effort to avoid the statue" when "ski[ing] past" it

      at Big Mountain, and he plans to continue skiing there in the future. *Id.* at

      53:9-11; Exhibit 11, Declaration of William A. Cox at ¶ 1-2 (hereafter,

      "Exhibit 11, Cox Decl. at __").

      **RESPONSE**:      No dispute.

76.   He has never "observed any religious conduct around the statue," Exhibit 7,

      Cox Dep. at 53:24-54:2, and he is not personally "aware of any religious

      ceremonies that have been conducted at the statue," *Id.* at 54:3-4.

      **RESPONSE**:      No dispute.

77.   The first time Cox saw the statue, he reacted in "astonishment, as what in the

      world is that doing there"; he was "amazed to find a statue of Christ standing

      at the top of a ski run." *Id.* at 41:10-13.

      **RESPONSE**:      No dispute.

78.   He objects to the statue because of his "outrage or revulsion over what [he]

NUMBER                                    STATEMENT

regard[s] as the ignorance or the superstition, not to mention the hypocrisy

that goes with much of our religious expression, and certainly the ignorant

superstition and hypocrisy that enter our public debates and our public

ceremonies where religion intrudes, and just a matter of personal belief." *Id.*

at 44:9-15.

**RESPONSE**:     No dispute.

79.   Cox finds the statue to be "totally out of place, just as a matter of personal

judgment." *Id.* at 44:22-24.

**RESPONSE**:     Dispute.  *See* Knights of Columbus Findings of Fact No. 80.

80.   He also objects to the statue as a "brazen contravention of our Constitution,"

as he believes that "right up to the [S]upreme [C]ourt, religious monuments

on federal property or maybe any public property have been found to be in

contravention of the establishment clause of the U.S. Constitution." *Id.* at

44:25; 45:8-11.

**RESPONSE**:     No dispute.

81.   According to Cox, the Forest Service should bar religious organizations from

its leasing policy because "it's pretty clearly in violation of our jurisprudence

. . . to lease property for a big, fat religious symbol, for a brazenly religious

monument." *Id.* at 57:19-58:1.

NUMBER                                   STATEMENT

>   **RESPONSE**:      No dispute.

82.   Cox concedes he is unaware of any evidence of "the Forest defending the

>   statue as a religious symbol." *Id*. at 68:21-24.

>   **RESPONSE**:      No dispute.

83.   Cox is not offended by public symbols on public property generally, but only

>   when their imagery or placement is what he subjectively considers

>   "inappropriate." *Id*. at 46:20-47:15, 50:22-51:12, 54:10-24.

>   **RESPONSE**:      Dispute.  The proposed finding mischaracterizes Mr. Cox

>   who testified that some religious symbols, in context, like a

>   museum, may not convey religious endorsement.

>   (Plaintiff's Statement of Disputed Facts., Nos. 141, 142,

>   143, 144, 145, 151).

84.   There is a war memorial at the "depot" in downtown Kalispell depicting "a

>   soldier kneeling with his head bowed before the upright rifle and the helmet

>   on top of his fallen comrade." *Id*. at 25:19-26:2.

>   **RESPONSE**:      No dispute.

85.   Cox understands that the depot property is "probably city property," *id*. at

>   25:5, and that the memorial depicts a "spiritual moment," *id*. at 26:15.

>   **RESPONSE**:      Dispute the proposed finding in so far as intended as a

NUMBER                                    STATEMENT

supposed characterization that the Memorial depicts a

religious moment.

86.   Cox does not object to this because he finds it "a fitting war memorial." *Id*. at

26, 2-3.

**RESPONSE**:        No dispute.

87.   Cox has viewed religious art in the National Smithsonian Museums, but does

not find it offensive or unconstitutional, because "[i]t's been there a long

time, and as far as [he] know[s], if nobody has objected … it's regarded as

cultural history." *Id*. at 49:20-25; 50:1-2; 50:25-51:2.

**RESPONSE**:        No dispute that Mr. Cox believes that context is important.

(Plaintiff's Statement of Disputed Facts, Nos. 141-145 and

151).

88.   He would object, however, if such art were displayed on the National Mall

because this would constitute a "very brazen representation of religion in a

national government setting." *Id*. at 51:11-12.

**RESPONSE**:        No dispute because context is important to Mr. Cox.

(Plaintiff's Statement of Disputed Facts, Nos. 141-145 and

151).

89.   Cox is aware that the words "Under God" are carved into the Lincoln

NUMBER                                STATEMENT

Memorial. *Id*. at 51:23-25; 52:1-4.

**RESPONSE**:      No dispute.

90.   He does not believe that they should be removed, however, because the words
      are part of "a historical document, the Gettysburg [A]ddress." *Id*. at 52:7-8.

      **RESPONSE**:      No dispute.

91.   Cox does not object to a plaque of the Ten Commandments that sits at the
      Kalispell city courthouse because "the Ten Commandments do have
      something to do with the law" and because it is "a nice little monument the
      size of a large gravestone." *Id*. at 66:18; 67:2.

      **RESPONSE**:      No dispute because Mr. Cox considers context to be
                         important.   (Plaintiff's Statement of Disputed Facts,
                         Nos. 141-145 and 151).

