## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin Non-Profit Corporation, | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Case No. CV 12-19-M-DLC** |
| CHIP WEBER, Flathead National Forest Supervisor, | ) ) ) | |
| and | ) ) | |
| UNITED STATES FOREST SERVICE, an Agency of the United States Department of Agriculture, | ) ) ) ) | |
| **Defendants,** | ) ) | |
| and | ) ) | |
| WILLIAM GLIDDEN, RAYMOND LEOPOLD, NORMAN DEFOREST, EUGENE THOMAS, and the KNIGHTS OF COLUMBUS (Kalispelll Council No. 1328), | ) ) ) ) ) ) | |
| **Intervenor-Defendants.** | ) | |

## PLAINTIFF'S CORRECTED STATEMENT OF DISPUTED FACTS

1.      The Defendant, Chip Weber, is the forest supervisor for the Flathead National Forest.  (Docket No. 9, ¶10.)

2.      The Defendant, Chip Weber, is an employee of the United States Forest Service, an agency of the United States Department of Agriculture.  (Docket No. 9, ¶12.)

3.      The United States Forest Service manages designated public lands of the United States.  (Docket No. 9, ¶15.)

4.      The Flathead National Forest is managed by the United States Forest Service, and consists of public lands of the United States.  (Docket No. 9, ¶16.)

5.      Big Mountain is located in the Flathead National Forest.  (Docket No. 9, ¶17.)

6.      The Knights of Columbus applied for a permit to erect a religious "Shrine overlooking the Big Mountain ski run" in 1953.  (Bolton Dec., Exh. 1.)

7.      The Knights of Columbus application stated that the applicant "proposes to erect a Statue of our Lord Jesus Christ" on land owned by the Forest Service.  (Bolton Dec., Exh. 1.)

8.      The idea for a shrine at the top of a ski run reportedly originated with requests from Catholic skiers for such a religious shrine, which the Knights of Columbus then pushed forward to eventual dedication on Big Mountain, as reported in contemporaneous sources in 1954.  (Bolton Dec., Exh. 2.)

9.      The Knights of Columbus is an exclusively Roman Catholic organization for which "Church-related activities are essential to our [its] work as an organization of Catholic laymen." (Docket 14-1, ¶22.)

10.     Membership in the Knights of Columbus is limited to practicing male Catholics who "accept the teaching authority of the Catholic Church on matters of faith

and morals, aspire to live in accord with the precepts of the Catholic Church, and are in good standing in the Catholic Church." (Docket 14-1, ¶23.)

11.     The Knights of Columbus has placed religious shrines at locations throughout the United States.  (Docket 14-1, ¶24.)

12.     The Forest Service granted the application of the Knights of Columbus on October 15, 1953, "for the purpose of erecting a religious shrine overlooking the Big Mountain ski run."  (Bolton Dec., Exh. 3.)

13.     On February 3, 2000, the Forest Service authorized the Knights of Columbus to continue to "Provide a site for religious shrine" on Big Mountain.  (Bolton Dec., Exh. 4.)

14.     After objection on May 26, 2011, by the Freedom From Religion Foundation to the Forest Service's authorization of a religious shrine on public land, the Defendant Chip Weber determined on August 24, 2011 that the placement of a statue of Jesus Christ on Big Mountain was inappropriate under the United States Constitution and must be removed.  (Bolton Dec., Exh. 7.)

15.     The denial decision noted that "the Knights of Columbus and Winter Sports, Inc. (WSI) (owners and operators of the Whitefish Mountain Resort Ski Area) contend that the Statue is a symbol of spiritual and religious significance for many citizens."  (Bolton Dec., Exh. 7.)

16.     The Forest Service decision also noted that a monument dedicated to the United States Army's 10th Mountain Division already exists on nearby private land, to which the Jesus Statue presumably could be relocated.  (Bolton Dec., Exh. 7.)

17.     The Defendant Weber's decision concluded as follows:

I have determined that renewing your permit would result in an inappropriate use of public land.  The original stated purpose for the statue was to establish a shrine, an inherently religious object.  Furthermore, the statue and its religious objective can be accommodated on an adjacent private land.  Therefore, I will not renew the special use permit.

(Bolton Dec., Exh. 7.)

18.     The Forest Service decision on August 24, 2011, relied on "Supreme Court decisions and recent case law that set the precedent regarding monuments with religious themes or icons with religious themes."  (Bolton Dec., Exh. 7.)

19.     The Defendant Chip Weber decided that authorization of a religious shrine conflicted with Supreme Court decisions and other decisions prohibiting such religious displays on public land.  (Bolton Dec., Exh. 7.)

20.     The Defendant Weber concluded in his decision of August 24, 2011, that the Shrine should be removed from public land no later than October 31, 2012.  (Bolton Dec., Exh. 7.)

21.     The Defendant Weber immediately faced criticism from religious and veterans interests, which opposed his decision, including intense lobbying by United States Representative Denny Rehberg.  (Bolton Dec., Exh. 12.)

22.     The Defendant Weber then withdrew his earlier decision of August 24, 2011, and announced plans on October 21, 2011, by the Forest Service to formally assess public comments for re-authorizing the religious shrine on Big Mountain.  (Bolton Dec., Exh. 6.)

23.     In Defendant Chip Weber's letter of October 21, 2011, withdrawing his earlier decision, Mr. Weber referred to "new information" indicating that the Jesus Statue might be eligible for listing on the National Historic Register.  (Bolton Dec., Exh. 6.)

24.     The Forest Service, however, actually first suggested the "new information" to the Montana State Historic Preservation Office, in a letter dated September 1, 2011, wherein the Forest Service requested that the Montana Historic Preservation Office "concur" in a statement that the statue of Jesus was eligible for listing on the National Register of Historic Places. (Bolton Dec., Exh. 9.)

25.     The Forest Service letter of September 1, 2011, describes the religious history of the Shrine at issue:

> The Statue was emplaced on Big Mountain and dedicated on September 5, 1954, by the Knights of Columbus ("K of C").  The Knights chose to put a shrine in the area after being approached by Winter Sports, Inc. ("WSI") and some participants in the 1949 and 1951 national ski championships, which took place at Big Mountain.  Many of the skiers were veterans of the fighting in Europe in WW II, where they observed many such shrines and thought there should be one here as well.  The Statue is located on  FSS – administered lands under a special use permit first issued to the K of C in 1953 for a spot of ground measuring 25 feet by 25 feet.  According to the permit application, the Knights wished to "erect a shrine overlooking the Big Mountain ski run."  A committee was formed by L.J. Reed, to select a site and design a shrine and then have it erected.  Other members of the committee were Frank Davis, Wayne Dirkson, Charles Smith, Ed Lyonais, Kenneth O'Brien, Bud Drew, Curtis Barnhardt, Fred Dennis, Charles Rogers, Tony Hecimobitch, and Father Cronin.   The Knights first approached WSI about placing the Shrine within the Village, but after being turned down by WSI, they turned to the Forest Service for a permit to place the Shrine at the top of the ski runs.  The final location was chosen because of the spectacular views over the valley below and for its proximity to the original main lift and run.

(Bolton Dec., Exh. 9.)

26.    The Forest Service letter to the Montana Historic Preservation Office further acknowledged that religious properties are not eligible for listing on the National Register of Historic Places if associated with important persons or events or religious values:  "The Statue of Jesus cannot be considered eligible for its association either with the soldiers who fought in WW II, nor for its association with Jesus."  (Bolton Dec., Exh. 9.)

