IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHIP WEBER, Flathead National Forest Supervisor; UNITED STATES FOREST SERVICE, An Agency of the United States, Department of Agriculture,<br><br>        Defendants,<br><br><br>   and<br><br>WILLIAM GLIDDEN, RAYMOND LEOPOLD, EUGENE THOMAS, NORMAN DeFORREST, and the KNIGHTS OF COLUMBUS (KALISPELL COUNCIL 1328),<br><br>        Intervenor-Defendants. | CV 12–19–M–DLC<br><br><br>ORDER |

IT IS ORDERED that the Court's Opinion dated June 24, 2013 (doc. 104) is AMENDED such that Part V of the Opinion reads as follows:

## V.  CONCLUSION

Plaintiff has organizational standing based on the affidavit of Pamela Morris because she would have standing to sue in her own right and was a member of FFRF when the complaint was filed.  Reaching the merits of the case, *Lemon* and *Van Orden* both support Defendant's reissuance of the permit because leasing public land within a private ski resort to a private organization who maintains a statue of Jesus does not violate the Establishment Clause.  The statue does not convey to a reasonable informed observer that the government, rather than a private party, endorses Christianity over any other faith or the absence of faith. No material factual disputes exist and summary judgment in favor of Defendants is appropriate.  Big Mountain Jesus has been in its current location for 60 years, where it will remain because Defendant's reissuance of the permit does not violate the Establishment Clause.

Accordingly, IT IS ORDERED that Defendant's motion for summary judgment (doc. 60) is GRANTED.

IT IS FURTHER ORDERED that Intervenor-Defendant's motion for summary judgment (doc. 64) is DENIED as to standing and GRANTED as to

reissuance of the permit.  This case is dismissed and the Clerk of Court shall enter judgment pursuant to Federal Rule of Civil Procedure 58.

The full amended Opinion is provided below.

## I.  INTRODUCTION

This action presents a constitutional challenge under the First Amendment's Establishment Clause to the renewal by the United States Forest Service ("USFS") of a Special Use Permit issued to the Knights of Columbus for maintenance of a privately-owned statue of Jesus on federal land leased to the Whitefish Mountain Resort ("Big Mountain") in Whitefish, Montana.  The original permit was issued by the USFS in 1953, and the statue of Jesus ("Big Mountain Jesus") was constructed by the Knights of Columbus the following year.   Until the subject action was filed, Big Mountain Jesus and the associated Special Use Permit have gone unchallenged for approximately 60 years.

Unquestionably, Big Mountain Jesus is a religious symbol commonly associated with one form of religion.  But not every religious symbol runs afoul of the Establishment Clause of the United States Constitution.  To some, Big Mountain Jesus is offensive, and to others it represents only a religious symbol, but the Court suspects that for most who happen to encounter Big Mountain Jesus, it neither offends nor inspires.

Although Big Mountain has undergone dramatic changes over the course of the last six decades, evolving from a small, local ski area to a destination resort, Big Mountain Jesus is one of the only vestiges that remains of the early days of skiing at Big Mountain, and to many serves as a historical reminder of those bygone days of sack lunches, ungroomed runs, rope tows, t-bars, leather ski boots, and 210 cm. skis.

Before the Court are the federal Defendants and Defendant-Intervenors motions for summary judgment, and an extensive factual record. As explained below, the Court finds that the renewal of the Special Use Permit does not constitute a government endorsement of a religious message and thus does not violate the Establishment Clause. Therefore, summary judgment is granted in favor of Defendants.