92.   He would object, however, if the Ten Commandments were put up "in neon
      lights." *Id*. at 67:3-4.

      **RESPONSE**:      No dispute because Mr. Cox considers context to be
                         important.   (Plaintiff's Statement of Disputed Facts,
                         Nos. 141-145 and 151).

93.   In general, Cox is not offended by religious images in public if they "have
      historical significance" and "[i]f they're in an appropriate place." *Id*. at 54:10-13.

NUMBER                                    STATEMENT

> **RESPONSE**:   No dispute because Mr. Cox considers context to be important.   (Plaintiff's Statement of Disputed Facts, Nos. 141-145 and 151).

94.  Cox has admitted on National Public Radio that the war memorial is "a part of the local culture." Exhibit 12, Transcript of William A. Cox's Interview with NPR at 3 (hereafter, "Exhibit 12, NPR Interview at __").

> **RESPONSE**:   Dispute that the proposed finding is an accurate characterization.

95.  For Cox, "whether a piece of religious art or a religious symbol is appropriately placed" depends on "whether it's in violation of the Constitution." Exhibit 7, Cox Dep. at 55:13-19.

> **RESPONSE**:   Dispute that the proposed finding is an accurate characterization.   (Plaintiff's Statement of Disputed Facts, Nos. 141-145 and 151).

96.  FFRF's lawsuit has generated significant controversy, triggering nationwide news coverage, public rallies, and action by Montana's congressional representatives. Exhibit 1, AR at E; Exhibit 6, Graves Decl. at ¶ 23; Exhibit 4, Stip. Facts at ¶ 14.

> **RESPONSE**:   No dispute.

NUMBER                                    STATEMENT

97.  FFRF has also identified Ian Cameron, Kelly Thibault, Pamela Morris, and
     Doug Bonham as residents of Montana who object to the statue. Exhibit 13,
     FFRF Answers to KOC Interrogatories at 2 (hereafter, "Exhibit 13, FFRF
     Inter. Answers at __"); Exhibit 10, FFRF Membership at 3-4; Exhibit 9,
     FFRF Prod. at 2-27.

     **<u>RESPONSE</u>**:    No dispute.

98.  Ian Cameron joined FFRF on August 5, 2011. Exhibit 10, FFRF Membership
     at 3.

     **<u>RESPONSE</u>**:    No dispute.

99.  He doesn't have "any personal history with the statue . . . ." Although he has
     "been skiing [at Big Mountain] before," he doesn't "recall seeing the shrine."
     Exhibit 9, FFRF Prod. at 24.

     **<u>RESPONSE</u>**:    No dispute.

100. Kelly Thibault joined FFRF on September 8, 2009. She is disabled and does
     not work. *Id.* at 8; Exhibit 10, FFRF Membership at 3.

     **<u>RESPONSE</u>**:    No dispute.

101. Pamela Morris joined FFRF on February 16, 2012, and has never skiied at
     Big Mountain. *Id.* at 4; Exhibit 9, FFRF Prod. at 12.

     **<u>RESPONSE</u>**:    Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 166,

NUMBER                                    STATEMENT

                        187, 189).

102.   Doug Bonham also joined FFRF on February 16, 2012. Exhibit 10, FFRF

        Membership at 4. The last time he skied Big Mountain was eight years ago.

        At the time of the lawsuit, he had no immediate plans to go. Exhibit 9, FFRF

        Prod. at 7.

        **RESPONSE**:   Dispute.  (Plaintiff's Statement of Disputed Facts, Nos. 187-

                188).

Dated this 19th day of February, 2013.          **BOARDMAN & CLARK LLP**

                                  By:   */s/ Richard L. Bolton*
                                        Richard L. Bolton, *Pro Hac Vice*
                                        *rbolton@boardmanclark.com*
                                        Boardman and Clark, LLP
                                        1 S. Pinckney St, Ste 410
                                        Madison, Wisconsin 53703-4256
                                        Telephone: 608-257-9521
                                        Facsimile: 608-283-1709

                                        Martin S. King
                                        *mking@wordenthane.com*
                                        Reid Perkins
                                        *rperkins@wordenthane.com*
                                        P.O. Box 4747
                                        Missoula, MT 59806-4747
                                        Telephone: 406-721-3400
                                        Facsimile: 406-721-6985

                                        Attorneys for Plaintiff, Freedom From
                                        Religious Foundation, Inc.

Notice of Electronic Filing and Service

I hereby certify that on February 19, 2013, this corrected document was filed electronically in accordance with the ECF procedures of the United States District Court, District of Montana, Missoula Division, under Rule 5(d)(1), Federal Rules of Civil Procedure and L.R. 1.4(c).  All parties who are represented and have consented to service of electronically filed documents are served upon receipt of the NEF from the electronic filing system.

To the best of my knowledge, there are no parties in this case that require service by means other than electronic service using the Court's NEF.  The original document on file with the filing party contains a valid original signature.

F:\DOCS\WD\26318\31\A1599673.DOCX  [plaintiff FFRF corrected response to intervenor defs' undisputed facts (summary judgment) ]