27.    The Forest Service, therefore, asked the Montana Historic Preservation Office to agree that the Jesus Statue has no association with Jesus or WW II veterans. (Bolton Dec., Exh. 9.)

28.    The Forest Service suggested instead that the Jesus Statue be characterized as something other than a religious shrine or a war memorial.  (Bolton Dec., Exh. 9.)

29.    The Montana State Historic Preservation Office then "concurred" that the Jesus shrine "Is not believed to be a religious site because unlike Lourdes or Fatima, people do not go there to pray."  (Bolton Dec., Exh. 10.)

30.    Advocates of the religious shrine responded to the Forest Service's request for public comment, with the American Center for Law and Justice, a conservative Christian advocacy organization, submitting more than 70,000 names of supporters; Representative Rehberg also submitted approximately 10,000 comments he solicited through his "Veterans Jesus.com" website.  (Docket No. 9, ¶43.)

31.    The Defendant, Weber, however, also received comments opposing the religious Shrine on public land, including from FFRF.  (Docket No. 9, ¶44.)

32.     The Defendant Weber subsequently issued a new decision on January 31, 2012, which principally rejected non-existent environmental issues that no one had raised.  (Bolton Dec., Exh. 11.)

33.     The Defendant Weber's subsequent decision reauthorized the special use permit to the Knights of Columbus to maintain "a statue of Jesus Christ located on National forest land near the top of chair # 2 within the Whitefish Mountain resort permit boundary."  (Bolton Dec., Exh. 11.)

34.     The Defendant Weber did not discuss or explain in his new decision the Supreme Court precedent prohibiting religious monuments on public land, which decisions he previously relied on as a basis for non-renewal of the Jesus permit.  (Bolton, Dec., Exh. 11.)

35.     An article in the Whitefish Pilot, dated September 10, 1954, provides a contemporaneous description of the dedication of the Statue of Christ on Big Mountain. The article begins by noting that "Sunday, September 5, 1954, at 2:30 p.m. on top of Big Mountain at Whitefish, the Knights of Columbus dedicated a Shrine which they have just completed."  (Bolton Dec., Exh. 2.)

36.     The contemporaneous article describes access to the Shrine as follows:

To get to the top of the Big Mountain one has two choices – they can hike up from the ski lodge, or they can take the chair lift to the top and follow the trail from there to the site.

(Bolton Dec., Exh. 2.)

37.     Recent supporters of the Big Mountain Shrine, however, have defended the Statue as a war memorial, including Congressman Denny Rehberg.  (Bolton Dec., Exh. 12.)

38.     The Freedom From Religion Foundation then wrote to the Forest Service on October 26, 2011, objecting to the decision by Defendant Weber to withdraw his earlier decision not to renew the Forest Service permit for a religious shrine.  FFRF explained the First Amendment implications of allowing a patently religious monument to remain on government property as a site for a religious shrine.  FFRF further noted the Forest Service's own initial reasoning that "recent established case law is not in favor of renewing a permit of this type."  (Bolton Dec., Exh. 16.)

39.     FFRF again wrote to the Forest Service on November 22, 2011, disputing the historic preservation claims being made.  FFRF quoted Defendant Weber in his original decision denying reauthorization of the Jesus Statue:  "The original stated purpose of the statue was to establish a shrine, an inherently religious object.  Furthermore, the statue and its religious objective can be accommodated on adjacent private land."  (Bolton Dec., Exh. 17.)

40.     Finally, FFRF again wrote to the Forest Service on December 7, 2011, providing contemporaneous evidence, from the September 10, 1954 published report, that the Jesus Statue was intended as a religious monument.  FFRF cited the article from the September 10, 1954 Whitefish Pilot, which noted that leading skiers of the Catholic faith asked why a shrine had not been placed on Big Mountain.  In response, the Knights of

Columbus selected the current location for the statue of Jesus after concluding that "that our Lord himself selected this site."  (Bolton Dec., Exh. 18.)

41.     FFRF received numerous contacts expressing objections to the Jesus Statue on Big Mountain, including comments from veterans.  (Bolton Dec., Exh. 20.)

42.     John Garrity, a Vietnam veteran, wrote on December 7, 2011, as follows:

As a Vietnam Veteran, and deeply Christian Church educated and involved person my whole life, I do NOT want to see a denominational statue of ONE Church (of many churches, ethical world views) in a PUBLIC place/space that belongs to ALL Americans.  Unless we respect the most different and the least in numbers among us, we have no right to expect that we are a moral, ethical people living in a free country that equally respects the rights of all Americans, as our Declaration of Independence and Constitution suggests we are.

The fact that FFRF has received so much deeply disturbing, threatening, violent, and vile mail directed against them for their mere request that a specific religion should NOT have a special right to their private use of public land [to the exclusion of all other religious or secular viewpoints and against precedent that we are a nation of laws and respect for the SEPARATION of Church and State], seems alone and by itself proof positive of WHY we so deeply need to continue to be vigilant against any specific religious viewpoint being given special privileges, unfortunately as has apparently already been done for 50 + years on Big Mtn.

Now is the time to correct the prior error.  The USFS is the agency needing to do the right thing on our behalf, no matter how difficult nor politically unpopular it is, no matter how much particular groups, churches, or congressmen or our congressman tries to force their particular sectarian or political view upon ALL of us as Americans where everyone should feel equally welcome, because our rights to separation of Church and State is recognized, valued and protected.

As to the suggestion that the statue of Jesus on Big Mtn. is not a religious but rather ONLY a "Veterans" or "Military" monument, on the face of it this seems totally unsupportable by any logic or fact.  No matter who or why it was first installed, nonetheless, Jesus is the "Christ" of the "Christians," and only represents one of the many religious and secular viewpoints of the many diverse veterans who have served our country these

> 200 + years.  It is admirable that the Roman Catholic Knights of Columbus want to honor our veterans, I among those Veterans.  They have every right to do so, with any statue or any monument they wish to, just not a religious statue on public land that belongs to ALL Americans.

(Bolton Dec., Exh. 10.)

43.     Forest Service employees met with the Knights of Columbus to discuss the status of the special use permit for the Shrine on June 10, 2011.  (Bolton Dec., Exh. 23.) At this meeting, the Knights of Columbus expressed: their deep reverence for the Shrine and what it stands for; their feeling that the Shrine's current location is an integral part of the spiritual experience; and their feeling that the statue is "a multi-denominational religious statue" that "speaks to all religions." (Bolton Dec., Exh. 23.)

44.     One option discussed by the Forest Service at the June 10, 2011 meeting with the Knights of Columbus was getting the statue declared a historical monument. The Forest Service's Heritage Specialist's initial thinking was that the Statue did not have "historical significance," and that having the statue listed as a historical monument does not mean it would not need to be moved off national forest system land in any event. (Bolton Dec., Exh. 23.)

45.     The Forest Service noted that "The Flathead has rejected proposals from other groups to put monuments, grave markers, crosses, etc. on the Forest Service land (for instance grave markers in the Jewel Basin Hiking Area, war memorial crosses near the Desert Mountain Communication Site, memorial signs/plaques at various trailheads;

spreading cremation ashes at the North Fork, air-dropping cremation ashes in the Bob Marshall Wilderness, etc.)."  (Bolton Dec., Exh. 23.)

46.    The Shrine on Big Mountain is striking.  (Bolton Dec., Exh. 19.)

47.    The Forest Service actually has long been concerned about the Jesus Statue on Big Mountain; in fact, Becky Smith noted on March 8, 2011, that "the first job I was given here on the Flathead by Neil Malkasian was to have Jesus removed from the Montana 24 years ago.  At that time I interviewed the permittee, visited the site, and talked to the administration of the resort.  I went back and told Neil that removing Jesus would cause a huge stir."  (Bolton Dec., Exh. 24.)