## II. FACTS

The original Special Use Permit was issued to the Kalispell, Montana-based Knights of Columbus Council No. 1328 on October 15, 1953. In the original application filed by the Knights of Columbus, it stated that the intent was to "erect a Statue of our Lord Jesus Christ" on a 6x6x6 foot base constructed of native stone and cement "for the purpose of Erecting a Shrine overlooking the Big Mountain Ski run." In the same application, the Knights of Columbus also recommended

that the statue "be made a permanent part of the recreation area on top of Big Mountain."  At the time of the dedication of the statue on September 5, 1954, the then chairman of the Knights of Columbus Shrine Committee, L.J. Reed, provided a statement to the local weekly newspaper, the *Whitefish Pilot*, that the idea for the statue "originated, to a great extent, during the two years the National Ski Championships were held on Big Mountain" in 1949 and 1951.  He went on to state, again as reported in the *Whitefish Pilot*:

> Several of the world's leading skiers are Catholics and they asked why a shrine had not been placed.  They had been to leading ski runs all over the world and the majority of them have a shrine of some sort at the top of the run.  The idea was passed on to me and I in turn passed it on to the Knights of Columbus early in 1953 and a committee was selected to go to the top of Big Mountain and look over the possibilities for a site.

The Knights of Columbus is a Catholic religious organization, and it appears from the record that some degree of divine inspiration determined the final location of the statue.  As L.J. Reed stated in the same article: "Our Lord himself selected this site, as each member of the committee after looking over all other possibilities returned to this site and were in complete accord that this was it."

However, there also appears from the record that many believed that the statue was erected in honor of veterans from the Army's 10th Mountain Division, as memorialized in a large plaque that was erected by Big Mountain in a location

immediately adjacent to the statue in 2010:

> When the troops started returning from WWII in Europe to their
> home in the Flathead Valley they brought with them many memories
> . . . some good, some bad.  Some of these troops were members of the
> Knights of Columbus at St. Matthew's parish in Kalispell.  A
> common memory of their time in Italy and along the French and
> Swiss border was of the many religious shrines and statues in the
> mountain communities.  This started a dialogue with the U.S. Forest
> Service for leased land to place this statue of Jesus.  On October 15,
> 1953 the U.S. Forest Service granted a permanent special use permit
> to the K of C Council #1328 for a 25ft x 25ft square for placement of
> the statue.  A commission for the statue construction was given to the
> St. Paul Statuary in St. Paul, Minnesota.  The statue was installed in
> 1955 and has been maintained by the Knights of Columbus from St.
> Matthew's ever since.  We thank those brave troops that brought this
> special shrine of Christ to the Big Mountain and hope that you enjoy
> and respect it.
>
> -Whitefish Mountain Resort, 2010.

Many of those involved in the early history of Big Mountain and the statue

are long deceased.  Thus, the precise motivation for the presence of the statue has

largely been lost in the passage of time, and it is conceivable that motivations

varied, depending on the person.  However, the recollections of one person, Bill

Martin, are particularly helpful to the Court in determining this issue.  In his

declaration, Mr. Martin states that he was once the manager of Big Mountain, that

he served on the board of directors for the ski area for fifty years, and was a close

friend of the founder of Big Mountain, Ed Schenk, who developed the ski area in

the late 1940s.  (Doc. 66-8 at 2-3.)  In the letter attached to his declaration, Mr.

Martin states that he "distinctly remembers the situation regarding the erection of a statue of Christ on Big Mountain." (Doc. 66-8 at 5.) In this same letter, Mr. Martin goes on to state:

> Ed Shenk was an officer in the Army in WWII, and was stationed in Italy with the 10th Mountain Division. He was an avid skier and skied on many of the slopes in Italy. He remembered that almost all of the slopes in Italy had statues of Christ on the slopes. More than one on several slopes, and also other statues and crosses. When Ed returned to Whitefish after the war, he bought some property on Big Mountain where there was an existing ski area. He eventually developed the Big Mountain ski area in the late 40s. He had such an admiration of the Christ statues that he had observed on the slopes in Italy during the war, that he wanted to install one on Big Mountain in memory of the men who had lost their lives in WWII. Somehow he contacted the local Knights of Columbus in Kalispell and asked if they would participate in getting the statue installed. The existing statue was installed in the mid 50's. I can remember that the statue was installed in memory of the veterans who Ed had served in WWII, and he wanted it dedicated to them. The Knights of Columbus were the workhorses who installed it.