48.    On April 18, 2011, Ms. Smith, Forest Recreation Program Leader of the Flathead National Forest, stated that Margaret Gorski had encouraged the Forest Service to call the Shrine a "heritage site" and "push the story behind the statue (10th Mountain Division, etc.)".  (Bolton Dec., Exh. 25.)

49.    Ms. Gorski herself advised that if the public asks for removal of the statue, "Push the historic significance."  (Bolton Dec., Exh. 25.)  Ms. Smith wrote, however, that the Forest Service "would not entertain one of these permit requests today."  (Bolton Dec., Exh. 25.)

50.    Ms. Gorski offered Becky Smith the following advice on how to finesse approval of the Shrine permit.  On April 18, 2011, Ms. Gorski wrote:

> Play up the historic nature of the site.  Perhaps Dan or the Knights would be willing to re-do the sign to be more interpretive and play up the historic

connection between the site and the 10th Mountain Division, which is tied to skiing after all.

(Bolton Dec., Exh. 25.)

51.     Earlier, on February 22, 2011, another Forest Service employee, Hans M. Castren, Acting Resource Assistant at Flathead National Forest, also discussed issues relating to the "Jesus Statue on Big Mountain."   Castren rhetorically asked: "Do we reissue the permit?  Even though it is a religious monument on FS [Forest Service] land?"  Casten also asked: "Do we continue Free Use/Fee Waiver as done in the past, even though this does not fit a category for fee waiver?"  (Bolton Dec., Exh. 27.)

52.     Finally, Castren noted that "The media attention that the Missoulian and Beacon brings to this matter is not helpful."  (Bolton Dec., Exh. 27.)

53.     The Forest Service's political sensitivity to the Shrine is not anything new, as Becky Smith previously noted.  Back on May 25, 1990, when the statue was also re-authorized, Ms. Smith wrote as follows:  "First and foremost, requiring the removal of the statue may cause public relations problems which we do not need at this time." (Bolton Dec., Exh. 28.)

54.     Ms. Smith's boss, Neil Malkasian, responded on June 8, 1990, as follows: "Unless one of us needs to establish some 'notoriety' (Whitefish Pilot: *Headlines – New Tally Lake Forester Kicks Jesus Off Big Mountain*"), then we should probably follow the path and reissue a permit with appropriate clauses as dictated by the type of permit." (Bolton Dec., Exh. 28.)

55.    The Forest Service was well aware before the pending litigation of concern about authorizing the Jesus Statue on Forest Service property.  In a summary memo dated October 18, 2011, the Forest Service noted the following:

> During at least the last two permit renewals there has been concern that reauthorization of this religious shrine may be a violation of the U.S. Constitution, established case law, and Forest Service policy.  (Forest Service handbook policy directs managers to not approve permits for activities or uses that could otherwise occur on other than public lands).  (Bolton Dec., Exh. 30.)

56.    On August 24, 2011, Weber denied reauthorization for the Jesus permit, which resulted in the "notoriety" predicted 21 years earlier, and so by September 1, 2011, a week later, the Flathead National Forest Archeologist determined that the Shrine was eligible for listing on the National Register of Historic Sites, and requested concurrence by the Montana Historical Society, State Historic Preservation Office.  (Bolton Dec., Exh. 7.)

57.    Having changed course, the Forest Service then plotted how to manipulate public perception of the Shrine.  Carl Davis, from the Forest Service Regional Office, made some recommendations in a summary dated November 7, 2011, including the need to "focus on historical values rather than religious ones."  (Bolton Dec., Exh. 31.)

58.    Davis also emphasized the need to "be clear about the historical value and National Register of Historic Places – eligibility of the statue in scoping letters and news releases since this is the central issue in permit reissuance; it is in the media; and it may help inform public response during scoping and beyond."  (Bolton Dec., Exh. 31.)

59.    Davis also highlighted the need to claim that the statue's "primary historical value is its association with the early development of the Big Mountain ski area, now Whitefish Mountain Resort." (Bolton Dec., Exh. 31.)

60.    Davis then urged Forest Service personnel to keep in perspective that National Register eligibility "largely turns on the statue's association with early ski hill development, and in a secular (people go there to play) rather than a religious context (people go there to pray)." (Bolton Dec., Exh. 31.)

61.    Finally, Davis candidly recognized that the "10th Mountain Division's association with the statue/shrine at Whitefish Mountain (formerly Big Mountain) ski area is hard to pin-point and substantiate with existing historical data." (Bolton Dec., Exh. 31.) "The statue's WW II Veteran Association with the 10th Mountain Division is anecdotal and ambiguous." (Bolton Dec., Exh. 31.)

62.    The Forest Service also considered measures to procedurally insulate its decision from appeal so that "only the permittee (Knights of Columbus) would be eligible to appeal." (Bolton Dec., Exh. 32.)

63.    According to the Defendants' recently commissioned-investigation, contemporaneous reports confirm that the intent was "to erect a statue of our Lord Jesus Christ," for the purpose of "erecting a religious shrine overlooking the Big Mountain ski run." (Docket No. 63-1 at 5.)

64.    According to the Defendants' oral historian, Ian Smith ("Smith"), the statue has subsequently been reported to be associated with WW II veterans, culminating in a

recent plaque purporting to describe the history of the statue, including the claim that "a common memory of theirs [troops] in Italy and along the French and Swiss border was of the many religious shrines and statues in the mountain communities."  (Docket No. 63-1at 9.)  The plaque concludes by thanking "Those brave troops that brought this special shrine of Christ to the Big Mountain and hope that you enjoy and respect it."  (Docket No. 63-1 at 9.)

65.    Smith also describes the location of the Shrine as originally being in a remote, pristine area removed from other structures and activities.  (Docket No. 63-1 at 9.)

66.    Smith also concluded that he "did not locate any sources contemporaneous with the Statue's 1954 dedication that showed a direct association between it and WW II Veterans who had returned to Whitefish less than a decade earlier."  (Docket No. 63-1 at 11.)  Smith concluded that "the historical records do not directly link the statue and these WW II Veterans."  (Docket No. 63-1at 12.)

67.    Smith's report documents considerable actual usage of the site of the Statue for religious services or gatherings.  (Docket No. 63-1 at 15-17.)   Smith states that "historical documents do not indicate any consistent uses of the Jesus Statue over time, but oral interviews conducted by HRA do indicate that church services and prayer gatherings have occurred periodically at the site."  (Docket No. 63-1 at 15.)

68.    Smith interviewed 13 individuals as part of his research, including three pastors, from different Christian traditions, who each commented that "From a personal

standpoint, the Jesus Statue was 'comforting' to them, since it reminded them of Christ's presence in the world."  (Docket No. 63-1 at 17.)

69.     After first noting the remoteness of the statue, moreover, Smith goes on to describe the status as a "well-known landmark and meeting place for skiers on the mountain."  (Docket No. 63-1 at 18.)  Smith concludes by describing the Shrine as a "Well-known local landmark at Big Mountain."  (Docket No. 63-1 at 19.)

70.     Smith admits that the Shrine is "something that has set Big Mountain apart from other ski resorts."  According to Mike Collins [interviewee], "the statue was something 'that made Big Mountain sort of stand out.' "  (Docket No. 63-1 at 24.) Another interviewee described the Shrine as providing a "unique historical thing" that distinguishes Big Mountain.  (Docket No. 63-1 at 24.)