*Id.*

As approved by the USFS, the statue was constructed by the Knights of Columbus on a plot of land that was 25x25 feet square. Big Mountain Jesus has remained in this same location to the present. The base is approximately six feet in height, and the statue itself is approximately six feet tall. In the winter months, the base of the statue is largely obscured by snow. At the time of its construction, Big Mountain Jesus was located approximately 400 feet beyond the upper

7

terminus of the original T-Bar that served the area's main ski runs at the time, and 70 feet higher in elevation. In other words, in order to view the statue during the early days of Big Mountain, one would have to walk uphill from the top of the T-bar lift. In the winter of 1960, the first chairlift on Big Mountain was installed, referred to as Chair One, which provided skier access to much higher and challenging terrain in a different location on the mountain. With some effort, intrepid skiers could find their way down into the location of Big Mountain Jesus. In 1968, a second chairlift was constructed, known as Chair Two, which replaced the original T-bar, with an upper terminal at a higher elevation above Big Mountain Jesus, thereby allowing skiers to ski down in the vicinity of the statue, although the runs serviced by Chair Two did not traverse in direct proximity to the statue. Because of the fact that the statue was and remains largely obscured by trees, one would have to ski out of their way and off the main runs in order to directly encounter Big Mountain Jesus. In fact, unless one was specifically looking for it, it is possible to ski at Big Mountain day after day and never encounter the statue. And certainly, if one wished to ski at Big Mountain and entirely avoid the statue, it is readily possible to do so without any diminishment of the skiing experience.

When it was originally erected, Big Mountain Jesus was uniformly "light

buff in color."  According to the record, sometime between 1981 and 1997, a son of a Knights of Columbus member painted the statue as an Eagle Scout project.  It has periodically been re-painted since that time.

Although there are rare, reported instances of church services being performed at the statue, religious services at Big Mountain are typically conducted at other locations.

Big Mountain Jesus has been the subject of much frivolity over the years. In addition to serving as a meeting place on the mountain for skiers, and a site for weddings, it has not infrequently been observed adorned with ski poles, goggles, ski hats, mardi gras beads, and other attire, all secular in nature.  In fact, frequent repairs have been made to the outstretched hands of Big Mountain Jesus which have been dislodged by passing skiers and snowboarders who have given a "high five" to the statue.

To the extent Big Mountain Jesus may have had some religious significance at the time of its construction by the Knights of Columbus, and may have provided from time to time spiritual inspiration or offense to some, over the course of the last 60 years the statue has become more of an historical landmark and a curiosity.

As previously stated, the original Special Use Permit was issued for an unspecified term by the USFS to the Knights of Columbus on October 15, 1953.

The Special Use permit was renewed in 1990 and 2000 for ten-year terms.  The

knights of Columbus sought renewal of the Special Use Permit in 2010, which was

originally denied by the USFS on August 24, 2011.  On October 21, 2011, the

USFS withdrew its denial and issued a public notice soliciting public comment on

a formal proposal for reisssuance of the permit.  In response to its solicitation for

comments, the USFS received approximately 95,000 comments from October 19

to December 8, 2011.  On January 31, 2012, the USFS issued a new decision to

reauthorize the Special Use Permit for a term of ten years, stating in its Decision

Memo of the same date that the statue "has been a long standing object in the

community since 1953 and is important to the community for its historical

heritage."  In the Cultural Resource Summary prepared by the USFS in

conjunction with the reauthorization of the permit, it was noted that the statue's

"primary historical value is its association with the early development of the Big

Mountain ski area, now Whitefish Mountain Resort.  It is a contributing (and

minor) piece of the ski hill's overall sociocultural, economic, and technological

history."

Other than these actions, the USFS has not been involved in any respect in

the design, construction, or maintenance of Big Mountain Jesus.

In the early fall of 2011, the Montana State Historic Preservation Office

initiated a process to determine whether the statue was eligible for listing on the National Register of Historic Places. After conducting a Heritage Resource Inventory Report, which was completed on December 15, 2011, the state historic preservation office concluded that the statue was eligible for listing, finding that the statue

> has integrity of location, setting, materials, workmanship, feeling, and association and is part of the early history of the ski area and would be considered a contributing element of such a historic district. Individually, it represents a small part of the history of the ski area but since so little remains intact of that early history, the statue of Jesus has been determined eligible for listing on the National Register of Historic Places under criteria 'a' - associated with events important to local history and criteria consideration 'f.'