71.     Smith also considers it "worth reiterating" that the area of the Shrine is a summer and winter tourist destination "visited by thousands of people each year." (Docket No. 63-1 at 25.)   In fact, Smith notes that the statue is located at a place of unique and great beauty in the Flathead Valley.  (Docket No. 63-1 at 26.)

72.     Smith's report includes the transcripts from 13 interviews of local residents. (Docket No. 63-1 at 41-117.)  Jean Arthur, one source who wrote a book on the local history of Big Mountain, noted that the statue is visible by skiing past it and "very popular with skiers and families, and, of course, with big weddings over the years." (Docket No. 63-1 at 42.) Ms. Arthur also notes that her own family "would pass by the Jesus Statue and say 'hi' to Jesus and maybe stop for a second."  (Docket No. 63-1 at 43.)

As to church services being held at the statue, Ms. Arthur commented "Oh yeah, yeah, definitely." (Docket No. 63-1 at 43.)

73.     Brad Brittsan, a Whitefish pastor, commented that "as a believer in Christ, I look at it [Shrine] as something that is comforting."  (Docket No. 63-1 at 45.)  Brittsan also commented that skiers "would stop on the way down the mountain and stop for a second and, at the base of the statue, and then finish skiing down the mountain." (Docket No. 63-1 at 45.)  Brittsan concludes that "Well, you know, I guess, when I look at the statue, and you know, it's at a great place where there is a great view of the Valley, and it reminds me of God watching over us."  (Docket No. 63-1 at 46.)

74.     Mike Collins, who has lived in Whitefish since 1988, noted that the Jesus Statue "was a well-established attraction up on the mountain when he arrived in 1988." (Docket No. 63-1 at 47.)  Collins acknowledged use of the Shrine in the winter months by religious groups.  Collins also commented on what a "well-known feature up on the mountain" the statue was; "lots of skiers would go by it and a lot of them would take pictures of themselves with their family and friends, you know, with the statue in the background.  So it was a pretty popular stop." (Docket No. 63-1 at 48.)

75.     Linda Fopp, by contrast, claimed that the statue was erected out of the area of main recreational usage.  (Docket No. 63-1 at 52.)

76.     Ms. Fopp also noted, however, that critics of the statue were admonished to "Don't look at it [the statue]," if bothered. (Docket No. 63-1 at 55.)

77.     Ms. Fopp stated that the Shrine, in her opinion, has an effect on people that goes beyond just the beauty of the scenery.  She notes that skiers say "You know when you stop there, there is something else that moves them."  (Docket No. 63-1 at 55.)  Ms. Fopp also describes the meaning of the Jesus Statue to her personally:

> It's just a reminder that he is constantly watching over us and protecting us in his, in one of his own ways that we have no control over.  There is – you can have a statue in your house, you can understand that much easier, but many people don't have any kind of a statue in their house that – and it is, they, as I said, many of the skiers, they said, "You know," they – "I stopped by that statue today."  They said, "And you know, I really felt."  And we say, "Yeah.  We know."  We're just smiling.  "Yeah.  We know.  Happy you did."  But it's something that needs to be – we believe, I believe, that needs to be shared more.  If only people knew how to accept it."  (Docket No. 63-1 at 55.)

78.     Dan Graves, another interviewee, came to Whitefish in the Fall of 2006, and observed the Shrine when he took one of his first skiing trips on the mountain. "I was coming down the mountain, skiing toward my office, and out of the corner of my eye – in the clouds, because it was a cloudy day – I saw something that looked like somebody standing off to the side, so I stopped, and, lo and behold, I saw this statue. And I thought, 'Wow.'  That is really kind of unusual.  I have not seen very many of these around the country.  I have seen several of them in Italy because I've traveled to Italy a few times."  (Docket No. 63-1 at 59.)

79.     According to Graves, about 30% of the skiing business on Big Mountain is local Valley residents who "come by [the Shrine] and reflect for, you know, lack of a better word."  (Docket No. 63-1 at 60.)

80.    Graves put up a plaque purporting to describe the history of the Shrine as he understood it, but he notes that "You know, when we put up the plaque, you know, in hindsight, I should've, you know, asked the Forest Service if it was okay, but I never even thought about it."  (Docket No. 63-1 at 64.)

81.    Graves recognizes the uniqueness of the Jesus Statue, insisting that he had never seen anything like this at other ski areas.  He described the Shrine as a monument unlike any memorial he had seen:

> I've seen, you know, monuments if you will – which I consider this, it's a monument – at other resorts that, you know, talked about maybe the 10th Mountain Division.  You know that is very common because so many resorts were, were founded by 10th Mountain Vets, just like this one.
>
> You know sometimes, it's just a plain concrete plinth with a plaque on it. Other times it's, you know, it may be a, just a statue of, you know, a person that was in the 10th Mountain that, you know, was instrumental in that particular resort.  I know there is a monument on top of Mammoth Mountain in California, you know, that's – which is on Forest Service land – and it's a monument which has two crossed skis and its for a patroller that died in an avalanche decades ago.  So I mean there's, you know, there's a few of them around, but it's not a lot of them."  (Docket No. 63-1 at 65.)

82.    In the end, Graves recognized that the religious character of the Shrine is what distinguishes it:

> If this statue on our mountain had been anything other than Christ, it'd be a non-event.  It would be a non-event.  And so I think, just that fact alone, that if it had been anything else, it never would have gotten to the point of where it's at.  But because it is a statue of Christ, you know, a small group of people are using this as a forum to express their viewpoint on religion, and I think that is where, you know, the whole essence of why it is there, you know, is not even really valued, if you will.  It's a veterans' memorial, and these vets just happen to use the statue of Christ as their symbol of what they wanted to ex- of how they wanted to express their gratitude and

thanks.  But, if it had been, you know, a statue of a 10th Mountain person carrying a rifle, it would have been a non-event today.  So just, you know, by that fact alone, you know, it just feels like a very – it just feels very peculiar.  Very peculiar.

(Docket No. 63-1 at 66.)

83.    Martin Hale, another interviewee, noted that "people stop there [at the Shrine] all the time, and they want to know, you know, the history of it, and it was really quite popular on that particular chair lift."  (Docket No. 63-1 at 68.)  Hale further noted that he wasn't sure what everyone was thinking about, "but they sure-it [the Shrine] sure caught their attention."  (Docket No. 63-1 at 68.)

84.    Hale was also struck by the quiet contemplation of those who looked upon the Shrine:

We'll, like I mentioned, sometimes people, when we would take classes out there and they would stop they always wanted pictures.  But some of them as they silently, you know, in their minds I don't know what they were saying but they weren't talking a lot.  They were quite, you know – I don't know what they were saying always, but they, lots of thinking.  And, and not – it was, it was kind of really eye-catching, and it meant a lot to some people and I don't know what all it, you know, I meant to some of them because they didn't say it, what they were always thinking.  (Docket No. 63-1 at 69.)

85.    Mike Jensen, who has lived in Whitefish most of his life, further surmised about the purpose of the Shrine, although his comments were not "meant to be gossip truth."  In any event, Jensen understood that "returning soldiers came back from Europe after the war, and they lamented the fact they did not have any iconic images around the mountains, and they found these when they were in Europe.  They like them."  (Docket No. 63-1 at 72-73.)

86.     Although Jensen doubted whether most people knew much about the history of the Jesus statue, he admitted that "he and others would tip their hat to the Jesus statue when they went by on Sunday." (Docket No. 63-1 at 74.)