The Plaintiff argues that the most recent reissuance of the permit, after first being denied on First Amendment grounds, and the involvement of the Montana State Historic Preservation Office, were the result of political pressure, largely due to the efforts of then United States Congressman Dennis Rehberg, and thus the entire process is suspect.

There is no question that political pressure was brought to bear, and undoubtedly many of the thousands of letters of support for reissuance of the permit were the result of this political lobbying effort. However, none of this bears any significance to the legal analysis that follows.

As will shortly be explained, the Court finds, as a matter of law, that the discrete act of permitting the statue by the USFS does not reflect government endorsement of any religious sect or a governmental preference for religion over non-religion. The government neither owns the statue nor exercises control over the property on which it is located. Big Mountain Jesus constitutes private speech reflecting the personal views of its private owners and therefore cannot be seen by the reasonable observer as reflecting government promotion of religion.

Stated another way, the statue does not convey any message that individuals visiting Big Mountain whether in the summer or winter might be treated more favorably or less favorably depending on their religious beliefs or affiliation.

In summary, the Court finds that the USFS renewed the Special Use Permit because the statue is steeped in the origins and history of Big Mountain and the surrounding community, which constitutes a legitimate secular purpose.

## III. SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The party seeking

summary judgment bears the initial burden of proving its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party has met his initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material. If so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted.

## IV. LEGAL ANALYSIS

### A. Standing

Intervenor-Defendants again challenge Plaintiff's standing in this matter. The Court previously ruled that Plaintiff Freedom From Religion Foundation ("FFRF") had standing based on the affidavit of FFRF member William Cox. (Doc. 55.) Intervenor-Defendants contend discovery has revealed that Cox was not a member of FFRF when the complaint was filed, negating FFRF's standing.

Plaintiffs respond that associational standing exists because FFRF members

Pamela Morris and Doug Bonham were members at the time the complaint was

filed.  Plaintiffs also argue Cox's interests have been in complete alignment with

FFRF's since initiation of the case, so requiring him to file a new action would be

a needless waste of time and resources.  FFRF has standing as an organization

based on the affidavit of member Pamela Morris who, unlike Cox, was a member

of FFRF when the complaint in this case was filed.

To have standing for injunctive relief under Article III a plaintiff must

demonstrate he is under threat of suffering concrete and particularized "injury in

fact; the threat must be actual and imminent, not conjectural or hypothetical; it

must be fairly traceable to the challenged action of the defendant; and it must be

likely that a favorable judicial decision will prevent or redress the injury."

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  An organization has

standing on behalf of its members when "its members would otherwise have

standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit."  *Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).  "The evidence

relevant to the standing inquiry consists of 'the facts as they existed at the time the

plaintiff filed the complaint.'" *D'lil v. Best Western Encina Lodge & Suites*, 538

F.3d 1031, 1036 (9th Cir. 2008) (citing *Skaff v. Meridien North America Beverly*

*Hills*, 506 F.3d 832, 838 (9th Cir. 2007)).

The Ninth Circuit Court of Appeals has recently reviewed standing in

various Supreme Court Establishment Clause cases:

> Standing was adequate for jurisdiction in Establishment Clause cases in the
> Supreme Court in the following contexts: prayer at a football game, a crèche
> in a county courthouse or public park, the Ten Commandments displayed on
> the grounds of a state capitol or at a courthouse, a cross display at a national
> park, school prayer, a moment of silence at school, Bible reading at public
> school, and a religious invocation at a graduation.  No one was made to
> pray, or to pray in someone else's church, or to support someone else's
> church, or limited in how they prayed on their own, or made to worship, or
> prohibited from worshiping, in any of these cases.  The Court treated
> standing (and therefore the concreteness element of standing) as sufficient
> in all of these cases, even though nothing was affected but the religious or
> irreligious sentiments of the plaintiffs.

*Catholic League for Religious and Civil Rights v. City and County of San*
*Francisco*, 624 F.3d 1043, 1049-50 (9th Cir. 2010)(internal citations omitted).