87.     Smith also interviewed Mike Muldown, another long time resident of Whitefish, since 1945. (Docket No. 63-1 at 77.) Muldown doesn't recall the statue ever being called a "memorial for the troops or anything. But I do recall the fact that they did mention that the World War II Veterans had come back from Europe and that was one of the reasons that they advocated the shrine on the mountain." (Docket No. 63-1 at 78.) Muldown reiterated that "I do not recall it ever being specifically any kind of a memorial to the troops, that it was just inspired by the people that were members of the Knights of Columbus that had been Veterans." (Docket No. 63-1 at 78.)

88.     Muldown personally enjoys seeing the Jesus statue. He stated that "I guess, to me, it's like, it's a -religious icon – that's kind of a private thing." (Docket No. 63-1 at 78.)

89.     Paul Ogle commented on the irritation caused by persons who object to the Jesus statue. "My understanding is everybody is – enjoys it being there and is irritated that some people from outside the state want to come and tell us whether we can or cannot do something locally here that the majority of the people seem to have no problem with, no issue with." (Docket No. 63-1 at 83.) He went on to describe his majoritarian view of the statue:

I think people viewed it just as an interesting icon that had some historical significance.  Most people that I'm aware of don't have any antipathy to religious symbols in general.  Whether it's crosses or statues, it doesn't – most people are totally comfortable and accepting of those who want to put those up and get permission to do it.  And I think my feeling is most people get irritated by those who try to enforce prohibitions against religious representations – statues and things.  They seem to be a vocal, tiny minority who seem to want to impose their will on the majority of people who don't have a problem with it.  (Docket No. 63-1 at 83.)

90.     For Mr. Ogle, the statue definitely has religious significance:

I personally just kind of enjoyed the fact that – I mean, it's a bit like the Jesus statue in Rio and Brazil or something.  It's just a reminder to me that Jesus is a very real presence in our world and I am, I guess I find some comfort in that, whether the statue is there or not.  It – I'm aware that Jesus is very present and active in our world, and to me, it's just a reminder of that.  It doesn't have any religious significance beyond that.

(Docket No. 63-1 at 83.)

91.     Ogle admits that he has been part of groups that have gone up to the statue "to gather to pray over our community and pray for God's protection and blessing on our community."  (Docket No. 63-1 at 84.)

92.     Karl Schenck also spoke to Smith's assistant about the Shrine built shortly after Schenck's birth in Whitefish in 1953.  (Docket No. 63-1 at 86.)  Schenck claims that the statue was built at a remote, but very beautiful part of the Mountain where people would go to view the Valley.  (Docket No. 63-1 at 87.)

93.     In Schenck's case, the statue has always been on the mountain and he has respect for it and even talks to it.  (Docket No. 63-1 at 88.)  To Schenck, he "grew up Catholic, and it was just kind of amazing that there was something that big and beautiful sitting out there on top of the mountain."  (Docket No. 63-1 at 88.)

94.     Jane Solberg, another interviewee, also cited hostility toward critics of the Shrine who were perceived as outsiders.  "What in the heck is some group from not in Montana butting into business in Montana?  If there is a real problem with the Jesus statue, it would've been handled locally."  (Docket No. 63-1 at 97.)

95.     Jeff Tepples, who has lived in the Whitefish area since 1973, voiced a common perception of the Jesus statue as having Christian meaning:

> I think it was probably around 6th grade that I, someone pointed out to me that there was a statue of Jesus on the top of Chair Two.  And, at that time, I thought, "that's really cool that there is a" – that, you know, that someone thought ahead to say, "let's say that this place is a special place."  And it really is to me.  Big Mountain is a special place in that it's tied into our love of creation and that there is a creator.  And so it didn't offend me at all.  I thought it was actually awesome to have Jesus up there and so we would often ski by there and wave at Jesus on our way by because we were Christians and it was really meaningful to have that statue there. (Docket No. 63-1 at 105.)

96.     Mr. Tepples also noted that "I think the people – if you're a Christian, I think they're really are happy about it, fond of it."  (Docket No. 63-1 at 106.)

97.     For Mr. Tepples, personally, the Shrine reminds him "that God is involved in everything I [he] do and the reason that I [he] think, you know, Jesus could be there is that he is the savior of the world.  And it's not trying to, you know, hammer anyone over the head with religion.  I just think it's an invitation to consider him.  So, for me personally, as a pastor, but as a Christian more, just a reminder that God is in my midst."  (Docket No. 63-1 at 107.)

98.     Tom Unger was the last person interviewed for Ian Smith's report and he noted that he saw the Shrine the very first time he ever skied on the mountain in 1955. (Docket No. 63-1 at 110.) "All the locals who happen to ski on those particular runs – or on the main run of that lift – would ski by that statue.  I mean, so they had to be well aware of the statue."  (Docket No. 63-1 at 112.)

99.     Ian Smith did not interview any tourists or persons who saw the Shrine from the perspective of a tourist coming to the Whitefish area.  (Bolton Dec., Exh. 22; Smith Dep. at 10.)

100.    Smith has personally skied by the Jesus Statue, which he recognizes as depicting Jesus.  (Bolton Dec., Exh. 22; Smith Dep. at 12.)

101.    Smith has not seen similar Shrines at other areas that he has skied.  (Bolton Dec., Exh. 22; Smith Dep. at 12.)

102.    Smith did not perceive the statue of Jesus as a joke when he encountered it. (Bolton Dec., Exh. 22; Smith Dep. at 13).

103.    Smith's archival research did not identify any intention for the statue other than as a religious shrine.  (Bolton Dec., Exh. 22; Smith Dep. at 16-17).

104.    Smith's research also did not uncover any evidence that the statue was not intended to represent Jesus Christ.  (Bolton Dec., Exh. 22; Smith Dep. at 19).

105.    Nor did Smith discover any contemporaneous sources suggesting that the Shrine was intended by the Knights of Columbus as a war memorial.  (Bolton Dec., Exh. 22; Smith Dep. at 19).

106.    Smith did not investigate whether the Shrine, if a war memorial, would be inconsistent with also being a religious shrine.  (Bolton Dec., Exh. 22; Smith Dep. at 20-21).

107.    Smith is aware of some suggestion that Shrine seen in Europe during WW II were religious.  (Bolton Dec., Exh. 22; Smith Dep. at 22-23).

108.    Smith claims he does not know whether the Knights of Columbus contend at this time that the Jesus Statue was intended as a war memorial.  (Bolton Dec., Exh. 22; Smith Dep. at 25).

109.    Smith understands that the Knights of Columbus is a Catholic organization. (Bolton Dec., Exh. 22; Smith Dep. at 26).

110.    Smith did not discover any information indicating that the Knights of Columbus have ever intended the statue as other than a representation of Jesus Christ. (Bolton Dec., Exh. 22; Smith Dep. at 27-28).

111.    Smith does not know whether the Shrine is viewed differently by local residents than tourists.  (Bolton Dec., Exh. 22; Smith Dep. at 28).

112.    Smith did discover evidence that the site of the Shrine has been used for religious ceremonies from time-to-time.  (Bolton Dec., Exh. 22; Smith Dep. at 30).

113.    Smith does not know whether skiers view the statue as representing Jesus Christ, but he admits that the statue does recognizably depict Jesus.  (Bolton Dec., Exh. 22; Smith Dep. at 33).

114.    Smith acknowledges that the personal perceptions of the interviewees represent the most direct evidence of perceptions of the Shrine, but he did not do any analysis of their perceptions.  (Bolton Dec., Exh. 22; Smith Dep. at 40).