Plaintiff has standing to sue because at least one of its members' affidavits

satisfy the requirements for organizational standing.  William Cox's affidavit will

not be considered because he was not a member of FFRF when the complaint was

filed.  Plaintiff presents no authority permitting the Court to consider the affidavit

of a member who joined the organization after the complaint was filed, and doing

so appears directly contrary to the requirement to consider standing from the "facts

as they existed at the time the plaintiff filed the complaint." *Id.*; see also

*Environmental Protection Information Center v. Pacific Lumber Co.*, 469

F.Supp.2d 803, 816 (N.D.Cal. 2007). As in *Pacific Lumber*, this Court need not

decide whether to consider Cox's individual standing once he became an FFRF

member because Plaintiff has at least one member who was a member at the time

of filing to support its standing.

### 1. Pamela Morris

Pamela Morris became an FFRF member on February 3, 2012, because of

her lifelong opposition to Big Mountain Jesus. Morris first encountered Big

Mountain Jesus in 1957 as a 15-year old ski team member. (Doc. 74 at 2-3.)

Although active in the Methodist Youth Fellowship, Morris found the statue

"startlingly out of place" and has avoided Big Mountain ever since. Morris states

that she would "enjoy skiing Big Mountain again if it were a welcome site for all

who love nature." (Doc. 74 at 3.) Morris wrote a letter to the Forest Service in

November 2011 protesting Big Mountain Jesus as a religious icon inappropriately

placed on federal lands. Specifically, Morris indicates she has "made a conscious

effort to avoid Big Mountain because of the Jesus Statue, which I perceive as a

Christian icon on public land that has the effect of promoting one particular

religious sect." (Doc. 74 at 4.)

Defendants' argument that Morris has suffered only a generalized grievance and thus lacks standing under *Caldwell v. Caldwell*, 545 F.3d 1126 (9th Cir. 2008) fails. The plaintiff in *Caldwell* was a parent of children in the California public school system who objected to a University of California website's discussion of evolution. *Id.* at 1128. Caldwell used the website to participate in elections and debates regarding science instructional materials and was offended by its statement that evolution and religion can coexist. *Id.* at 1129. The Ninth Circuit held that

> Caldwell's asserted interest-informed participation as a citizen in school board meetings, debates, and elections, especially with respect to selection of instructional materials and how teachers teach the theory of evolution in biology classes in the public schools-is not sufficiently differentiated and direct to confer standing on her to challenge the University of California's treatment of religious and anti-religious views on evolution.

*Id.* at 1133. Caldwell's connection to the offending government conduct was too remote to support standing. *Id.*

Unlike Caldwell, a plaintiff who avoided a section of the Mojave National Preserve where a Latin cross sat atop a rock did have standing because his "inhibition from freely using the Preserve sufficed as injury in fact and constituted 'personal injury suffered ... as a consequence of the alleged constitutional error.'" *Id.* at 1132 (citing *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004)). Buono's

offense to the cross sprung from the fact that it was on federal property–not simply because it was a cross–and he avoided the area surrounding the rock so long as it remained standing. *Id.* Buono's standing was further supported because the Ninth Circuit has "repeatedly held that inability to unreservedly use public land suffices as injury-in-fact." *Id.*

Similarly, a county employee who was offended by the removal of a cross from the county seal had standing despite his lack of affirmative avoidance of the seal. *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). The employee was not forced to quit his job in protest of the anti-religious symbol in order to have standing. *Id.*

Morris' objection to Big Mountain Jesus is more like the plaintiff's in *Buono* than the plaintiff's in *Caldwell*. Like Buono, Morris is offended by what she considers a religious icon on federal property and intends to avoid the offending area until Big Mountain Jesus is removed. Morris is an avid and lifelong skier, but has avoided Big Mountain for over 50 years because of the statue. Defendants argue this avoidance prohibits standing because she has not been in frequent contact with the offending symbol. However, Buono similarly avoided the offending area without forfeiting his right to bring suit pursuant to the Establishment Clause. Morris' choice to ski at mountains sans Jesus statues likens

18

to Buono's avoidance of the cross. Similarly, the plaintiff in *Vasquez* was not forced to quit his job in order to have a sufficient injury in fact. Morris likewise is not required to continue skiing at Big Mountain to continually be offended by Big Mountain Jesus. The fact that Morris was offended enough by Big Mountain Jesus to avoid the ski hill for fifty years despite her professed desire to ski there otherwise is precisely the type of injury in fact required by Article III.