115.    In fact, Smith did not reach any conclusions about the perceptions by the interviewees themselves as to whether they perceived the Shrine as having religious significance.  (Bolton Dec., Exh. 22; Smith Dep. at 41).

116.    According to Smith, he did not investigate whether the Shrine had personal religious significance to the interviewees.   (Bolton Dec., Exh. 22; Smith Dep. at 41-42).

117.    Smith also did not investigate whether the statue is intended as a parody. (Bolton Dec., Exh. 22; Smith Dep. at 44).

118.    Smith further did not investigate the question of whether or not "playfulness and irreverence" represented typical behavior in regard to statues, landmarks and public landmarks.  (Bolton Dec., Exh. 22; Smith Dep. at 45).

119.    Smith claims he does not know whether speaking out against the statue is a popular or unpopular local position to take; he also does not know whether speaking out against religion is a popular or unpopular local position.  (Bolton Dec., Exh. 22; Smith Dep. at 48).

120.    Smith does not have an opinion as to whether a pervasive culture of hostility against people opposed to the Shrine would discourage complaints about it. (Bolton Dec., Exh. 22; Smith Dep. at 48-49).

121.    Smith did not investigate whether there is any local hostility toward people who oppose the Shrine.  (Bolton Dec., Exh. 22; Smith Dep. at 50).

122.    Smith also does not know the extent of irreverence and playfulness, nor did he investigate why some people engage in irreverent behavior with regard to the Shrine. (Bolton Dec., Exh. 22; Smith Dep. at 51-52).

123.    Smith also did not investigate whether persons who had personal exposure to the Shrine perceived it as a religious symbol.  (Bolton Dec., Exh. 22; Smith Dep. at 52-53).

124.    Smith did not interview anybody who engaged in playful or irreverent behavior, nor does he know whether they perceive the Shrine as inappropriate or incongruous in its location.  (Bolton Dec., Exh. 22; Smith Dep. at 53).

125.    Smith acknowledges that religious sites and commemorative markers typically are not eligible for the National Register.  (Bolton Dec., Exh. 22; Smith Dep. at 56).

126.    Smith acknowledges that something can both convey a religious impression and have regional historical significance.  (Bolton Dec., Exh. 22; Smith Dep. at 57).

127.    Smith says he does not know whether WW II Veterans perceive the Shrine as evoking their religious faith and the inspiration gotten from religious symbolism in Europe.  (Bolton Dec., Exh. 22; Smith Dep. at 61).

128.    Smith admits that the Shrine does not make any reference to the local 10th Mountain Division from Montana.  (Bolton Dec., Exh. 22; Smith Dep. at 68).

129.   Smith does not know whether persons who object to the Shrine are a discouraged minority.  (Bolton Dec., Exh. 22; Smith Dep. at 72).

130.   Smith admits that some of the interviewees ascribe religious significance to the Shrine.  (Bolton Dec., Exh. 22; Smith Dep. at 73-74).

131.   Smith does not have any opinion as to why religious ceremonies are sometimes held at the Shrine site.  (Bolton Dec., Exh. 22; Smith Dep. at 76).

132.   Smith acknowledges that persons aware of the Shrine would view it as depicting Jesus.  (Bolton Dec., Exh. 22; Smith Dep. at 77).

133.   William Cox decided to become a member of FFRF because of the maneuvers regarding the Shrine by the Forest Service.  (Bolton Dec., Exh. 21; Cox Dep. at 6-7).

134.   Cox has long been personally opposed to the Shrine but he did not know anything could be legally done.  (Bolton Dec., Exh. 21; Cox Dep. at 9).

135.   FFRF did not offer any incentive to Cox to support this lawsuit.  (Bolton Dec., Exh. 21; Cox Dep. at 11-12).

136.   According to Cox, the recent story by the Knights of Columbus that the Shrine was erected as a war memorial "was news to just about everybody around here." (Bolton Dec., Exh. 21; Cox Dep. at 14).

137.   Cox personally very much favors this lawsuit.  (Bolton Dec., Exh. 21; Cox Dep. at 27).

138.    Cox has a Ph.D. in economics from Princeton; he previously was a senior specialist in economic policy at the Congressional Research Service; and he was a deputy chief economist in the Department of Commerce during the Carter administration. (Bolton Dec., Exh. 21; Cox Dep. at 31-33).

139.    Cox and his wife ski at Big Mountain 25-30 times every year.   (Bolton Dec., Exh. 21; Cox Dep. at 38).

140.    Cox is vigorously opposed to having the Statue of Jesus Christ on public land which he considers totally inappropriate; he also recognizes the statue as unmistakably a religious monument located on federal property. (Bolton Dec., Exh. 21; Cox Dep. at 45).

141.    Cox is not opposed to all religious symbols on public property, depending upon the contextual appropriateness.  (Bolton Dec., Exh. 21; Cox Dep. at 46-47).

142.    Cox, for example, recognizes that religious themes can have artistic value, such as with respect to art and cathedrals.  (Bolton Dec., Exh. 21; Cox Dep. at 48-49).

143.    For that reason, Cox recognizes that religious-themed art might be appropriate at the Smithsonian.  (Bolton Dec., Exh. 21; Cox Dep. at 49).

144.    Cox considers that religious art may be publicly suitable in context, such as at a museum.  (Bolton Dec., Exh. 21; Cox Dep. at 50-51).

145.    On the other hand, a Christian monument located on the National Mall would not be appropriate, according to Cox.  (Bolton Dec., Exh. 21; Cox Dep. at 50).

146.   Cox's wife is Jewish and she is very apprehensive about overtly Christian expressions, especially in public contexts.  (Bolton Dec., Exh. 21; Cox Dep. at 52-53).

147.   Cox acknowledges he is not a lawyer, but he believes that leasing property to a religious organization violates the Constitution. (Bolton Dec., Exh. 21; Cox Dep. at 57).

148.   Cox does not have a legal opinion as to whether or not it is unfair or discriminatory for the Forest Service to allow public property to be used for religious purposes.  (Bolton Dec., Exh. 21; Cox Dep. at 59).

149.   Cox believes that the statue of Jesus is be an inappropriate war memorial because it does not say anything about the sadness of war; "It's just a statue of Christ with his arms outstretched."  (Bolton Dec., Exh. 21; Cox Dep. at 61).

150.   Cox believes that some persons support the statue on Big Mountain out of religious conviction.  (Bolton Dec., Exh. 21; Cox Dep. at 65).

151.   Cox emphasizes that context affects his objection to religious symbols on public land.  (Bolton Dec., Exh. 21; Cox Dep. at 67-68).

152.   Shortly after the U.S. Forest Service denied the lease renewal for the land beneath the Shrine on Big Mountain, according to Mr. Cox, proponents of the Shrine declared that it was a war memorial erected in recognition of the deeds of American servicemen during World War II.  (Cox Dec., ¶3.)

153.   Prior to the war memorial explanation that suddenly materialized, Mr. Cox had never heard or otherwise known that the Shrine was anything other than an absurd

likeness of Jesus in a Roman Catholic style.  He knew of no indication that the statue had originated as a war memorial.  (Cox Dec., ¶4.)

154.   Mr. Cox considers the statue to be utterly inappropriate as a public war memorial.  It is an unambiguously Christian religion monument with nothing about it to remind one of the heroism or the heartache of war, according to Mr. Cox.  (Cox Dec., ¶5.)