Unlike Caldwell, Morris' objection is more than an abstract disagreement with one page of an 840 page website. Caldwell failed to allege any specific harm connected to direct exposure to unwelcome religious (or non-religious) material. Here, Morris wrote the Forest Service in protest of its decision to keep Big Mountain Jesus well before Plaintiff filed suit, and contacted Plaintiff for assistance in fighting the decision. She asserts that she intends to ski at Big Mountain again if the statue is removed. Morris' affidavit is properly considered under Federal Rule of Civil Procedure 56(e), and it supports the first requirement of organizational standing because Morris would have standing to sue in her own right.

### 2. Douglas Bonham

"The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not

19

decide the standing of the others." *Buono*, 371 F.3d at 548 (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977)). The Court in *Buono* did not consider a second plaintiff's standing because it found that Buono had standing. This Court also finds it unnecessary to determine whether Bonham has standing because it has already determined FFRF member Morris satisfies Plaintiff's standing requirement.

Regarding the second standing requirement, the parties do not dispute that the interests at stake are germane to Plaintiff's organizational interests. This Court has already held that the third standing element is satisfied because participation of individual members should not be required for the lawsuit, particularly because only declaratory and injunctive relief is sought. (Doc. 55 at 8.) The additional submissions filed with the summary judgment motions do not change that analysis. Plaintiff therefore satisfies the elements of organizational standing in this case. Intervenor-Defendant's remaining standing arguments primarily apply to William Cox, so they will not be addressed because he was not a member of FFRF when the complaint was filed. Because standing has been established, the Court will now address the merits of Plaintiff's claims.

## B. Establishment Clause Challenge

The First Amendment to the United States Constitution states that

"Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  The Establishment Clause mandates government neutrality between individual religions, as well as between religion and nonreligion.  *Trunk v. City of San Diego*, 629 F.3d 1099, 1106 (9th Cir. 2011).  Traditionally, Establishment Clause challenges were analyzed under the test established by *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  The "*Lemon* Test" requires that challenged government conduct must (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster excessive government entanglement with religion.  *Id.* at 612-13.  The entanglement inquiry is often seen as part of the effect inquiry, and this combined analysis also examines "whether governmental aid results in government indoctrination [and] whether recipients of the aid are defined by reference to religion."  *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1083 (9th Cir. 2012)[1](citing *Card v. City of Everett*, 520 F.3d 1009, 1015 (9th Cir. 2008)).  The government action is viewed from the perspective of a reasonable, informed observer.  *Trunk*, 629 F.3d at 1110.

The applicability of *Lemon* was called into question by *Van Orden v. Perry*, 545 U.S. 677 (2005).  *Van Orden* involved a Ten Commandments monument on

---

[1]The Court observes that Plaintiff's response brief contains an entire paragraph that is identical to a paragraph in *Barnes-Wallace* without a single citation to that opinion.  (See doc. 86 at 23-24; 704 F.3d at 1083.)

Texas state capital property. A plurality of the Court held the *Lemon* test was "not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds." *Id.* at 686. Instead, the Court's analysis centered on the nature of the monument and the nation's history, recognizing that "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* Justice Breyer, in concurrence[2], noted the Court's continuing criticism of the *Lemon* test, and found that in difficult border-line cases there is "no test-related substitute for the exercise of legal judgment." *Id.* at 700. Justice Breyer emphasized the importance of how a monument is used, its context, and its history in deciding the monument did not violate the Establishment Clause. *Id.* The fact that the monument had stood uncontested for two generations was a critical factor in that determination. *Id.* at 704. *Van Orden* thus established an exception to the *Lemon* test for longstanding religious monuments with a historical or secular message or context.