155.   As a rationalist and non-believer, Mr. Cox considers the statue of Jesus on public land to be ridiculous and offensive.  He sees it as a religious monument, conspicuously Roman Catholic in style, that belongs in the courtyard of a monastery or on the roof of a church.  (Cox Dec., ¶6.)

156.   As a regular skier, however, Mr. Cox has frequent and unwanted contact and exposure to the Shrine when he is skiing on Big Mountain many times each winter, which he finds to be offensive.  (Cox Dec., ¶7.)

157.   Doug Bonham lives in Essex, Montana, approximately 60 miles from Big Mountain.  He is a member of the Freedom From Religion Foundation and he appreciates of the Foundation's challenge to the Jesus statue prominently located on Big Mountain. He agreed to join as a member of FFRF and to be identified with this lawsuit, although he knows it is not a popular local position.  He is a religious non-believer.  (Bonham Dec., ¶1.)

158.   Approximately 7 or 8 years ago, Mr. Bonham first encountered the Jesus statue on Big Mountain while skiing, and his immediate reaction was that the statue was

grossly out of place and an oppressive reminder that Christians are a controlling and favored group in the Flathead Valley.  He has not skied or hiked by the statue since, and his aging knees limit him, in any event.  Nonetheless, his 15 year old daughter regularly skis on Big Mountain and has exposure to the Jesus Statue, which she also considers ridiculously out of place.  (Bonham Dec., ¶2.)

159.   As a resident of Flathead Valley, Mr. Bonham is still affected by the statue on Big Mountain, which literally and figuratively looms over the Valley.  He knows from residing in the Flathead Valley that this is Christian country, and he knows from personal experience with local residents that the statue is perceived as a religious symbol – in fact, the statue is proudly perceived as a reminder of the Christian religious values that the majority in the Valley promote.  (Bonham Dec., ¶3.)

160.   The presence of the Shrine on Big Mountain is known to skiers and non-skiers alike in the Valley, and it is perceived as a recognized symbol of the religious majority, according to Mr. Bonham.  (Bonham Dec., ¶4.)

161.   Mr. Bonham knows that disagreement with or disapproval of the statue of Christ is not a popular or prudent local position, and objection to the statue is discouraged.  (Bonham Dec., ¶5.)

162.   The Shrine has an influence throughout the Valley that has the effect of making non-believers, like Mr. Bonham, feel marginalized in the own local community. (Bonham Dec., ¶6.)

163.    Pamela Morris is a third generation Montanan who knows and values the State's natural heritage.  For over 60 years, she has skied, camped, hiked and fished in the mountains of Montana.  (Morris Dec., ¶1.)

164.    Ms. Morris is a member of the Freedom From Religion Foundation, which she joined after learning of their opposition to the religious icon located on public land on Big Mountain.  (Morris Dec., ¶2.)

165.    Ms. Morris contacted the Freedom From Religion Foundation on January 28, 2012, when she heard that they were intending to file a lawsuit objecting to the Big Mountain Shrine.  (Morris Dec., ¶3.)

166.    Ms. Morris communicated her willingness to join in a lawsuit and subsequently agreed to join as a member shortly before the present lawsuit was filed. (Morris Dec., ¶4.)

167.    On November 14, 2011, Ms. Morris previously had sent a message to the Forest Service strongly protesting allowing a religious icon on federal lands.  Her letter to the Forest Service stated as follows:

> Remove this public religious display from public lands, and confirm the practice that public lands are not to be used to promote any particular ideology.  No trade of lands, either, as this is a public view that all deserve to enjoy in its natural state.  Such a display is <u>pollution</u>, as it is both artificial not environmentally beneficial.  No revenue is forthcoming from this to off-set the cost of use.  Permitting this statue is partisanship.  Selling or trading public lands to any religious entity violates separation of church and state.  This Catholic statue is a poor precedent: once allowed to continue, other

special interest groups can use this gesture also to use public
lands to display their own individual totems.

(Morris Dec., ¶5.)

168.   The Jesus Statue on Big Mountain reminds Ms. Morris of her first
encounter with it during Christmas break in 1957, as a member of the Great Falls,
Montana, ski team in her first major winter outing in the mountains, skiing Big Mountain.
Ms. Morris felt the natural, grand, glorious (yes, spiritual) beauty.  But to her, the statue
felt startlingly out of place: intrusive.   She was 15, active in the Methodist Youth
Fellowship; still, she remembers the unsettled feeling she first had when she saw it.
Since then she has avoided the area: she back-packs, fishes and camps where nature has
not been so violated in Montana.  (Morris Dec., ¶6.)

169.   Ms. Morris grew up appreciating the outdoors and has continued to recreate
regularly, skiing as recently as just last February.  (Morris Dec., ¶7.)

170.   Ms Morris has skied many areas in Montana throughout her life, but she
would definitely enjoy skiing Big Mountain again if it were a welcome site for all who
love nature.  The Jesus Statue, however, is an intrusive icon, and therefore, she does
avoid Big Mountain.  (Morris Dec., ¶8.)

171.   Recreation is still a valuable part of Montana.  People are drawn here
because of its natural beauty.  Ms. Morris hopes to protect our public lands from the
intrusion of partisan artificial icons: To protect the interests of all citizens, especially
those who love Montana.  (Morris Dec., ¶9.)

172.   Ms. Morris taught English and mythology (comparative religion) for 30 years in Billings, Montana.  She is committed to preserving First Amendment rights and she considers the imposition of one sect's values on the rest of the citizenry to violate the First Amendment.  Ms. Morris would support any religious group's efforts to build on private land, including a mosque in her neighborhood, but she opposes any building on public land.  (Morris Dec., ¶10.)

173.   Ms. Morris objects strongly to using or trading public land in order to accommodate a particular religious expression, such as the Big Mountain statute.  For that reason, she contacted the Freedom From Religion Foundation asking how to put pressure on Representative Rehberg in order to stop his land trade legislative proposal.  (Morris Dec., ¶11.)

174.   Ms. Morris considers herself a spiritual, but not religious person, and not "Christian."   She is a member of the Unitarian Universalist's "Church of the Larger Fellowship," and she has close connections to the Billings and Missoula communities, as well as her hometown of Great Falls and the rest of North Central Montana. (Morris Dec., ¶12.)

175.   Ms. Morris has made a conscious effort to avoid Big Mountain because of the Jesus Statue, which she perceives as a Christian icon on public land that has the effect of promoting one particular religious sect. (Morris Dec., ¶13.)

176.   Freedom From Religion Foundation ("FFRF"), is a membership group organized as an educational 501(c)(3) charitable non-profit that advocates for the

separation of state and church, and educates on matters of non-theism. FFRF's membership consists primarily of persons who identify as freethinkers (atheist, agnostic, or who are otherwise non-religious).  (Gaylor Dec., ¶1.)

177.    Annie Laurie Gaylor co-founded FFRF with her mother when she was a college student in 1976. FFRF was incorporated in 1978 and then went national.  Since its beginning, FFRF has received complaints from atheists and agnostics around the country who object to religious displays on government property as a violation of their freedom of conscience. (Gaylor Dec., ¶2.)

178.    FFRF has more than 19,000 members nationally, and more than 100 in Montana, including members who reside in the City of Whitefish, the City of Kalispell and the surrounding area of Flathead County, Montana. (Gaylor Dec., ¶3.)

179.    FFRF represents its members when complaining about religious displays on public-owned property. (Gaylor Dec., ¶4.)