The Ninth Circuit employed this exception in *Card* in holding that a Ten Commandments monument on city grounds did not violate the Establishment Clause. 520 F.3d 1009. The monument at issue in *Card* was very similar to that

---

[2]Justice Breyer's concurrence is recognized by the Ninth Circuit as the controlling opinion in *Van Orden*. *Trunk*, 629 F.3d at 1107.

in *Van Orden*, and the Court again focused on the fact that few complaints were raised during the monument's 30 year presence on public land. *Id.* at 1021.

The presence of a religious symbol on public land does not automatically equate to a constitutional violation. *Trunk*, 629 F.3d at 1102. Moreover, "[s]ecular elements, coupled with the history and physical setting of a monument or display, can–but do not always–transform sectarian symbols that otherwise would convey a message of government endorsement of a particular religion." *Id.* at 1117. *Trunk* held that a war memorial with a 29-foot cross on federal land violated the Establishment Clause under both the *Lemon* test and the factually-based *Van Orden* analysis. *Id.* at 1107. The cross in *Trunk* conveyed a message of government endorsement of religion because, although it was a war memorial, the vast size of the cross, its preeminent symbolism of Christianity, its prominent location in a historically anti-Semitic area of the city, and its dedication as an emblem of faith all pointed toward a constitutional violation.

Considering all of these factors as they relate to Big Mountain Jesus, no such constitutional violation exists under either the *Lemon* test or the *Van Orden* analysis.

## 1. *Lemon* Test

Defendant USFS' reissuance of the permit to the Knights of Columbus does

not violate the Establishment Clause under *Lemon*.  The permit does not reflect a religious purpose by USFS, its primary effect neither advances nor inhibits religion, and no excessive government entanglement exists because of its reissuance.

The government's renewal of the permit does not reflect a religious purpose because, in essence, the renewal allows a private organization's continued maintenance of a privately owned statue on public land leased to a private ski resort.  The government's action need only be motivated in part by a secular purpose to be constitutional.  *Cholla Ready Mix v. Civish*, 382 F.3d 969, 975 (9th Cir. 2004).  The USFS observed in its 2012 memo that the statue has been part of the community since 1953 and reflects its historical heritage.  (Doc. 61 at 20.) This historical, secular purpose shows the government's motivation was not wholly religious and it thus passes muster under the first prong of the *Lemon* test.

The fact that the Knights of Columbus, a Catholic mens organization, own and maintain the statue does not change the analysis.  The Knights of Columbus' purpose for erecting Big Mountain Jesus is separate and distinct from the governmental purpose of reissuing the permit.  The Knights' religious beliefs and reasons for erecting the statue are not juxtaposed onto the government.  See *Barnes-Wallace*, 704 F.3d at 1084, n. 15.  Further, the plaque set at the base of the

statue in 2010 says the statue was privately erected and maintained, leading a reasonable informed observer to believe there is no governmental religious purpose.

The permit does not violate step two of the *Lemon* test because its reissuance does not reflect governmental endorsement of religion. Along with the plaque's pronouncement of private ownership, a reasonable observer would also recognize that the statue is located on a privately owned ski hill–not at a county courthouse, a federal reserve or some other property obviously governmental in nature. Plaintiff does not allege, nor is there any evidence, of the USFS promoting religion or religious ceremonies at the site. Although some private groups have used the site for religious purposes on occasion, there is no connection to government endorsement of religion. As in *Barnes-Wallace*, the government's leasing of land to a private organization whose activities include rare religious activities here does not indicate government endorsement of religion.

The statue's location also supports Defendant's decision as compared to monument locations in other Establishment Clause cases. The statue's location renders it less reflective of governmental religious endorsement than the monument in *Van Orden* because it is secluded within a group of trees off the side of a run at a private ski resort, rather than placed on the grounds of the state

capitol. Unlike the cross in *Trunk*, Big Mountain Jesus is not visible from miles away nor does it tower over a section of a town mired in a history of anti-Semitism. Many of those who view Big Mountain Jesus are likely unaware of any governmental connection at all. For these reasons, permitting continued presence of the statute at Big Mountain does not reflect governmental endorsement of religion.