180.    FFRF received complaints about the Sacred Heart of Jesus Shrine ("Jesus Shrine") located in Flathead National Forest, prompting FFRF to write letters of complaint.  FFRF Staff Attorney Stephanie Schmitt first wrote a letter to the U.S. Forest Service on May 26, 2011, making a Freedom of Information Act request on behalf of "a concerned resident and taxpayer, and other Montana members of the Freedom From Religion Foundation ('FFRF'), who object to the erection and maintenance of a statue of Jesus Christ on government property." (Gaylor Dec., ¶5.)

181.    On Oct. 26, 2011, on behalf of FFRF's national and Montana membership, she sent a letter to Tim Tidwell, Office of the Chief, U.S. Forest Service, urging him to "immediately overrule a misguided decision by Forest Supervisor Chip Weber" to take public comments and reconsider its decision to remove the shrine.  She noted this was a longstanding First Amendment violation, that erecting a "shrine" constitutes an impermissible religious purpose, that the Forest Service acknowledges preferential treatment and constitutional concerns, that the public comment was "irrelevant, inappropriate, divisive," that the "war memorial" rationale "is a sham," that the fence and plaque violate the Special Use Permit, and that the Forest Service must uphold the Constitution. (Gaylor Dec., ¶9 and Exh. 3.)

182.    Ms. Gaylor is a co-founder of FFRF, and she has been an active part of FFRF since its beginning, and she became co-president in 2004.  She has personally observed that the public reaction to requests to end Establishment Clause violations often devolves into *ad hominems*, hostility and veiled or unveiled threats to FFRF and members who are state/church separation advocates. (Gaylor Dec., ¶13.)

183.    Attacks on FFRF since contacting the Forest Service about the Shrine have often been framed in hostile and religious terms, not as mere disagreement over a "historic" monument. (Gaylor Dec., ¶14.)

184.    FFRF has received a number of vitriolic phone calls and messages in response to FFRF's request that the U.S. Forest Service decline to reissue a permit for the

Jesus Shrine. These messages often treat the issue as a religious matter. (Gaylor Dec., ¶15.)

185.    Correspondence received by FFRF in October of 2011, which is when the Shrine issue garnered substantial national media attention, demonstrates the hostility to objectors.  (Gaylor Dec., ¶16 and Exh. 4.)

186.    The level of hostility prompted FFRF not to name individual Montana members as plaintiffs in the Complaint, both because Ms. Gaylor felt they could still be represented by FFRF in the suit and to protect local Montana membership from harassment.  (Gaylor Dec., ¶17.)

187.    FFRF's electronic database used during February 2012 was Filemaker Pro. FFRF staff typically enter membership information in batches into Filemaker Pro. This meant that the date a new record was created in the Filemaker Pro database was typically after the date that a member actually joined FFRF. For this reason, the date of payment determines the initial membership date. (Gaylor Dec., ¶18.)

188.    Doug Bonham has been a member of FFRF since February 3, 2012. Mr. Bonham's physical membership card includes the date that a household membership for Mr. Bonham and his daughter was paid, which was on February 3, 2012. (Gaylor Dec., ¶19 and Exh. 5)

189.    Pamela Morris has been a member of FFRF since February 3, 2012. Ms. Morris' physical membership card includes the date that an individual membership was paid, which was on February 3, 2012.  (Gaylor Dec., ¶20 and Exh. 6.)

190.   Since FFRF filed this federal lawsuit, it has continued to receive both hostile phone calls and vitriolic e-mails, often claiming the United States is founded on a deity or Christianity and calling FFRF and its membership "anti-American."  (Gaylor Dec., ¶21.)

191.   In Ms. Gaylor's experience, working in various capacities as founder, volunteer, board member, and staff member at FFRF for more than 35 years, many persons who object to religious displays on government property are reluctant to come forward for fear of alienation or retribution.  (Gaylor Dec., ¶23.)

192.   It has been Ms. Gaylor's experience that, over the years, government officials often ignore or may fail to keep or hold onto complete records of Establishment Clause complaints. She has found this to be particularly the case regarding religious displays that were erected on public property in the 1950s and 1960s. (Gaylor Dec., ¶24.)

193.   A prime example occurred when a complaint that Ms. Gaylor, FFRF, its members and others made over a religious display that evidently went unrecorded by government officials, concerning the Ten Commandments monument on the Texas State Capitol lawn. Madalyn Murray O'Hair, director of American Atheists, and Anne Nicol Gaylor, then president of the Freedom From Religion Foundation, objected several times to Texas governors since the 1970's regarding this monument on state property. None of these complaints apparently became a part of the court record in the case *Van Orden v. Perry,* but reports on these complaints, from the Galveston Daily News and the Corpus

Christi Times respectively, were published on November 16, 1977.  (Gaylor Dec., ¶25 and Exhs. 8-9.)

194.   Ms. Gaylor also wrote Texas Gov. Rick Perry a letter on Sept. 4, 2001, prior to any commencement of action by Mr. Van Orden to challenge the decalogue at the Texas State Capitol, asking Governor Perry to order the immediate removal of that monument: "The State of Texas has no business dictating to its constituents which gods they may have, how many gods they should have, or that they need to have any gods at all!" (Gaylor Dec., ¶26 and Ex. 10.)

195.   Ms. Gaylor's 2001 letter of complaint was made on behalf of a Texas FFRF member whose email correspondence notes that he too had written Gov. Perry ("no reply"), Congressman Lamar Smith and Senators Wentworth and Ogden. The Texas FFRF member emailed FFRF that "all replies I did receive expressed support for the monument claiming tradition, America being based on godly principles, etc., etc." FFRF's reply to its complainant also noted "FFRF has complained about this in the past." (Gaylor Dec., ¶27 and Exh. 11.)

196.   Ms. Gaylor is not surprised that the U.S. Forest Service has not provided/retained records of complaints over the Jesus Shrine. This is consistent with how FFRF's complaints have been treated in other situations. (Gaylor Dec., ¶28.)

197.   Ms. Gaylor indicates that just as a display ridiculing the beliefs of Roman Catholics on federal land would be offensive to practitioners of that religion, a Roman

Catholic shrine to Jesus Christ on federal land is offensive to FFRF members who are non-religious.  (Gaylor Dec., ¶29.)

Dated this 19th day of February, 2013.                    **BOARDMAN & CLARK LLP**


By:      */s/ Richard L. Bolton*
_____
Richard L. Bolton, *Pro Hac Vice*
*rbolton@boardmanclark.com*
Boardman and Clark, LLP
1 S. Pinckney St., Ste 410
Madison, Wisconsin 53703-4256
Telephone: 608-257-9521
Facsimile: 608-283-1709

Martin S. King
*mking@wordenthane.com*
Reid Perkins
*rperkins@wordenthane.com*
P.O. Box 4747
Missoula, MT 59806-4747
Telephone: 406-721-3400
Facsimile: 406-721-6985

Attorneys for Plaintiff, Freedom From Religious Foundation, Inc.


<u>Notice of Electronic Filing and Service</u>

I hereby certify that on February 19, 2013, this corrected document was filed electronically in accordance with the ECF procedures of the United States District Court, District of Montana, Missoula Division, under Rule 5(d)(1), Federal Rules of Civil Procedure and L.R. 1.4(c).  All parties who are represented and have consented to service of electronically filed documents are served upon receipt of the NEF from the electronic filing system.

To the best of my knowledge, there are no parties in this case that require service by means other than electronic service using the Court's NEF.  The original document on file with the filing party contains a valid original signature.

F:\DOCS\WD\26318\31\A1599012.DOCX  [ffrf plaintiffs corrected statement of disputed facts 021513rlb]