Likewise, the statue's private ownership and maintenance forego any excessive entanglement with religion. Again comparing Defendant's action to that in *Barnes-Wallace* compels a finding of no excessive government entanglement here. In *Barnes-Wallace*, the city of San Diego leased land to the Boy Scouts of America who occasionally performed religious activities on the property. 704 F.3d at 1074. The Court took a broad view of the city's leasing practices, and determined the leases were "allocated on the basis of criteria that neither favor nor disfavor religion." *Id.* at 1084. The fact that the city was not involved in managing the leased properties also weighed in favor of no government entanglement. *Id.* The government here does not maintain the statue, and its only involvement is reissuing the permit every 10 years. This limited involvement cannot amount to excessive government entanglement under the *Lemon* test.

Analyzing all of the factors outlined in *Lemon* demonstrates that the permit

allowing Big Mountain Jesus does not violate the Establishment Clause. The more detailed factual inquiry set forth in *Van Orden* compels the same result.

### 2. *Van Orden* Analysis

Reissuance of the permit is also permissible under *Van Orden* because the nature of Big Mountain Jesus, its context, and its history all support a secular use. The fact that a statue of Jesus is an unmistakably Christian symbol is not enough to violate the Establishment Clause. *Van Orden*, 545 U.S. at 690. All of the other *Van Orden* factors support Defendant's reissuance of the permit.

The statue's secular and irreverent uses far outweigh the few religious uses it has served. The statue is most frequently used as a meeting point for skiers or hikers and a site for photo opportunities, rather than a solemn place for religious reflection. Big Mountain Jesus is one of the last remaining remnants from the original Big Mountain Ski Resort, and many individuals in the community value its historic significance. For many, it reflects the evolution of the town of Whitefish from a lumber town to a tourist attraction. This independent secular value was recognized by the State Historic Preservation Officer in support of allowing Big Mountain Jesus to remain.

Similarly, the context in which Big Mountain Jesus is set is not religious. The statue sits next to a ski run and is not directly on any hiking trails used during

the summer. Prior attempts at holding religious services at the statue failed due to poor weather. None of the statue's surroundings support a religious message–there are no seats for observance of the statue or similar accommodations for worshipers. Typical observers of the statue are more interested in giving it a high five or adorning it in ski gear than sitting before it in prayer.

Finally, and perhaps most importantly, Big Mountain Jesus has stood unchallenged for almost 60 years. This longevity demonstrates that "few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect." *Van Orden*, 545 U.S. at 702. The fact that the monument in *Van Orden* stood for 40 years unchallenged was determinative in that case. The statue's 60 year life free of formal complaints also tips the scales in this case. A careful factual analysis under the guidance provided in *Van Orden* and subsequent Ninth Circuit opinions reveals no Establishment Clause violation in this case.

## V. CONCLUSION

Plaintiff has organizational standing based on the affidavit of Pamela Morris because she would have standing to sue in her own right and was a member of FFRF when the complaint was filed. Reaching the merits of the case, *Lemon* and

28

*Van Orden* both support Defendant's reissuance of the permit because leasing public land within a private ski resort to a private organization who maintains a statue of Jesus does not violate the Establishment Clause. The statue does not convey to a reasonable informed observer that the government, rather than a private party, endorses Christianity over any other faith or the absence of faith. No material factual disputes exist and summary judgment in favor of Defendants is appropriate. Big Mountain Jesus has been in its current location for 60 years, where it will remain because Defendant's reissuance of the permit does not violate the Establishment Clause.

Accordingly, IT IS ORDERED that Defendant's motion for summary judgment (doc. 60) is GRANTED.

IT IS FURTHER ORDERED that Intervenor-Defendant's motion for summary judgment (doc. 64) is DENIED as to standing and GRANTED as to reissuance of the permit. This case is dismissed and the Clerk of Court shall enter judgment pursuant to Federal Rule of Civil Procedure 58.

DATED this 25th day of June, 2013.

Dana L. Christensen, Chief District Judge
United States District Court